H9788
8/27

IN THE ALABAMA COURT OF CRIMINAL APPEALS

============================================================
APPEAL NO. CR-02-0739
============================================================

JERRY E. WHITLEY,

    Appellant,

V.

STATE OF ALABAMA,

    Appellee.

============================================================

BRIEF OF APPELLANT

============================================================

Appeal from Russell County Circuit Court:

CC-02-186, 187, 188

                        Hon. J. Michael Williams, Sr.
                        P. O. Box 1068
                        Auburn, Alabama  36831-1068
                        (334) 705-0200
                        ATTORNEY FOR APPELLANT



EXHIBIT
2
PenGAD-Bayonne,N.J

ORAL ARGUMENT REQUESTED

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................. ii

STATEMENT OF THE CASE.................................. 1

STATEMENT REGARDING ORAL ARGUMENT...................... 7

STATEMENT OF THE ISSUES............................... 8

STATEMENT OF THE FACTS................................ 9

ARGUMENT............................................. 39

CONCLUSION........................................... 62

CERTIFICATE OF SERVICE............................... 64

SUMMARY OF ADVERSE RULINGS........................... 65

## TABLE OF AUTHORITIES

<u>CASES</u>

<u>Alabama Rules of Criminal Procedure,</u>
Rules 3.8 and 3.9 . . . . . . . . . . . . . . . . . . . .  52

<u>Brown v. State,</u>
167 So.2d 281 (1964). . . . . . . . . . . . . . . . . .  39

<u>Ex parte Fletcher,</u>
718 So.2d 1132 (1998) . . . . . . . . . . . . . . . . .5,54
                                                      40,55
<u>Ex parte Fletcher,</u>
718 So.2d 1132,
(Ala. 1998, on Remand, 718 So.2d 1136).

<u>Ex parte Oswalt,</u>
686, So.2d 368 (Ala. 1996). . . . . . . . . . . . . . .  52

<u>Hilley v. State,</u>
484 So.2d 476 (Ala. Crim. App. 1985). . . . . . . . . .  40

<u>Johnson v. United States,</u>
68 S.Ct. 367, 369 (1948). . . . . . . . . . . . . . . .  49

<u>Langston v. State,</u>
348 So.2d 273, (Ala. Crim. App.), Cert. denied 348 So.2d
277, (Ala. 1977). . . . . . . . . . . . . . . . . . .40,45

<u>May v. State,</u> . . . . . . . . . . . . . . . . . . . . 2,3

<u>McLemore v. State,</u>
562 So.2d 639 (Ala. Crim. App. 1989). . . . . . . . . .  39

<u>Moore v. State,</u>
650 So.2d 958, (Ala. Crim. App. 1994) then rehearing
denied, Cert. denied, 650 So. 2d. 966 (Ala. 1994). . . . 40

<u>Murray v. State,</u>
396 So.2d 125, (Ala. Crim. App. 1980) . . . . . . . .45,46
                                                     47,53

People v. Lott,
478 N.Y.S.2d 193, 196-197, (1987). . . . . . . . . . .    49

Teat v. State,
409 So.2d 940 (Ala. Crim. App. 1981) . . . . . . . .    40

Theresa Wilson v. State,
830 So.2d 765 (Ala. Crim. App. 2001) . . . . . . . . .60-61

Tyler v. State,
227 So.2d 442 (Ala. Crim. App. 1969) . . . . . . . .    45

United States v. Alfonso,
759 F.2d 728, 742 (9th Cir. 1985) . . . . . . . . . .    48

United States v. Janik,
723 F.2d 537, 547 (7th Cir. 1983) . . . . . . . . . .    49

United States v. Johnson,
999 F.2d 1192 (7th Cir. 1993) . . . . . . . . . .    55

United States v. Karo,
1014 S.Ct., at 3305 (1984). . . . . . . . . . . . . .    50

Weeks v. United States,
232 U.S. 383 (1914) . . . . . . . . . . . . . . . .    40

Wong Son v. United States,
83 S.Ct. 407 (1963) . . . . . . . . . . . . . . . .    51

Yountz v. State,
494 So.2d 189 (Ala. Crim. App. 1986). . . . . . . . . 47,48
                                                       49

Acts, Statutes, Constitutions

Fourth Amendment to the U. S. Constitution. . . . . . 39,53

Article I, Section 5, of the Constitution
of Alabama of 1901 . . . . . . . . . . . . . . . . . . .    39

## STATEMENT OF THE CASE

The Appellant, Jerry E. Whitley, was arrested on September 21st, 2001, at 17:30 hours by the Metro Drug Task Force (C-11). The arrest occurred on Rusk Drive, Phenix City, Alabama. This was a mobile home and no specific mobile home number was listed on the arrest report. There was no warrant issued prior to the arrest, nor was there a search warrant issued prior to the arrest.

Whitley was arrested for possession of a controlled substance (13-A-12-212); resisting arrest (13-A-10-41); and unlawful manufacturing of a controlled substance (13-A-12-211). The arrest report included a comment concerning a "meth lab". The arresting officers were J. Whitten and Sergeant Price.

Whitley was Indicted for trafficking methamphetamine, CC-02-186 (C-12-13), on January 16th, 2002; he was Indicted for possession of a controlled substance- methamphetamine, on January 16th, 2002 (C-209). Whitley was Indicted for Resisting Arrest on January 16th, 2002 (C-377). Whitley was found guilty of all three charges on December 5th, 2002 (C-484). The Sentencing Order in the Resisting Arrest case is found at (C-490). He was sentenced to six (6) months in

1

the County Jail, to run consecutively and in addition to the Trafficking (for which he received 35 years) and the Possession Conviction (for which he received 5 years concurrently) (C-490). He gave Notice of Appeal of these cases on January 14th, 2003.

After being indicted, the Court determined that Whitley was indigent and appointed Hon. Laurel Farrar to represent him. A request for expenses under May v. State; and request for Discovery were filed by Whitley's attorney. The State also filed a Motion to consolidate the offenses; which was subsequently granted (C-24). A Motion for bond reduction was denied on February 5th, 2002. The Defendant entered a plea of Not-Guilty on March 5th, 2002.

Whitley filed a Petition for Writ of Habeas Corpus in regard to the request for the bond to be reduced. This was filed in the Court of Criminal Appeals of Alabama, Case number CR-01-1243. The bond was subsequently reduced. There was a subsequent filing of a Writ of Habeas Corpus, when Whitley's higher bond was reinstated, which was denied by the Court of Criminal Appeals, CR-02-0133.

The State filed a Motion to join Defendants for Trial. The Defendants included Whitley, Caylene White, and Wayne

2

Meadows (C-42). Whitley's attorney objected to the consolidation and joinder motions of the State.

Whitley filed a Motion to Suppress the arrest and evidence and search warrant on June 13th, 2002 (C-45).

Whitley's attorney filed a Motion for the approval of extraordinary expenses pursuant to May v. State. This was to obtain an independent laboratory analysis of the substances alleged to be methamphetamine, along with a Motion to permit an independent analysis of these drugs (C-49-53). The request for the independent analysis of the drugs was filed again and there were several hearings, these motions were denied by the Trial Court. Additional information was provided in regard to the need for such tests, which were to be performed by a Dr. John Haitt of Quest Labotoraries, Las Vegas, Nevada, (C-64). Upon receiving that further information, the Court granted this Motion for extraordinary expenses on August 7th, 2002 and an Order was issued to transport the samples of the drugs in question. The State filed a Notice of Intent to Seek Sentencing Enhancements in regard to the possession of firearm during commission of a drug trafficking act, 13-A-12-231(13) on August 23rd, 2003 (C-86).

3

Whitley's Motion to Suppress was denied by the Court on August 26th, 2002 (C-89).

Whitley's Bond Reduction was set aside and the original bond amounts of $250,000.00, $20,000.00, and $1,000.00 were reinstated on September 4th, 2002 (C-90).  Several Motions and Objections to Motions were filed in regard to how to get samples of the drugs to Dr. Hiatt in Las Vegas for an independent analysis.  This resulted in Motions to Continue the Trial of the case, pending the receipt of the final report from Dr. Hiatt.

Whitley filed another Motion to Continue on December 3rd, 2002 (C-125-129).  This Motion pointed out that Dr. Hiatt, the independent expert witness needed further time to analyze the "mixture" of seized substances, in order to determine the actual composition and weight of the alleged controlled substances in a solid form rather than in a liquid mixture.  It was further pointed out that Dr. Hiatt would need to be available to travel to Court to render his testimony and findings.  These Motions were denied on December 5th, 2002.  The State filed Responses to Whitley's Motions for Continuance and additional expenses.  The State's response included the argument that Alabama Law

4

states that a mixture of a controlled substance which is co-mingled and diffused with other substances (which is the case here), the weight of the entire mixture should be counted, Ex parte Fletcher, 718 So.2d 1132 (1998). (C-135).

The Trial on all three (3) Indictments occurred on December 5th, 2002 and the Defendant was found guilty of all three (3) charges on that same date. Whitley was found guilty of unlawful possession of a controlled substance in Case number CC-02-187 on December 5th, 2002. The sentencing Order is found at (C-331) and Whitley was sentenced to five (5) years in prison to run concurrent with the Trafficking case. He filed Notice of Appeal in this case on January 14th, 2003. The jury further found that Whitley did possess a firearm during the commission of the crime of trafficking methamphetamine (C-150, 151). The Sentencing Order is found at (C-157). He was sentenced to thirty-five (35) years in prison; a $50,000.00 (Fifty-Thousand Dollars & no/100); fines; and other costs, on January 14th, 2003. At that time, he gave Notice of Appeal (C-159). Subsequently, Attorney Farrar filed a Motion to Withdraw from further Representation of Whitley, on January 31st,

5

2003.   Attorney J. Michael Williams, Sr. filed a Notice of Appearance for the purposes of representing Whitley on this Appeal, on February 17th, 2003 (C-172).

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant, Whitley, does request Oral Argument in this matter for the following reasons:    First, the violation of his Constitutional Rights in regard to the Fourth Amendment, United States Constitution and Article I, Section 5 of the Constitution of the State of Alabama, warrant Oral Argument.    The law enforcement officers intentionally "created" a raid in an effort to avoid being required to obtain a search warrant.    Secondly, the issue of the actual contents or weight of drugs in any similar drug case should be addressed.    In this case, there could have been a distinction between the methamphetamine and other non-controlled substances, as described in, Ex parte Fletcher, 718 So.2d. 1132, (Ala.1998, on Remand, 718 So.2d 1136).    Evidence showed that there was less than 28 grams of methamphetamine in the exhibits admitted into evidence by Whitley.    Therefore, the evidence does not support a trafficking conviction.

Third, there was not sufficient evidence to support a resisting arrest conviction.

## STATEMENT OF ISSUES

I.  The Trial Court erred in not granting Whitley's
    Motion to Suppress for two reasons:

    a)  The acts of law enforcement prior to obtaining a
        search warrant, and

    b)  The search warrant was not properly obtained or
        supported.

II. The Trial Court erred in not allowing for the
    testimony of Dr. Hiatt concerning the amount of
    methamphetamine in the liquid mixtures which were
    used to establish an amount of more than 28 grams.
    The scientific, unrebutted evidence of Dr. Hiatt,
    established less than 28 grams of methamphetamine,
    and therefore there was insufficient evidence to
    support a conviction of Trafficking.

III. There was insufficient legal evidence to support
    convictions for possession of methamphetamine and
    resisting arrest.

IV. The sentence of 35 years is cruel and unusual.

## STATEMENT OF THE FACTS

### SUPPRESSION HEARING

Whitley's Motion to Suppress is found at (C-45). The Transcript of that Hearing begins at (R-3). Whitley's Attorney stated that the grounds for the Motion were due to the search being illegal because it was a warrantless arrest and search and did not fall under any of the exceptions.

**Sergeant James Price** of the Harris County (Georgia) Sheriff's Department testified first. He was assigned to the Metro Narcotics Task Force. In regard to the information received concerning the search of September 21st, 2001 at Rusk Trailer Park, he stated that Agent Whitten had received information from Officer Ricky Lawrence that he had a subject in his office that had information on a meth lab at that location. When asked what the subject told Price, the Defense objected and asked who the subject was. The Judge did not Order the disclosure of that person. Double hearsay was also objected to but the Court overruled that objection. The information received was that a subject known as Jerry Whitley was manufacturing meth at one of the trailers in

9

Rusk Trailer Park. The trailer was supposed to be booby-trapped and there were supposed to be several weapons at the trailer. When asked, at that point, based on the information that the informant had given Price, did Price feel that he had sufficient information to obtain a Search Warrant? His answer was "I don't think we had sufficient information" (R-7). Note, this same officer testified at trial that another reliable informant had provided the same information to the task force two (2) weeks earlier and that he and others had gone to the same trailer and observed it, two weeks earlier (R-121). The informant had not given a specific address, but described the trailer, its location and vehicles at the trailer. Then Price, Agent Whitten and Agent Memmo went to the trailer park to try to locate the trailer and see if they could smell a chemical smell, based on the informant's information. If the meth lab was running, we should smell chemicals. The Officers located the vehicles at a trailer. They set up surveillance and watched the trailer a few minutes. They observed a subject come out and walk toward a vehicle. That person's name was Steve Moseson. All three (3) Agents

10

approached him.  He had a shaken look on his face and he smelled of chemicals.

Price testified that he had received training on methamphetamine labs and recognized odors associated with a methamphetamine lab.  Moseson was patted down for weapons for the officers' safety and a small plastic bag containing methamphetamines was located (and apparently thought to be a weapon).  Moseson was then placed under arrest for possession of methamphetamine.

Price and Agent Whitten then went to the front door of the trailer and Agent Memmo went to the rear door.  He knocked on the door for the purpose of finding out who lived at this trailer.  A woman named Caylene White answered the door.  Price asked if Jerry was home, but he also noticed the smell that came out of trailer, a strong ether smell.  Ether is associated with the production of methamphetamine.  Price asked if Mr. Whitley was there, Ms. White said yes; and Price asked to speak to him.  Whitley then stepped out of the door.  Price was wearing a Metro Raid vest and a sidearm and the vest had the words "Metro Narcotics" written on it with a star, identifying him as a law enforcement officer.  At that time, Whitley stepped out

11

of the door.   Price had known Whitley for a number of years.   When Whitley stepped out, Price noticed that he had a big wrench in his pocket.   Price removed the wrench and when he did a bag of methamphetamine fell on the ground.   At that time, Price grabbed Whitley by the arms (R-13).   Price stated that he removed the wrench because he thought it was a possible weapon.   Whitley was then cuffed and put in the back of a car.

Price had received information from the informant that there was some type of booby-trap in the trailer.   Whitley began to yell blow it up.   There were other trailers just a few feet from the Whitley trailer.   The District Attorney asked Price if the trailer had blown up, would it have endangered any of the people in that trailer park.   Price responded, yes.

Agent Whitten went in and removed Ms. White from the trailer.   Price testified that Whitley started yelling, Wayne, set it off.   Agents Whitten and Memmo went back in the trailer and came out with a subject later identified as Wayne Meadows.   Ms. White was secured and Wayne Meadows was secured.   The trailer was secured and the subjects were placed in Police vehicles and then a search warrant was

12

obtained.    (Emphasis Added).    Mr. Whitley was already arrested for possession of methamphetamine, but his rights were not read to him.    Price testified that the other trailers were at least twenty-five (25) feet from that trailer of Whitley.    He again testified that Whitley had stepped out of the trailer and that Price pulled the wrench out of Whitley's pocket and that was when the methamphetamine fell on the ground (R-19).    After Whitley stepped out of the trailer, he in fact said "hey, Jim" and acknowledged that he knew Price.    There was no struggle between Price and Whitley until Price pulled the wrench out of Whitley's pocket and a little piece of plastic fell out.

The surveillance lasted between ten (10) and fifteen (15) minutes and occurred before five (5:00) in the afternoon.    Price did not talk with Sergeant Lawrence concerning the informant, nor has he talked to Lawrence about the informant since the date of the arrest.

Price testified that there was no search warrant whatsoever when he went to the trailer park to pull surveillance on it to see if there - - - actually, to find the trailer and then to see if there was any activity (R-22).    Whitley's attorney questioned Price about the pat-

13

down search of Mr. Moseson.  The State objected to this as being irrelevant.  The Court allowed the questioning because it was brought up in direct examination and because it was part of the transaction that was used to lead to the entry into the trailer (R-23).  The officer reached into the pocket of Moseson where the plastic bag of meth was found.  Moseson had been approached by Metro Narcotics Officers after he left the trailer and as he was walking to a red pickup truck.  He was actually approached while he was still on the trailer lot property.  Moseson was not on the public road.  Price did not remember Moseson putting his hand in his pocket (R-23-24).

Price did not observe any other people besides Moseson. He did not notice if the windows were open nor did he notice if there was a storm door on the front of the trailer.  After Price grabbed Whitley and Whitley was yelling, Caylene White just stood at the door and Agent Whitten grabbed her.  Whitten may have gone into the trailer.  Price went back into the trailer after Meadows had been removed.  The chemical odor was strong and he went into the kitchen and then he came back out.

14

**Jason Whitten,** who is employed with the Phenix City Police Department and assigned to the Metro Narcotics Task Force then testified. Whitten received information about a methamphetamine lab in Rusk Trailer Park in Phenix City from Sergeant Lawrence from the Phenix City Police Department. Whitten called Lawrence and spoke to him over the telephone. There was "a subject" in Lawrence's office during the conversation. Whitten then actually talked directly to the informant who gave the location of the lab as being about three-quarters of the way down Rusk Drive on the left; he described the awning on the trailer and the vehicles in the driveway. The informant did not give a specific address. He stated that the name of the occupant or person renting the trailer was Jerry Whitley. He stated that there was a cook going on, that day. This conversation occurred around noon, 1:00, maybe 2:00 (R-32). The officer stated that based upon his experience and training he did not have sufficient evidence to obtain a search warrant. He then went to the trailer park to set up surveillance on the trailer. The purpose of going there was surveillance, just to see if we could observe subjects coming and going, observe odors of methamphetamine labs.

15

They were trying to confirm the information the informant had given them.  They were also attempting to determine a street address for the property or a better physical address.  Whitten testified that they arrived at around 2:30 in the afternoon and set up surveillance for fifteen (15) or twenty (20) minutes.  They weren't there very long. They observed Moseson exit the trailer and walk toward a vehicle.  The trailer that Moseson came out of matched the description given by the informant, and the vehicles around it matched what the informant had told Whitten (R-35). Moseson was detained and became nervous.  Whitten did a pat-down search and felt a plastic bag in his pocket (R-36).  Whitten testified that he saw a camera and that the informant had given him information about surveillance equipment being at the trailer.  Cameras were visible from the outside of the trailer.

Whitten testified that the informant had told him about how the trailer was rigged.  The Defense objected and the Court sustained the objection.  The District Attorney then stated that this questioning "goes to the state of mind of the Officers in determining whether or not they felt like they had exigent circumstances and/or an emergency

16

situation." The Court then stated that it had been testified to that two (2) individuals were requested to blow it up, and the Court stated that this would be sufficient. The District Attorney then moved on in his questioning (R-37-38). The Officer testified that when they approached the front door of the trailer, the purpose was to speak to Mr. Whitley; to establish that this was where Mr. Whitley lived and get an address on the trailer. He testified that he was dressed like a law enforcement officer, with a gun belt with accessories and a mesh raid vest with a Metro Narcotics star on the front and a badge hanging over his shoulder and Metro Narcotics Agent patch on his back. He approached the door dressed like this (R-39). When Whitley stepped out of the door, Sergeant Price grabbed him and the wrenches that were in Whitley's front and back pockets (R-40). Caylene White first came to the door and then Jerry came to the door and stepped out of the door and halfway down the steps. After being arrested, Whitley started screaming for Wayne to "do it". Agent Memmo and Whitten went inside the residence and cuffed Wayne Meadows. When they were in the trailer they noticed the smell of ammonia and ether type chemical smells, which

17

were associated with methamphetamine labs. While Whitten was in the trailer he also recognized apparatus or equipment as a part of a lab. The Officer observed compressed gas cylinders of various sizes, shapes and colors, brass fitting hoses, a canister in the kitchen area that had fumes coming from inside it, handguns through out the living room; and surveillance equipment. At that point he did <u>obtain a search warrant (Emphasis added).</u> The search warrant was admitted as Exhibit "1" (C-529). This search warrant was not obtained until 8:25 p.m. that date on September 21st, 2001, and after the three (3) officers had already been in the trailer. Whitten testified that he personally went to Judge Funderburk to get the search warrant.

Whitten had testified that they entered the trailer about 3:00 that afternoon. There is no Affidavit attached to the search warrant or in evidence, nor is there Exhibit "A" for a diagram of the area to show where the subject residence is located. Whitten testified that there was no evidence of anyone violating the law at the residence, prior to his actually stopping Moseson and in fact when Moseson came out of the trailer, the Officer had no reason

18

to believe that he was violating the law. In fact, when the Officers approached Moseson they actually reached into his pocket and pulled out contraband (R-51). Whitten testified that he had never talked to the informant before or since. The informant stated that he had been in the trailer recently (R-52).

Agent Whitten stated that after he got the search warrant he did note a fishing line strung from the ceiling going around the walls to a candle in the back bathroom where there were containers of solvents and other flammable materials. The District Attorney testified that the way the fishing string was done, someone could grab it and tip over the solvents (R-44). The Officer testified that he did not know where the end of the line went to. There were pictures offered at the hearing concerning those surveillance cameras. The District Attorney asked the question of Whitten as to whether he was concerned about his safety and his fellow Police Officers when he entered the trailer and Whitten responded, yes. The District Attorney asked him if he was also concerned about residents in the trailer park and he said yes.

19

A **Cindy Hoyle** testified that she lived at 24 Rusk Drive on September 21st, 2001. She was standing outside and saw one of the guys pull out one of the guys in the house. The men had on Metro Narcotics Task Force gear.

**Steve Moseson** testified that he walked out the door and was going to get in the truck. About halfway to the truck, the Officers got out of their car with guns drawn and told him to get down on his knees. Mr. Whitten then searched him. Whitten found $25.00 worth of meth in his pocket. Moseson was then hand cuffed. He was sitting on the ground near the trailer and observed the Police knock on the door. Caylene opened it and the Police pulled her out the front door, and put her off to the side (R-65). They went back to the front door with their guns drawn and said Metro Narcotics. The door opened and Jerry was pulled out of the door and then the Officers went inside and got Wayne out.

**Wayne Meadows** testified that he was at the residence of Mr. Whitley on September 21st, 2001. He was sitting in the living room when there was a knock on the door. Caylene White went to the door (R-68). Whitley went to the door and Meadows heard some banging like the storm door was banging back and forth and that there was a bunch of

20

commotion out there. Meadows looked out and then went back in the living room and sat down. Meadows did not notice any fishing line in the trailer; he did not recall Jerry Whitley telling him to blow up the trailer. The Officers came into the trailer and got him out of the trailer. There were jars on the kitchen floor. The Court then examined Mr. Meadows (R-74). Meadows was questioned about the smell of ether and whether or not some ether was spilled on Meadows before the raid. Meadows stated that nothing was spilled on him but he did smell something similar to ether.

In closing arguments to this Hearing the District Attorney stated that this was "A classic case of exigent circumstances." (R-75). The Officers received information which was insufficient for a search warrant; they set up surveillance; and they encountered an individual who smelled strongly; they went to the door to verify who lived there and at that point were confronted by people screaming to light it or blow it up. They entered the trailer to protect themselves and citizens from the threat of an explosion. Obviously, it would serve the dual purpose to preserve evidence. They went in there and

21

secured Mr. Meadows, brought him out and then immediately got a search warrant.   Whitley's Attorney stated that the Police   Officers   cannot   create   their   own   exigent circumstances.   She stated, "Rather than in encountering an individual, they went up to him and actually arrested him illegally with guns drawn, and they actually did raid the residence of my client.   It was an illegal arrest and anything that stems from it would be poisonous fruits." The Moseson arrest was actually used to create the exigent circumstances.   The Court then denied the Motion to Suppress (R-76).   Whitley's Attorney requested that the Court allow her a continuing Objection to the admission of the arrest itself, the search warrant and any statements or seized contraband as a result of this search and seizure. The Court allowed this continuing objection.

## THE TRIAL

The Trial of this case began and ended on December 5th, 2002.   The Court addressed some motions on the day of the trial.   Whitley's attorney had an outstanding motion to continue  and  request  for  additional  funds  to  get  an additional lab report and get Dr. Hiatt transported for trial.   The Court denied that motion.   Whitley's Attorney

22

stated that she was not ready for Trial due to the denial of this motion. She explained the need to have Dr. Haitt further analyze the substances which were the subject of this case and in order to pay for his transportation from Nevada to Alabama for the testimony. There was a discussion concerning that Pending Motion and the need for that information. Dr. Hiatt's initial results showed that there was methamphetamine present in the liquid substance. However, Whitley presented an offer of proof that there would be a very small amount (less than three (3) grams) of methamphetamine mixed into the liquid substance (R-83-86). The report was admitted as Defendant's Exhibit "1" (C-547-551). The toxicology reports related to items 15 and 9 on the Department of Forensic Sciences Report and showed a small amount of milligrams per milliliter of methamphetamine in the liquids that constituted those two (2) items. The Exhibit was initially entered into Evidence for the purposes of the Appellate Record. The District Attorney argued that the ratio of meth to other substances in the mixture is immaterial and irrelevant.

There was a Motion in Limine which had previously been filed, which addressed whether or not the argument of the

23

actual amount of meth could be argued and introduced by the Defense in order to argue that less than twenty-eight (28) grams of illegal substance was actually present. Both the District Attorney and Whitley's Attorney referred to the Fletcher case which called for a distinction between crack cocaine and soap chips in determining the overall weight of a substance or mixture. The Judge granted the State's Motion to the effect that Whitley's Attorney could not argue to the jury that there was less than twenty-eight (28) grams of methamphetamine and the Judge ruled that the law was clear that there was a mixture containing methamphetamine of twenty-eight (28) grams or more (R-87-93). At (R-84-92) is a long, confusing, discussion about the admissibility of Dr. Hiatt's report related to the percentage of methamphetamine in the mixtures which were listed on the Alabama Department Forensic Sciences report as Items 9 and 15. Finally, the State stipulated to this report being admitted into evidence to be presented to the jury and the Court admitted the report. However, Dr. Hiatt was not present to testify and explain any conclusions based upon his tests. Whitley's attorney pointed out that there was Federal Case Law which required a determination

24

of the difference of the amount of the illegal drug in a mixture.

The District Attorney's Opening Statement included the following:

> On September 21st, of last year, 2001, agent Jason Whitten, who is employed by the Phenix City Police Department and assigned to the Metro Narcotics Task Force, a unit which, as the name implies, concentrates on drug offenses. Jason received a phone call from a citizen, and he said I want to give you some information. He said a guy named Jerry Whitley is running a methamphetamine lab in Rusk Trailer Park. This caller said, look, I don't know the exact trailer number, but here's a description of the trailer and here's a description of some cars that are parked in front of it. And the caller said and oh, by the way, I think you need to know Whitley's got surveillance cameras, closed circuit television surveillance cameras set up so he can see outside the trailer. He's got a bunch of guns, and he's booby-trapped the trailer so he can blow it up if the Police show up. . . . Jason Whitten, together with other Officers of Metro Narcotics Task Force, went out to Rusk Drive back on September 21st, to see if they could verify this information they had been given. Sure enough, they found a trailer that matches the description. Sure enough, in the yard of that trailer are the exact cars that the caller indicated. So Agents Whitten, Price and Memmo decided that they would just watch this trailer a little while and see if there was anything unusual going on (R-101-103).

When the trial began the first witness was **Chris McKinstry** who works for the Monarch Company, which owns Rusk Trailer Park. Whitley was the sole resident at Lot # 29 (R-113).

25

**Jody Williford,** an employee of the Russell County Sheriff's Department assigned to Metro Narcotics testified. The witness stated that he was the drug custodian and transported drugs to and from the lab. He testified that he had taken State's Exhibit "1" to the lab and then picked up those drugs on January 31st, 2002 and they had been in the Russell County Sheriff's Department evidence locker since that time in substantially the same condition they were, when he picked it up from the lab (R-116).

**Jim Price,** an employee of the Harris County, Georgia, Sheriff's Department testified as to his duties with the Metro Narcotics Task Force. He testified that he had known Whitley for over twenty (20) years and had grown up with Whitley. He stated that on September 21st, 2001 they had received information from a confidential informant. Whitley's Attorney objected to hearsay. The District Attorney stated that this information was not offered for the truth of the matter, but simply to explain why the Officers went there. The Court sustained part of the Objection and overruled the objection in part. The Court explained to the jury that normally hearsay was not allowed into evidence but that the Officer would be able to answer

26

the question to explain why he acted upon that information.
The Defense objection to this hearsay was overruled, (R-119).    Price testified that the informant stated Whitley
was cooking methamphetamine at his trailer.    The informant
did not give an address.    The District Attorney asked what
information - - how were you going to identify the right
trailer?    Price then stated that the informant had provided
a description of the trailer and vehicles located at the
trailer.    <u>Also, a few weeks prior to this, we had set up on
the same trailer (Emphasis added)</u>.    (R-121).    The Officers
were told that the trailer was booby-trapped and there were
video surveillance cameras.    He stated that they arrived at
the trailer around 5:00 p.m.    The Officers located the
trailer that matched the description that the informant had
given, and the vehicles in front matched what the informant
had described.    This included a truck parked in front of
the trailer, with Texas plates.    The Officers observed the
trailer for about ten (10) minutes.    They observed a
subject leave the trailer and go toward a red pickup truck,
this being Steve Moseson.    The Officers then approached
Moseson.    He acted nervous, looked toward the trailer, had
a chemical smell on his person, so they placed him in cuffs

27

for Officer safety and conducted a pat down.   (R-123-124).

Moseson smelled like ether and ammonia, items used in the

manufacturer of methamphetamine.   As a result of the pat-

down  search,  a  small  plastic  bag  was  recovered  from

Moseson's      pocket,      which      contained      suspected

methamphetamine.   Moseson was arrested.   When asked the

purpose of his going to the trailer, he responded "to see

if Mr. Whitley was actually in the trailer" (R-125).   Two

Officers went to the front door and one Officer went to the

back door.   Price knocked on the door.   A lady named

Caylene White answered the door.   She was asked if Jerry

Whitley was in the trailer.   She said yes and Whitley came

to the door and stepped out of the trailer.   Whitley spoke

to Price and said hello Jim and he responded with hello

Jerry.   Price pulled a big wrench out of Jerry's front

right pocket and when he did a bag of meth came out.   Price

then grabbed Whitley.   Whitley started yelling to set it

off.   Price cuffed Whitley, who was trying to run away at

the time.   Ms. White was arrested and set in a chair

outside the trailer door, next to the chair Mr. Moseson was

sitting in.   The other Officers went inside the trailer and

came out with Wayne Meadows.   Price identified the plastic

28

bag that came out of Whitley's pocket as methamphetamine and he identified State's Exhibit "1". He later turned over all evidence to Agent Whitten. The District Attorney then asked: "Let me ask you, after ya'll got everything settled down, after you got all of these people secured, did ya'll obtain a search warrant or any authority to search this trailer?" Price answered that Agent Whitten obtained a search warrant for the residence. The Officers found all kinds of chemicals used to cook methamphetamine. Price stated that Whitley was just rambling after his arrest and this was not done in response to questioning. He stated that his life was over and that he had messed up.

Under cross examination, Price stated that two weeks prior to September 21st, he had set up surveillance on the same trailer. A confidential informant had called him at that time (R-133). When asked who the confidential informant was, the Court sustained the objections made by the District Attorney. The confidential informant who provided the earlier information had previously provided information to the police that was reliable. The task force had been working with that informant, who had provided information that produced other cases. The

29

informant was doing this due to the fact that the informant had a case on him. The informant who provided information on September 21st, was a different informant from the earlier informant. Price was not aware of the reliability of the informant from September 21st.

**Melissa Kelly** testified as an employee of the Alabama Department of Forensic Sciences at the Auburn Laboratory. She testified as an expert witness. She testified in regard to State's Exhibit "1" and State's Exhibit "1(a)" and stated that there was methamphetamine in the sample.

**Sherwin Boswell**, testified that he was employed by the Department of Forensic Sciences, Auburn Laboratory as Chief of the drug chemistry section (R-143). He testified as an expert and stated that he processed illegal laboratories and explained how methamphetamine is made. He stated that some of the chemicals used in the process are explosive and toxic. Boswell and others arrived at 29 Rusk Drive on September 21st, at 8:59 p.m., to collect evidence. He had that evidence present with him in Court at the Trial. State's Exhibit "4" was a plastic container sealed with a blue plastic lid holding a bi-layered liquid. The bottom layer of the liquid contained methamphetamine and

30

pseudoephedrine. The top layer of the liquid did not contain a controlled substance (R-154). This liquid was not weighed. Several exhibits were admitted which were coffee filters, which were explained to be used in the straining process. The residue on several of these filters was determined to contain methamphetamine. Exhibit "9" was a liquid which contained methamphetamine and pseudoephedrine in the weight of 500 grams. There were several other jars of liquid which were seized, but did not contain any illegal substances. Whitley's Attorney objected to most exhibits which were not controlled substances. However, a number of these items were explained to be important in the manufacturing process of methamphetamine. Exhibit "15" was a glass jar containing a cloudy liquid and off-white powder. This liquid and powder revealed the presence of d-methamphetamine and pseudoephedrine, 1,435 grams (R-172). Exhibit "16" was a summary of the testimony in a written report form.

Under cross examination Boswell was asked about Exhibits "9" and "15", which were alleged to contain methamphetamine. Samples had been provided to the Defense for further analysis. Boswell testified that he weighed

31

the entire liquid after it was taken out of the container. He testified that he did not weigh the powder and the liquid in these samples separately. He testified that item number 9 had a volume of about 800 milliliters and that there were 1,000 milliliters in a liter. Item number 15 had less than a liter because there was powder and stuff involved. The independent expert witness (Hiatt) did an analysis of these products and his report (Defendant's Exhibit "1") found that in one sample there was 1.8 milligrams per milliliter or 1.8 grams per liter. The other sample had 3 milligrams per milliliter. The witness was asked how many grams of methamphetamine would have been included in Exhibits "9" and "15". The witness never answered the question. The witness further stated that very little of the residue from the filter papers were suitable for ingesting. This did not include any of the substance in Exhibits "9" and "15" (R-193). The witness was asked if it was true that there was only approximately 3 grams in the whole sample as exhibited by "9" and "15". The District Attorney objected and the Court sustained the objection (R-194). The District Attorney asked Mr. Boswell if there <u>had not been a police raid,</u> could the 8,000 grams

32

of pseudoephedrine been turned into methamphetamine, his answer was yes (Emphasis added) (R-196).

**Wayne Meadows** testified that he knew Whitley for about a year and was at Whitley's trailer in Rusk Trailer Park on September 21st. Meadows stated that he smelled something when he came into the trailer and that he had been there about five minutes prior to the police arriving. He heard a knock on the door and Ms. White opened the door and the Officers said "Police". Whitley then went out and Meadows heard noises and shouting going on outside. Meadows was later charged with possession of methamphetamine and entered a plea bargain and pled guilty. He stated that the jars and things comprising the lab were visible inside the kitchen in the trailer. Under cross examination, Meadows stated that he was originally charged with trafficking and resisting arrest. However, those charges were dropped and he pled guilty to ten (10) years on one count of possession and seven (7) years on another count of possession. He was aware that he could have gotten ten (10) to ninety-nine (99) years for the trafficking charge.

**John Memmo** who is employed with the Columbus Police Department and assigned to Metro Task Force testified that

33

he went to the trailer park on September 21st (R-206). They had received a complaint about a meth lab in one of the trailers out there. They went to the trailer park and located the trailer and set up several lots down (R-207). After about ten (10) minutes of surveillance they saw someone exit the trailer, being Steve Moseson. They then approached him to investigate his activities. All of the officers had on their marked colors identifying themselves as agents. Moseson acted nervous, looked back at the trailer, and had a loud odor about his person, so Agent Whitten handcuffed him. Memmo went into the trailer to arrest Wayne and while in the kitchen area he could see an active lab on the floor and several handguns laying about. Agent Whitten asked Whitley if he would give consent to search the trailer and Whitley said no (R-210). They then maintained security around the area until they got a search warrant.

**Jason Whitten** was employed by the Phenix City Police Department and assigned to the Metro Task Force. On September 21st, 2001 he received information concerning Rusk Trailer Park. He received a call from Sergeant Ricky Lawrence of the Phenix City Police Department who had a

34

subject in his office.  Whitten talked to the subject that had given information.  The Defense Attorney objected to hearsay, but the Court allowed it.  The informant stated that Jerry Whitley at Rusk Trailer Park had an active meth lab.  The informant described the trailer and the vehicles at the trailer.  Based upon this information the Task Force went to the location and set up surveillance at the residence of Jerry Whitley.  They did not know the actual house number but the trailer matched the information that they had been given, along with the vehicles in front of the trailer.  They observed the trailer and observed Mr. Moseson exit the trailer.  They contacted him and subsequently arrested him because of his smell.  Exhibit "24" was offered, being a picture of a camera from the window of Whitley's trailer.  This camera which could be observed from outside of the trailer, matched the description given by the informant.  Whitten and others then approached the trailer and arrested Caylene White, Whitley, and Meadows, as had been described in earlier testimony.  Whitten went inside the trailer to remove Mr. Meadows and did a walk-through and noticed handguns, propane cylinders, gas cylinders, and large containers

35

containing liquid and powder. Later, Whitley would not consent to a search of the residence, so they then went and got a search warrant. A number of pictures that were taken of the inside of the trailer were admitted into evidence. Several guns were testified about. A video tape of Whitley and Meadows setting up a video camera in the living room was admitted. Whitten testified that when he did his walk-through of the trailer he saw several guns and none of these guns were determined to be illegal (R-235). Therefore, there was not a sufficient basis for guns being an enhancement on the sentence of Whitley (R-235).

The Defense called as its only witness, Stephen Moseson, who had been at the trailer that date. He was arrested that day and has since pled guilty to possession. He stated that he did not notice any large quantity of methamphetamine in the trailer. Under cross-examination, Moseson's statement was offered as Exhibit "32". That document was dated 12/27/01, which was more that three (3) months after the initial arrest. The statement was that Whitley was the only one involved in the manufacturing.

The Defense rested (R-246).

36

The Court, it its Jury Charge, stated: "A mixture is defined to include a portion of matter consisting of two or more components that do not bear a thick proportion to one another and that however thoroughly commingled are regarded as retaining a separate existence. A mixture is also defined as two substances blended together so that the particles of one are diffused among the particles of the other (R-254).

Upon completion of the Closing Statements by the Attorneys and the Charge, the Jury began deliberations. They reached a verdict of Guilty on all charges and a decision that Whitley did possess a firearm during the commission of the crime of Trafficking in methamphetamine (R-268-269).

<u>SENTENCING HEARING</u>

The State took the position that, based upon the weight of the drugs in this case, the minimum sentence to be imposed would be fifteen (15) years, plus a five-year enhancement for <u>use</u> of a gun during this crime. Whitley was sentenced to thirty-five (35) years on the Trafficking case, which ran concurrent with the possession charge, in which he received a five-year sentence. A $50,000.00 fine

37

was imposed as well as other Court costs, the $10,538.64 appointed attorney fee, and other fees and costs. He was sentenced to six (6) months on the Resisting Arrest charge. Whitley was informed of his right to Appeal the sentence and Oral Notice of Appeal was given at that time on all three (3) cases (R-276-277).

## ARGUMENT OF ISSUES

**ISSUE I: The Trial Court erred in not granting Whitley's Motion to Suppress for two reasons:**

    a) **The acts of law enforcement prior to obtaining a search warrant, and**

    b) **The search warrant was not properly obtained or supported.**

The IV Amendment of the <u>United States Constitution</u> and Article I, Section 5, of the <u>Constitution of Alabama</u> of 1901, protected citizens from unreasonable searches and seizures. This Amendment and Section read essentially the same which is:

> That the people shall be secure in their persons, houses, papers and possessions from unreasonable seizure and searches, and that no warrants shall issue to search any place or to seize any person or thing without probable cause, supported by Oath or Affirmation.

There are numerous cases which are cited in regard to search and seizure, which include <u>McLemore v. State, 562 So.2d 639 (Ala. Crim. App. 1989)</u> and <u>Brown v. State, 167 So.2d 281 (1964)</u>. The general rule is that all searches and seizures conducted without a search warrant are unreasonable unless the search and seizure comes within the

39

scope of certain recognized exceptions, <u>Hilley v. State,</u> <u>484 So.2d 476 (Ala. Crim. App. 1985).</u> The United States Supreme Court has developed an exclusionary rule which declares that evidence, secured in violation of the Constitutional right to be secure from unreasonable searches and seizures, should be excluded in both Federal and State Criminal cases, <u>Weeks v. United States, 232 U.S.</u> <u>383 (1914).</u>

However, there have been certain exceptions to this rule which have developed through the years in regard to warrantless searches, the six (6) exceptions are as follows:

1) Plain View,
2) With consent voluntarily and knowingly given,
3) Incident to a lawful arrest,
4) Hot pursuit or emergency situations,
5) Exigent circumstances coincidental with probable cause as in the case of moveable vehicles, etc., and,
6) Stop and frisk situations, <u>Langston v. State, 348</u> <u>So.2d 273, (Ala. Crim. App.), Cert. denied 348 So.</u> <u>2d 277, (Ala. 1977).</u> Further, in the case of <u>Moore</u> <u>v. State, 650 So.2d 958, (Ala. Crim. App. 1994)</u> <u>then rehearing denied, Cert. denied, 650 So.2d 966</u> <u>(Ala. 1994).</u> The burden is on the State to show the intrusion and seizure were lawful. <u>Teat v.</u> <u>State, 409 So. 2d 940 (Ala. Crim. App. 1981).</u>

The law enforcement officers entered the trailer and searched it prior to receiving a search warrant.

40

It appears that Sergeant Price and Officer Whitten have gone to some school to learn how to avoid the necessity of obtaining a search warrant. At the Suppression Hearing in this case, the officers testified that they set up surveillance for the purpose of getting a specific address of the Whitley trailer. These officers apparently did not investigate the reliability of this particular informant as to prior information provided to the Phenix City Police Officer who set up the exchange of information. However, the September 21st, informant certainly provided sufficient information upon which the Metro Task Force could have obtained a legal search warrant. The informant stated the trailer was in Rusk Trailer Park, was three-quarters of the way down the street on the left; he described the awning on the trailer; he described the vehicles in the driveway; he told that there were cameras pointed out of the windows which were visible from the outside; and he stated that the occupant and person renting the trailer was Jerry Whitley (R-31, R-7). The officers testified that they had no problem finding the trailer, as described by the informant, and set up surveillance.

41

At the Suppression Hearing, the officers failed to mention that they had actually been to this same trailer based on the same information from another informant, approximately two (2) weeks earlier. The earlier informant was reliable and had provided credible information which resulted in other arrests in other cases. That informant gave virtually the same information as the September 21st, informant. The officers had actually gone the Whitley trailer two (2) weeks earlier and had set up surveillance on it. Therefore, when they stated that they needed the actual address in order to obtain a search warrant, this was not true. Further, since they had been to this trailer earlier, they could have certainly gotten the address either from the trailer park management or could have provided a sufficient description of the trailer in relation to other trailers that might have had numbers on the trailer. The State even had a representative from the owner of the trailer park testify that Whitley was the sole resident of Lot # 29 (R-113).

Thus, when Officers Price and Whitten testified that they did not have sufficient information upon which to get a search warrant, this was not true. Remember, that Price

42

had personally known Whitley for over twenty (20) years. Thus, the officers had two (2) separate opportunities to get search warrants of the Whitley trailer and had not done so. As Whitley's Trial Attorney pointed out in her arguments at the Suppression Hearing, the Police Officers "created their own exigent circumstances, in order to raid the residence of Whitley". When the officers went out to put the trailer under surveillance, they were already dressed in their "raid" uniforms, with vests and drawn guns. The arrest of Moseson was illegal. This man walked out of the trailer and was walking toward his truck when he was stopped, searched, and arrested. The police officers had no basis to approach Moseson or to search or arrest him. Apparently the Police did find a small plastic bag with methamphetamine in it. However, these trained members of the Narcotics Task Force should not have mistaken this plastic bag for a weapon. The officers then went to the trailer door with their guns drawn. Their excuse was that they wanted to find out if Jerry Whitley lived in the trailer. They already knew this from two (2) weeks earlier. Thus, the basis for their approaching the trailer was false. Then, Whitley actually came out of the trailer.

43

Whitley was a mechanic and had a wrench in his pocket. Price had no arrest warrant and had observed no crime being committed, but he removed the wrench and miraculously a small plastic bag containing methamphetamine came out of Whitley's pocket along with the wrench.   Even if this miracle had occurred, this was still not a sufficient basis to search the trailer.   However, the intent of the Police was to search the trailer, whether they had a search warrant or not.   They then proceeded on into the trailer and observed the contraband and other substances, etc., along with some guns.

There was never any evidence or testimony that any guns or weapons were involved in this case.   One of the officers testified that there was nothing illegal about the guns (R-235).

The Metro Task Force certainly had sufficient information to get a search warrant.   Since they did not, then the drugs and paraphernalia seized should have been suppressed and excluded.   The guise that the officers used that they needed a specific lot or trailer number is an insufficient argument for their not obtaining a search warrant.   They had all of the descriptions of the trailer,

44

its location in the trailer park and a description of specific vehicles in front of the trailer, to include that one truck even had Texas license plates. Further, they had been to the trailer two (2) weeks earlier and had the trailer under surveillance. The officers knew the name of the person who allegedly lived in the trailer and in fact Mr. Price had known Mr. Whitley for over twenty (20) years. The case of Tyler v. State, 227 So. 2d 442 (Ala. Crim. App. 1969) stated that a search affidavit with the described premises to be searched through use of the words:

> "From Moulton go West on Highway 24 to a road known as Aubrey Cameron Rock Road. Turn South and go past a church and cross a creek, turn West on a rock road and go to the first rock road leading South, then go to the first house on the right hand side of the road, a white house with old cars in the yard."

This was specific enough. Certainly the information that the officers had in regard to Whitley's trailer was even better than this description. Therefore, there was no excuse for a search warrant to have not been obtained either on September 21st, or two (2) weeks earlier.

In regard to the exceptions noted previously under the Langston v. State case, Supra and Murray v. State, 396 So.2d 125, (Ala. Crim. App. 1980), the exceptions to

45

obtaining a search warrant did not exist in this case.  The items seized were not in plain view of a person outside of the trailer.

1. These items were in plain view after the officers illegally entered the trailer and performed a "walk-through".

2. Whitley did not voluntarily consent to a search.

3. The search did not occur incident to a lawful arrest. Whitley argues that there was no lawful arrest of Moseson, Caylene White, or himself, prior to the officers entering the trailer.  Even if there had been a lawful arrest, all of this occurred outside the trailer and did not establish a reason for the officers to enter the trailer.

4. There was no hot pursuit occurring.  Additionally, there was no emergency situation in existence, other than what the officers may have created or stated. There was no evidence that the trailer was about to blow up, nor that there was anyone else in the area who could have been injured.  Except, the law enforcement officers who should not have been present without a search warrant.

46

5. There were no exigent circumstances coincidental with probable cause. The trailer was certainly not going to move anywhere.

6. This was not a stop and frisk situation. <u>Murray v. State, Supra,</u> also states "a search is not justified by what it subsequently uncovers."

In <u>Yountz v. State, 494 So. 2d, 189 (Ala. Crim. App. 1986)</u> the Court held that police officers did not have the authority to enter the Defendants' home without either an arrest or search warrant. The case stated that imminent danger that evidence will be destroyed will not justify warrantless entry into a private home when the State's interest is only to arrest for a minor offense; and distribution of a controlled substance is not a grave offense. In the Whitley case, before the Court, there was a question as to whether or not there was a legal arrest, but even that would have been just for possession. <u>Yountz,</u> also states that a mere speculative claim that evidence might be destroyed if it had not been seized without a warrant is insufficient to justify a warrantless search and that the police cannot justify a warrantless search upon the basis of exigent circumstances of their own making.

47

The <u>Yountz</u> case involved a search of the residence after an arrest had been made.  <u>United States v. Alfonso, 759 F.2d, 728, 742 (9th Cir. 1985)</u> stated that a search of a residence merely because a suspect is arrested inside does not follow as a matter of routine . . . "an arrest even on probable cause does not itself automatically provide exigent circumstances justifying a warrantless search of the suspect's house."  The officer in the <u>Yountz</u> case admitted that the only purpose in going to the Defendant's residence was to arrest Mr. Yountz.  There was never any attempt made to obtain a search warrant or an arrest warrant.  In the Whitley case here, the supposed purpose of going to the trailer park was simply to determine which trailer Mr. Whitley lived in.  However, the police had known who Whitley was and where he lived for at least two (2) weeks, because they had the trailer under surveillance two (2) weeks prior to September 21st.  However, the officers searched the trailer and became aware of what contraband was located in the trailer, during their "walk-through".  They then tried to cure their illegal activity and search by then obtaining a search warrant.

Inconvenience and slight delay are never "very convincing reasons" for not obtaining a warrant, <u>Johnson v. United States, 68 S.Ct. 367, 369 (1948)</u>. The modern decisions state over and over again that law enforcement officers must have a good reason for not getting a warrant, especially when the search is of a home, <u>United States v. Janik, 723 F.2d 537, 547 (7th Cir. 1983)</u>. The mere fact that police have information that a weapon is located within a suspect's apartment, however, does not justify a warrantless entry. <u>People v. Lott, 478 N.Y.S.2d 193, 196-197, (1987)</u>. In the <u>Yountz</u> case, the Court noted that the arrest and search were made pursuant to a preconceived plan and not in response to any exigency. . . .The police cannot justify a warrantless search on the basis of exigent circumstances of their own making. The officers testified, under oath, that their reason for going to the trailer park was to look at the trailer and get a better address. That is not true. They went already dressed in bullet proof vests with their guns strapped on, and later drawn, for the purpose of creating an exigent circumstance. Whitley would argue that the Task Force "planned" the arrest and search. If their purpose in going to look at Whitley's trailer was

49

to get a better description, they could have taken a Polaroid picture and shown a Judge a picture of the place in order to justify the issuance of a search warrant for that particular place. They already had two (2) different informants inform the Task Force of the existence of illegal activities and contraband being present in the trailer. The Courts have understandably been reluctant to accept police claims of exigent circumstances in these situations, for it ordinarily appears that whatever exigencies which thereafter arose were foreseeable at the time the arrest decision was made, when a warrant could have readily been obtained. Quick actions like this in failure to get a search warrant creates a situation where the warrant requirement serves no meaningful function and the enhanced privacy interest attaching to one's residence is illusory.

Those suspected of drug offenses are no less entitled to that protection of the warrant requirement of the Fourth Amendment than those suspected of non-drug offenses, United States v. Karo, 1014 S.Ct., at 3305 (1984). Whitley would argue that under the circumstances of his case, the Task Force had no authority to enter his home without either an

50

arrest or a search warrant.  The Motion to Suppress was due to have been granted because the contraband seized constituted "fruits of the poisonous tree", Wong Son v. United States, 83 S.Ct. 407 (1963).

The search warrant was not properly obtained or supported.

The search warrant in this case is State's Exhibit # 1 to the Suppression Hearing, (C-529-530).  There is no Affidavit supporting the application for the search warrant.  There is no receipt signed by the Judge acknowledging a return.  There is no indication on the face of the search warrant as to when it may be executed.  There is no Exhibit "A" for a diagram of the area or trailer to be searched.  The information used to describe the person or place was the information that the police had two (2) weeks prior to September 21st, 2001.  It should also be noted that the search warrant form included the name of Jerry Whitley.  In describing what to be searching for, the police simply included information that they had already obtained when they had entered the trailer earlier in the day.  It should be remembered that the Task Force was in

the trailer around 5:00 p.m. that date, yet they did not obtain the search warrant until 8:25 that night.

Officer Whitten had time to type up the search warrant. He certainly would have had time to type up an Affidavit to support the search warrant.  Failure to comply with Rule 3.8 of The Alabama Rules of Criminal Procedure, is impermissible, Ex parte Oswalt, 686, So.2d, 368 (Ala. 1996).  Rule 3.9 states that a search warrant shall issue on Affidavits sworn to before the issuing Judge.  There was no written Affidavit presented in this case.  Once again, the Task Force was apparently trying to get around any requirements of a written Affidavit to establish probable cause.  It should be noted that the Task Force could certainly provide the Judge with information as to what was in the trailer, since they had already searched it.  The failure of this search warrant to include the Affidavit in support of the application for the search warrant, made it impossible for Whitley's Attorney to determine whether or not the necessary elements for the probable cause and issuance of the warrant had been met and provided to the issuing authority.  The failure of the Affidavit to be presented at the Suppression Hearing is a material defect,

52

since all searches are presumed to be unreasonable and in violation of the Fourth Amendment to the <u>United States Constitution</u>, and <u>Murray v. State, 396 So.2d 125 (Ala. Crim. App. 1980)</u>.   Thus, Whitley argues that the Court should have granted the Motion to Suppress.

**ISSUE II:  The Trial Court erred in not allowing for the testimony of Dr. Hiatt concerning the amount of methamphetamine in the liquids mixtures which were used to establish an amount of more than 28 grams.  The scientific, unrebutted evidence of Dr. Hiatt, established less than 28 grams of methamphetamine, and therefore there was insufficient evidence to support a conviction of Trafficking.**

Whitley's Attorney filed numerous Motions in request for an independent analysis of the contraband involved in this case.  She obtained the services of a Dr. John Hiatt, Ph.D., who is employed by Quest Diagnostics, Inc. of Las Vegas, Nevada.  Eventually the Court granted a motion to provide samples of Items 9 and 15, as listed on the Forensic Sciences report to Dr. Hiatt (C-547-551).  Funds were made available for this analysis.  However, the Court denied a motion to continue the case in order for further

53

analysis to be done; the Court denied a motion to pay for these services; and the Court denied extraordinary expenses in order to transport Dr. Hiatt to Russell County to testify at the Trial. This put the Defense at a great disadvantage in explaining that such a mixture as described under Alabama Case Law, could be separated in order to determine the actual contents of the substance. Failure of the Court to allow this testimony was error.

Mr. Sherman Boswell testified that based upon these Exhibits and reports and the number of milliliters in the items, there was approximately three (3) grams of methamphetamine in the mixtures of the two (2) items which he tested. However, based upon the language in the Statute, he testified that there was approximately 500 grams of total liquid content in Item 9 and 1,435 grams in Item 15.

The Federal Courts have already recognized that science has improved to such a degree that there can be a determination as to the amount of an illegal substance found in a mixture. The Alabama Courts have begun to recognize the circumstances as set forth in Ex Parte Fletcher, 718, So.2d, 1132 (Ala. 1998). This case was

54

referred to during the trial of Whitley. There is a new definition describing "mixture", which the Court actually read to the Jury (R-254). It is seriously doubted if the Jury understood the distinction or what was being read to them in the Jury Charge. In fact, this really should be interpreted as a matter of Law, based upon the particular facts. In this particular case, if Dr. Hiatt had testified, he would have stated that there was approximately three (3) grams of methamphetamine in the evidence that was submitted against Whitley. He was not allowed to testify, based upon the Court's Rulings. However, his Exhibits were placed into evidence. This clearly establishes the fact that Whitley was not in possession of twenty-eight (28) grams of methamphetamine.

Fletcher recognized in footnote 3 the position taken by the Federal Sentencing Guidelines in regard to useable substances. United States v. Johnson, 999 F.2d 1192 (7th Cir. 1993), points out that waste water left over from the manufacturing process of crack cocaine should not be included in computing a Defendant's sentence. Whitley would argue that the amount of weight of the illegal substance should be based upon the useable mixture or

55

weight, and not the total gross weight or volume of a mixture. Science can make this distinction and therefore it should be used and allowed.

Sherwin Boswell, of the Alabama Department of Forensic Sciences noted in Item 4 that there was a separation of a liquid in the container and he described this as a bottom layer and a top layer. The top layer did not contain any prohibited substance. He did not weigh or make an indication as to the degree of methamphetamine in the bottom layer. Mr. Boswell also explained the process of making methamphetamine. This process basically describes the mixing of various substances, distilling processes, cooking, and then filtering of the actual methamphetamine from all of the other precursor drugs. He also explained how the liquids were poured through coffee filters in order to separate the methamphetamine from all of the other liquid. After the State had Mr. Boswell bring all of the various jars and substances which were seized at Whitley's trailer into Court, Whitley's Attorney asked him, "Did you find any methamphetamine in any of these samples that you seized that was in a form suitable for ingesting based on your experience and scientific knowledge?" He answered:

56

A. The residue found on the aluminum foil could have possibly been smoked, ingested, or used at any particular time;

B. Some of the residue from the filter papers might be ingested if extracted with an alcohol and then dried (R-193, 194).

These items are listed on the Forensic report, State's Exhibit 16, (R-531-532) as Items 2, 3 and 6. None of these items had enough weight to even be included in the report of Mr. Boswell. Thus, under the "useable theory" the most that Mr. Whitley could have been convicted of would have been possession.

As an analogy, Item 4, which is the bi-layered liquid, could be compared to in the old days when a bottle of milk had the milk at the bottom and the cream at the top. If you got a quart bottle, you would have certain portions which would be distinct and would be cream and the other portion would be the milk. Even if this liquid was shaken up, it would eventually separate again. The cooking and mixing process which Mr. Boswell explained to the Jury, shows that only a very small amount of methamphetamine is actually extracted from the liquid substances which are mixed together to produce that particular drug. Whitley would argue that only the illegal substance should be

considered in this case. A more ludicrous example of the Alabama Law of Mixture would be as follows:

> A man owned a lake with a million gallons of water in it and was out fishing on the lake. Thus he had constructive possession of all of the water in the lake. Rather than drinking beer, he was ingesting cocaine while he was fishing. The game warden showed up to check his fishing license. Where upon, the man emptied his plastic bag of cocaine into the lake, and the game warden observed this. Under Alabama Law, the man is now guilty of possessing a million gallons of cocaine.

Apparently someone in the Legislature recognized the particular problems associated with facts such as in the Whitley case. Statutes 13-A-12-217 and 218 were enacted by the Legislature and became effective five (5) days after Whitley was arrested. These Statutes deal with the unlawful manufacture of controlled substances and the operation of clandestine laboratory operations. These Statutes call for lesser sentences than 13-A-12-231, under which Whitley was convicted.

Therefore, Whitley would request that the Court either remand and/or render this case, with directions for proper sentencing under the possession Statute. Otherwise, remand the case for a new trial with Dr. Hiatt being allowed to testify and explain the scientific differences between a

58

homogeneous mixture and a mixture of separate components or elements.

**ISSUE III:** **There was insufficient legal evidence to support convictions for possession of methamphetamine and resisting arrest.**

The arrest and conviction of Whitley for possession of methamphetamine and resisting arrest was improper. As argued above, the contact with Whitley by the Task Force was illegal and everything thereafter should be excluded. Sergeant Price knocked on Whitley's trailer door and asked him to step out. When Whitley did this, apparently he had a wrench in his pocket. There is nothing against the law in having a wrench in one's pocket. Further, Price had testified that the only reason that he was there was to get the address of the trailer. Thus, there was no reason for Price to pat-down Whitley. Further, the wrench was in plain view. The act of Price in removing one (1) or two (2) wrenches out of the pockets of Whitley was improper and illegal. It seems amazing that the pulling of a wrench out of a pocket would result in a plastic bag containing methamphetamine to "fall" out of the pocket at the same time. However, this is what Price testified to. The

59

removal of the plastic bag from the pocket of Whitley was a violation of his Fourth Amendment Rights and all of the other cases related above in Issue I.

Officer Price then testified that he immediately proceeded to handcuff Whitley. There was no testimony that he said words to the effect "you are under arrest". Thus, there was an illegal arrest and one cannot be convicted of resisting arrest, when there is an illegal arrest.

Wherefore, Whitley would argue that both of these convictions should be rendered.

**ISSUE IV:** **The sentence of 35 years is cruel and unusual.**

As stated above, if Whitley had been arrested five (5) days later, on September 26th, 2001, he would have been charged under Section 13-A-12-217 or 218. It is believed that these Statutes had already been passed by the Legislature prior to Whitley's arrest on September 21st, and that for some reason an arbitrary effective date of September 26th, was set. Further, the Scientific evidence indicates that Whitley possessed less than twenty-eight (28) grams of methamphetamine. He had no prior Felony convictions. Thus, under the rational as set forth in Theresa Wilson v. State, 830 So.2d. 765 (Ala. Crim. App.

60

<u>2001)</u>, the sentence of thirty-five (35) years plus the five (5) years concurrent, is cruel and unusual. Therefore, Whitley would request that he be re-sentenced to a more fair and just sentence.

CONCLUSION

Whitley would contend that errors were made by the Trial Court.    It is recognized that the facts and circumstances surrounding this case are fairly complicated and confusing.    Particularly, when it comes to what a mixture is and is not.    It is obvious that in the manufacturing, cooking, distilling, or extraction of methamphetamine is a fairly complex process.    There are a number of by-products from this process.    A huge volume of the substances involved are not controlled substances.    In fact as of September 21st, none of these ingredients were controlled substances.    However, the chemical process resulted in a very small amount of methamphetamine.    This is what Whitley was convicted of possessing.    It is obvious that he did not possess twenty-eight (28) grams of methamphetamine.    Further, only an extremely small amount of this drug was "useable".

The search and seizure and arrest involved in this case were all illegal.    The Police Officers simply ignored the Fourth Amendment.    The Task Force Officers generated excuses not to obtain a legal search warrant.    These excuses were not even true in this case, because the Task

62

Force had already been to the same trailer two (2) weeks earlier in order to try and conduct a raid on that occasion. The September 21st, operation was simply a raid without a search warrant. That was the sole purpose for the Task Force to be dressed like they were and act like they did on that particular date. Everything that happened after their improper actions should be excluded and suppressed.

Whitley would request that the Court render this case or remand it to the Trial Court with directions to allow Mr. Hiatt to testify and/or that Whitley be determined to be guilty of only possession of methamphetamine.

RESPECTFULLY SUBMITTED,

*J. Michael Williams, Sr.*

Hon. J. Michael Williams, Sr., WIL103
Attorney for the Defendant
P. O. Box 1068
Auburn, Alabama  36831-1068
(334) 705-0200

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing Brief of Appellant upon the following counsel of record by placing a copy of same in the United States Mail, properly addressed and postage prepaid, on this the 6th day of August, 2003:

Hon. Bill Pryor,
Office of the Attorney General
11 South Union Street
Montgomery, Alabama  36103

Of Counsel

## ADVERSE RULINGS

| Record page # | Summary |
|---|---|
| C-30 | Denial of Bond Reduction. |
| C-60 | Denial of motion for extraordinary expenses. |
| C-61, 63 | Denial of motion for extraordinary expenses. |
| C-89 | Denial of Motion to Suppress. |
| C-104 | Denial of Motion to Compel transport of Samples. |
| C-122 | Denial of Motion to reduce bond. |
| C-155 | Denial of Motion for extraordinary expenses for lab analysis. |
| C-308 | Motion for continuance and additional funds for analysis, denied (C-329). |
| R-6 | Objection to "Subject" person not being identified and double-hearsay, overruled. |
| R-30 | Defense objected to testimony about hearsay from a subject informant, overruled. |
| R-31 | Defense continued objection, each was overruled and Defense requested a continuing objection, but the Court stated "You can keep objection all you want. Go right ahead." |
| R-46 | Defense objection to testimony about substances seized, overruled. |
| R-76 | Court denied the defendant's Motion to suppress. |
| R-87-93 | Court denied argument related to the actual amount of meth in the mixture. |
| R-120 | Objection to hearsay about confidential informant, overruled. |
| R-133 | District Attorney objected to testimony about a prior confidential informant, sustained. |
| R-151 | Defense objected to Exhibit 2, admitted. |
| R-194 | Defense asked witness if there was only 3 grams of meth in Exhibits 9 and 15, State objected, sustained. |
| R-217 | Objection to Exhibit 24, picture of camera, overruled. |
| R-234 | Defense asked Whitten why the defendant had not been charged with manufacturing, State objected, sustained. |
| R-240 | Defense moved for judgment of acquittal at close of State's case, denied. |

65