*Defendant's*
*Exhibit 1*  1 & 5

Quest Diagnostics Incorporated
Department: (Toxicology)
Address: 4230 Burnham Ave. Las Vegas, NV 89119
Phone: 702-733-7866
www.questdiagnostics.com


Quest
Diagnostics

# FAX COVER SHEET

DATE: 11-25-02                              TIME: 3:45 pm

TO: LAUREL FARRAR                          PHONE:
COMPANY: EZELL & CHANCEY                   FAX: 334-297-3842

FROM:                                      PHONE:
E-MAIL:                                     FAX:

RE:
COPY:
Number of pages including cover sheet: 5

Comment:

CONFIDENTIALITY NOTICE:

This fax transmission contains confidential information, belonging to the sender, which may include proprietary information of Quest Diagnostics. The information is intended only for the use of the individual identified above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this faxed information is strictly prohibited. If you have received this fax in error, please notify us by telephone immediately to arrange for return or destruction of the documents.

**AML**
American Medical Laboratories, Inc. ®

(702) 733-3790 • (800) 433-2750
www.amltx.com

| | AML ROUTE REFERRED BY | APL   7099 |
|---|---|---|
| PATIENT | | TOXICOLOGY MISCELLANEOUS ACCT |
| | ACCESSION NO | ATTN: TOXICOLOGY CLIENT SERVICE |
| EX | MED. RECORD NO | 4230 BURNHAM AVE. |
| COLLECTED 10/ 2000 | CHART NO | LAS VEGAS, NV 89119 |
| CESSIONED 10/23/2000 | SS NO | |
| COLOGY NO 0200305107 | | |

## TOXICOLOGY REPORT

TOXICOLOGY, MISCELLANEOUS

RESULTS: SPECIMEN: ITEM # 15, A CLOUDY LIQUID.

RESULT: METHAMPHETAMINE = 1.08 MG/ML.
EPHEDRINE AND PSEUDOEPHEDRINE IDENTIFIED.

LARREL FARRAR ESQ
EZELL & CHANCEY, L.L.P.
1200 8TH AVE
PHENIX CITY, AL 36867

PRINTED: 11/29/2000 15:29

Page  1  of

FORM NO. C1-035 (10/

AMERICAN MEDICAL LABORATORIES, INC.

| | | | Las Vegas, Nevada 89119 | Technical Director, Toxicology |
| | | | (702) 733-3790 · (800) 433-3750 | |
| | | | www.aml.com | |

| PATIENT | | | AML ROUTE | APL |
| | | REFERRED BY | TOXICOLOGY MISCELLANEOUS ROUT |
| SEX | | ACCESSION NO | ATTN: TOXICOLOGY CLIENT SERVICE |
| COLLECTED | | MED RECORD NO | 4230 BURNHAM DRIVE |
| ACCESSIONED | | CHART NO | LAS VEGAS, NV 89119 |
| COLOGY NO | | SS NO | |

## TOXICOLOGY REPORT

TOXICOLOGY, MISCELLANEOUS

  RESULTS: SPECIMEN: ITEM #9, A CLEAR LIQUID

          RESULT: METHAMPHETAMINE = 389 MG/ML.
                  EPHEDRINE AND PSEUDOEPHEDRINE IDENTIFIED.


  DARREL FARRAR
  EZELL & CHANCE    L.P.
  1200 8TH AVE
  PHENIX CITY AL 36867



CURRICULUM VITAE

JOHN E. HIATT, PH.D.

## GRADUATE

Occidental College, Los Angeles, California          1963
A. B. degree with honors in chemistry.

Yale University Graduate School, New Haven, Connecticut          1968
Ph.D. in organic chemistry.

## POSTDOCTORAL STUDIES

Department of Chemistry, Stanford University
Stanford, California 94304          1968-1970
Position: Postdoctoral Research Fellow in
Organic Chemistry

Clinical Laboratory, University of California
Medical Center, San Francisco, California 94122          1971-1973
Position: Postdoctoral trainee in Clinical Chemistry

## EMPLOYMENT

June 1976 - Present, Associated Pathologists Laboratories,
Inc., 4230 So. Burnham Ave., Suite 250, Las Vegas, NV 89107.
Position: Technical Director - Responsible for solution of
technical problems in all areas of the laboratory. Also
serve as Certifying Scientist and Technical Resource in the
Toxicology Department.

February 1973 - June 1976, Valley Clinical Laboratories,
74-040 El Paseo, Palm Desert, CA 92260.
Position: Clinical Chemist and Assistant Laboratory
Director - Responsible for methods, instrumentation and
quality control.

## OTHER

Qualified as an expert witness in the Eighth Judicial District
of the State of Nevada on the subject of analyses of drugs and
alcohol in biological fluids and interpretation of same.

# ASSOCIATED PATHOLOGISTS LABORATORIES
## FORENSIC LABORATORY
### STATEMENT OF QUALIFICATIONS

Date: 10/09/97

Name: John E. Hiatt, Ph.D.

Title: Technical Director

## EXPERIENCE IN THE FOLLOWING DISCIPLINES

| | | | |
|---|---|---|---|
| Controlled Substances | XXX | Blood Alcohol | XXX |
| Toolmarks | | Breath Alcohol | |
| Trace Evidence | | Arson Analysis | |
| Toxicology | XXX | Firearms | |
| Latent Prints | | Crime Scene Investigation | |
| Serology | | Clandestine Laboratory Response Team | |
| Document Examination | XXX | DNA Analysis | |

## EDUCATION

| Institution | Dates Attended | Major | Degree Completed |
|---|---|---|---|
| Occidental College, Los Angeles, CA. | 1963 | Chemistry | A.B. |
| Yale University Graduate School, Connecticut | 1968 | Organic Chemistry | Ph.D. |
| | | | |

## ADDITIONAL TRAINING / SEMINARS

| Course / Seminar | Location | Dates |
|---|---|---|
| Postdoctoral Research Fellow in Organic Chemistry | Department of Chemistry, Stanford University | 1968-1970 |
| Postdoctoral trainee in Clinical Chemistry | Clinical Laboratory, University of California Medical Center | 1971-1973 |

## COURTROOM EXPERIENCE

| Court | Discipline | Number of Times |
|---|---|---|
| Eighth Judicial District Court, Clark County, Nevada | Expert Witness to testify regarding the analysis of alcohol and controlled substance in biological samples | several |
| City of Las Vegas Municipal Court, Las Vegas, Nevada. | Expert witness concerning analysis of alcohol and drugs of abuse. | Several |

| State of Alabama<br>Unified Judicial System | **TRANSCRIPT PURCHASE ORDER**<br>**OF APPELLANT - CIVIL** | Appellate Case Number<br>(To be filled in by appellate court) |
|---|---|---|
| Form ARAP-1A       Rev. 8/91 | *(See Rules 10(b) and 11(a) of the Alabama Rules of Appellate Procedure)* | |

| APPELLANT | JERRY EUGENE WHITLEY |
|---|---|
| v.   APPELLEE | STATE OF ALABAMA |

| Civil Action Number | Trial Judge GEORGE R. GREENE | |
|---|---|---|
| Court Reporter LINDA WILSON | County RUSSELL | Date of Notice of Appeal 1/14/03 1/17/03 ORAL & WRITTEN |

**PART I. TO BE COMPLETED AND FILED WITH THE COURT REPORTER BY APPELLANT WITHIN 7 DAYS OF THE FILING OF THE NOTICE OF APPEAL.**

A. Request is hereby made to the reporter for a transcript of the following proceedings (give particulars):

NOTE: Exhibits are included in the clerk's record and need not be specified - see Rule 10(b)(1), A.R.App.p.

☑ Entire Transcript
☐ Testimony of Plaintiff
☐ Testimony of Defendant
☐ Testimony of Witness _____
☐ Testimony of Witness _____

☐ Oral Charges to the Jury
☐ Objection to Oral Charge
☐ Objection to Refused Requested Written
  Charge(s), Numbers _____
☐ Others: _____

NOTE: Unless the entire transcript is ordered, appellant must attach a statement of the issues to Pages 4 and 5.

B. **I CERTIFY** that I HAVE paid the Court Reporter the estimated cost of transcribing that part of the proceedings I have deemed necessary to be included in the record.

1/23/03    *[signature]*    334-297-2400
Date       Signature        Telephone Number

NOTE:   Upon Completion of PART I, Appellant should distribute pages as follows:

| * Pages 1, 2 and 3 - Court Reporter | Page 4 - Trial Court | Page 5 - Appellee | Page 6 - Retained by Appellant |
|---|---|---|---|

**PART II. TO BE COMPLETED BY COURT REPORTER ON SAME DATE TRANSCRIPT PURCHASE ORDER IS RECEIVED.**

| A. | Date Transcript Purchase Order Received | Estimated Completion Date |
|---|---|---|
| | Estimated Number of Pages          ) | Estimated Cost |

B. **I CERTIFY THAT** ☐ I HAVE ☐ I HAVE NOT (*check one*) been paid the estimated cost of the transcript.

_____   _____   _____
Date      Signature   Telephone Number

NOTE:   Upon Completion of PART II, Court Reporter should distribute pages as follows:

| * Pages 1 and 2 - Retained by the<br>Court Reporter | Page 3 - Transmitted to the Appropriate Appellate Court on<br>Same Date Transcript Purchase Order is Received. |
|---|---|

**PART III. CERTIFICATE OF COMPLETION OF REPORTER'S TRANSCRIPT.**

NOTE: This is to be completed by court reporter on date of filing of transcript in trial court. On the day of completion, this certificate must be forwarded to the appropriate appellate court (Page 2) and copies thereof shall be served on the clerk of the trial court and each of the parties.

I CERTIFY that I have this date completed and filed with the clerk of the trial court the original of a true and correct transcript of the evidence and matters designated by the parties. All pages are numbered serially in the upper right corner of the pages, prefaced by an index, and ending with the following number: _____

I CERTIFY that photocopies of this certificate are this date being served on the clerk of the trial court and each of the parties, along with a copy of the index (with copies of the transcript as ordered).

Dated this _____ day of _____, _____    _____
                                                Court Reporter

NOTE:   Upon Completion of PART III, Court Reporter should distribute pages as follows:

| * Page 1 - Retained by the Court Reporter | Page 2 - Transmitted to the Appropriate Appellate Court |
|---|---|

| * Distribution Code: | Page 1: White | Page 2: Blue | Page 3: Green | Page 4: Canary | Page 5: Pink | Page 6: Goldenrod |
|---|---|---|---|---|---|---|

# INDEX TO REPORTER'S TRANSCRIPT

Reporter's Transcript Order                                    1
Index                                                          2
Suppression Hearing                                          3-77
Caption (December 5, 2002)                                    78
Court's Introduction of Case to Jury Venire                 79-81
Challenges                                                   81-82
Motions                                                      83-92
Court's Opening Instructions to Jury                        93-100
Opening Statement by Mr. Landreau                          101-107
Opening Statement by Ms. Farrar                            107-112

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| For the State: | | | | |
| Chris McKinstry | 112-114 | 114-115 | | |
| Jody Williford | 115-117 | | | |
| Jim Price | 117-133 | 133-136 | 136 | |
| Melissa Kelly | 137-143 | | | |
| Sherwin Boswell | 143-181 | 181-194 | 195-197 | |
| Wayne Meadows | 198-204 | 204-206 | | |
| John Memmo | 206-211 | | | |
| Jason Whitten | 212-233 | 233-235 | | |

Charge Conference                                          236-240
Motion                                                     240-241

| For the Deft.: | | | | |
|---|---|---|---|---|
| Steve Moseson | 241-243 | 243-246 | 246 | |

Objections to Closing Arguments                            247-248
Jury Charge                                                248-267
Verdict                                                    267-271
Sentencing                                                 272-277
Reporter's Certificate                                       278

STATE OF ALABAMA

IN THE CIRCUIT COURT FOR THE COUNTY OF RUSSELL

TWENTY-SIXTH JUDICIAL CIRCUIT

CRIMINAL


STATE OF ALABAMA

    v.                    Case Nos. CC 02-186, 187, 188

JERRY E. WHITLEY,

       Defendant.
_____/


### SUPPRESSION HEARING

Before:

        Honorable George R. Greene
          Phenix City, Alabama - August 26, 2002


APPEARANCES:

        For the State:
          Buster Landreau, Esq.
          Chief Deputy District Attorney

        For the Defendant:
          Laurel W. Farrar, Esq.
          Phenix City, Alabama


Linda S. Wilson
Official Court Reporter

1    THE COURT:  State of Alabama versus Jerry

2  Whitley.

3    MS. FARRAR:  Defendant's here, Your Honor.

4    THE COURT:  State ready to proceed?

5    MR. LANDREAU:  State's ready, Your Honor.

6    MS. FARRAR:  Defense is ready, Your Honor.

7    THE COURT:  This is on a motion to suppress;

8  is that correct?

9    MS. FARRAR:  Yes, Your Honor.

10    MR. LANDREAU:  That's correct.

11    THE COURT:  Who would the State call as its

12  first witness?

13    MR. LANDREAU:  Your Honor, we'd ask that the

14  Rule be invoked.

15    THE COURT:  Would grant your motion.

16    MR. LANDREAU:  There's two over here that I

17  think the defense called.

18    (Brief pause.)

19    THE COURT:  What is sought to being

20  suppressed at this point?  What evidence are you

21  seeking to suppress?

22    MS. FARRAR:  Your Honor, I had filed a

23  suppression motion to suppress the arrest, any

24  statements, any seized contraband.  Suppress the

25  search warrant which was --

1    THE COURT:  And upon what grounds do you

2    base this motion?

3    MS. FARRAR:  That the search was -- the

4    arrest was in itself illegal because it was a

5    warrantless arrest and doesn't fall under any of

6    the exceptions.

7    THE COURT:  Who would the State call as its

8    first witness?

9    MR. LANDREAU:  Call Jim Price as our first

10   witness.

11                    JAMES PRICE

12        was sworn and testified as follows:

13                 DIRECT EXAMINATION

14   BY MR. LANDREAU:

15   Q    State your name, please, sir?

16   A    James Price.

17   Q    Where are you employed, Mr. Price?

18   A    I'm a sergeant with the Harris County Sheriff's

19        Department.

20   Q    And are you assigned to any other organization?

21   A    I'm currently assigned to the Metro Narcotics

22        Task Force.

23   Q    And as part of your duties with the Metro

24        Narcotics Task Force, did you investigate some

25        information that your agency received on

```
 1        September 21st, 2001, concerning Rusk Trailer

 2        Park?

 3   A    Yes, sir.

 4   Q    How did y'all receive that information?

 5   A    Agent Whitten had received information from

 6        Officer Ricky Lawrence that he had a subject that

 7        had information on a meth lab at that location.

 8   Q    Do you recall exactly what the subject told you

 9        in reference to this methamphetamine lab?

10            MS. FARRAR:  Objection.  Who is the

11        subject?

12            MR. LANDREAU:  Judge, I don't think we're

13        required to disclose this.  The subject was not

14        involved in any purchase and was not involved

15        directly in any transaction with the Defendant.

16            MS. FARRAR:  I would object on double

17        hearsay.

18            THE COURT:  I would overrule the objection,

19        but I will allow it to come in only to show what

20        this officer did, not to prove the truth of the

21        matter asserted.

22            MR. LANDREAU:  Certainly, Your Honor.

23   Q    What information did y'all receive from this

24        informant of Sergeant Lawrence's?

25   A    That the subject known as Jerry Whitley was
```

1    manufacturing meth at one of the trailers in Rusk

2    Trailer Park.

3  Q  Did you receive any information concerning

4    whether or not Mr. Whitley was armed or unarmed

5    or whether or not there was anything unusual

6    about this trailer?

7  A  The information was the trailer was

8    booby-trapped, and there were supposed to be

9    several weapons also at the trailer.

10 Q  Now, at that point, based on the information that

11    the informant had given you, did you feel you had

12    sufficient information to obtain a search

13    warrant?

14 A  I didn't think we had sufficient information.

15 Q  Specifically, did you have an address --

16 A  No, sir.

17 Q  -- where this was supposed to be taking place?

18 A  The informant could not provide an address for

19    Mr. Whitley.

20 Q  Did he provide a description of the trailer

21    itself?

22 A  He described some of the vehicles there.  I

23    believe he described the trailer, but mostly he

24    described the vehicles that should be at the

25    trailer.

1   Q   Did anyone from Metro Narcotics Task Force go to

2        Rusk Trailer Park after receiving this

3        information?

4   A   Yes, sir.

5   Q   Who all went?

6   A   It was myself, Agent Whitten, and Agent Memmo.

7   Q   And what was y'all's purpose in going?

8   A   We were trying to locate the trailer park.  Also,

9        see if there was any activity at the trailer and

10       see if we could smell a chemical smell, based on

11       the informant's information.  If the meth lab was

12       running, we should smell chemicals.

13   Q   So you basically were following up trying to

14       verify what the informant had given you?

15   A   Yes, sir.

16   Q   Now, when you went to Rusk Trailer Park, did

17       y'all locate a trailer that had vehicles parked

18       in front of it that corresponded to those the

19       informant told you?

20   A   Yes, sir, we did.

21   Q   At that point did you know for sure who resided

22       in that trailer or who was renting that trailer?

23   A   No, sir, not at that point.

24   Q   What did y'all do after you located these

25       vehicles?

9

| 1 | A | We set up surveillance and watched the trailer |
| 2 | | for a few minutes, and then we observed a subject |
| 3 | | come out and walk towards one of the vehicles. |
| 4 | Q | Did you later identify that subject? |
| 5 | A | Yes, sir. |
| 6 | Q | And who was that? |
| 7 | A | His name was Steve Moseson. |
| 8 | Q | Did anyone approach Mr. Moseson? |
| 9 | A | Yes, sir.  All three agents approached him. |
| 10 | Q | Did you notice anything unusual about his person, |
| 11 | | demeanor, appearance? |
| 12 | A | As soon as we walked up to him, he kind of -- he |
| 13 | | had a shaken look on his face.  He had a smell -- |
| 14 | | we could smell chemicals on him.  At that time we |
| 15 | | patted him down for officer safety. |
| 16 | Q | Sergeant Price, have you received any training on |
| 17 | | methamphetamine labs? |
| 18 | A | Yes, sir, I have. |
| 19 | Q | Do those labs produce certain distinctive odors? |
| 20 | A | Yes, sir. |
| 21 | Q | And have you been trained to recognize those |
| 22 | | odors? |
| 23 | A | Yes, sir. |
| 24 | Q | The odors that were coming from the person from |
| 25 | | Moseson, were they, in fact, the odors associated |

1       with a methamphetamine lab?

2   A   Yes, sir.

3   Q   And you said he was patted down for officer

4       safety?

5   A   That's correct.

6   Q   Was any contraband located on him?

7   A   Yes.  A small plastic bag containing

8       methamphetamine.

9   Q   You've seen methamphetamine before?

10  A   Yes, sir.

11  Q   And based on your experience and training, the

12      substance you recovered from Moseson was, in

13      fact, methamphetamine?

14  A   Yes, sir.

15  Q   What did the agents do next?

16  A   Placed Mr. Moseson under arrest.

17  Q   For what?

18  A   Possession of methamphetamine.

19  Q   Then what did the officers do?

20  A   At that time we approached.  Myself and Agent

21      Whitten went to the front door of the trailer.  I

22      had Agent Memmo go to the rear door.  I knocked

23      on the door.

24  Q   And at that time what was your purpose in going

25      to the door and knocking?

11

```
 1   A    To see who lived at this trailer.

 2   Q    Were you trying to verify that this was the

 3        trailer of Jerry Whitley?

 4   A    Yes, sir, I was.

 5   Q    Did someone answer the door?

 6   A    Yes, sir.  A female answered the door.

 7   Q    Do you now know who that female was?

 8   A    Yes, sir.  Her name was Caylene White.

 9   Q    Did you know her at the time?

10   A    No, sir.

11   Q    And when Ms. White answered the door, was there

12        any conversation between you and she or any other

13        person with you?

14   A    I asked her if Jerry was home, but the first

15        thing that struck me when the door opened was the

16        smell that came out and hit us.

17   Q    What smell was that?

18   A    A strong ether smell.

19   Q    And is ether associated in any way with the

20        production of methamphetamine?

21   A    Yes, sir.

22   Q    So this was a smell consistent with a

23        methamphetamine lab?

24   A    Yes, sir.

25   Q    You were telling me once you smelled this odor,
```

1      what, if anything, transpired between you and any

2      other officer and Ms. White?

3   A  I asked Ms. White if Mr. Whitley was there or if

4      Jerry was there.  She said, yes, he is.  I said

5      can I speak to him.  At that time she turned and

6      said, Jerry, they want to speak to you, and Mr.

7      Whitley stepped out the door.

8   Q  Now, when you approached this trailer, how were

9      you dressed?

10  A  I was wearing my Metro raid vest and also had my

11     side arm on.

12  Q  Does this raid vest have the words Metro

13     Narcotics on it?

14  A  Yes, sir.  It's a black mesh vest with a star on

15     the front that says Metro Narcotics Task Force,

16     and on the back is a big patch that says Metro

17     Narcotics Agent.

18  Q  So you were wearing items of clothing that

19     clearly identified you as a law enforcement

20     officer?

21  A  Yes, sir.

22  Q  You said she turned and told, Jerry, they want to

23     talk to you?

24  A  That's correct.

25  Q  And did someone else come to the door at that

13

| | | |
|---|---|---|
| 1 | | point? |
| 2 | A | At that time Mr. Whitley came to the door. |
| 3 | Q | Now, was this the first time you had ever met Mr. |
| 4 | | Whitley? |
| 5 | A | No, sir. |
| 6 | Q | How did you know Mr. Whitley? |
| 7 | A | I've known Mr. Whitley since he was a child.  We |
| 8 | | grew up in the same neighborhood. |
| 9 | Q | Is Mr. Whitley in the courtroom today? |
| 10 | A | Yes, sir, he is. |
| 11 | Q | Would you point him out to us? |
| 12 | A | He's sitting at the defense table with the blue |
| 13 | | shirt. |
| 14 | Q | Now, was that the same man who came to the door |
| 15 | | of the trailer on the night of September 21st, |
| 16 | | 2001? |
| 17 | A | Yes, sir, it is. |
| 18 | Q | Once Mr. Whitley came to the door, what happened? |
| 19 | A | He was very excited.  I asked him to step out to |
| 20 | | talk to him and when he stepped out, I noticed he |
| 21 | | had a big wrench in his pocket, so I removed the |
| 22 | | wrench and when I removed the wrench, a bag of |
| 23 | | methamphetamine fell on the ground.  At that time |
| 24 | | I grabbed him by the arms and told him to calm |
| 25 | | down because he started to like run in place. |

14

```
 1    Q    Let me stop you.  Did he appear nervous when he
 2         answered the door?
 3    A    Very nervous.
 4    Q    And you noticed that he had a wrench, a large
 5         tool or wrench in his pocket?
 6    A    Yes.
 7    Q    Why did you remove the wrench?
 8    A    Because I thought -- I saw that as a possible
 9         weapon.
10    Q    And when you removed the wrench, you said a bag
11         of methamphetamine fell out?
12    A    Yes, sir.
13    Q    And you've seen methamphetamine before?
14    A    Yes, sir, I have.
15    Q    And, in fact, that substance was sent to a lab
16         and verified to be methamphetamine; is that
17         correct?
18    A    That's correct.
19    Q    At that point what did you do?
20    A    I grabbed him by his arms because, like I said,
21         he started to try to run, and he turned towards
22         the trailer and said set it off, blow it up.
23         Caylene, you know what you got to do.  And then I
24         finally cuffed him and put him on the back of a
25         car that was there.
```

1    Q    Now, y'all had received some information from

2         this informant about the trailer and certain

3         things being rigged a certain way inside; is that

4         correct?

5    A    The information we had was that he had some type

6         of booby-trap that he could set off.

7    Q    And when he began to yell blow it up, what did

8         you feel like that referenced?

9    A    I felt like that he had meant to set off the

10        booby-trap to blow up the trailer.

11   Q    Now, this particular trailer, does it sit in a

12        trailer park, or does it sit on a piece of

13        property by itself?

14   A    It sits in a trailer park.

15   Q    How close are the nearest trailers?

16   A    They're just a few feet apart.

17   Q    Can you give us something in the courtroom that

18        would be about the same distance?

19   A    They're probably from about here to the bench

20        behind Mr. Whitley.  Only about a few feet, 20.

21   Q    Are there trailers on either side of this

22        particular trailer?

23   A    On the right and left side, and also in the

24        front.

25   Q    Did you observe whether or not any of those

1        trailers appeared to be occupied?

2    A   Yes, sir.

3    Q   Sergeant, in your opinion, had this trailer been

4        blown up, would it have endangered any of the

5        people in that trailer park?

6    A   In my opinion, yes, sir, it would have.

7    Q   Would it have endangered, considering where you

8        and the other officers were standing, would it

9        have endangered you?

10   A   Yes, sir.

11   Q   What did the officers do when Mr. Whitley began

12       screaming blow it up?

13   A   At that time Agent Whitten went in and removed

14       Ms. White from the trailer.  About the same time

15       Agent Memmo had come back around front, and once

16       Ms. White was placed into custody, Mr. Whitley

17       then started yelling, Wayne, set it off.  Wayne,

18       blow it up.  You know what you got to do.  Wayne,

19       do it.  And at that time Agents Whitten and Memmo

20       ran back in the trailer and came out with a

21       subject later identified as Wayne Meadows.

22   Q   So there were two other subjects in the trailer,

23       Ms. White and a guy named Meadows?

24   A   That's correct.

25   Q   And after Ms. White was secured, the Defendant

1        began to yell blow it up, Wayne?

2    A    That's correct.

3    Q    Officers went in and secured Wayne Meadows?

4    A    That's correct.

5    Q    Did they bring him out of the trailer?

6    A    Yes, they did.

7    Q    Let me ask you, Sergeant, at that point was a

8        search warrant secured?

9    A    The trailer was secured.  All subjects were

10        placed out front till we got the police vehicles

11        to contain them, and then a search warrant was

12        obtained.

13    Q    And the search warrant was then executed?

14    A    Yes, sir.

15    Q    Mr. Whitley had already been arrested, I take it,

16        for possession of methamphetamine?

17    A    That's correct.

18    Q    Okay.  And that location is in Russell County?

19    A    Yes, sir, it is.

20            MR. LANDREAU:  Ms. Farrar may have some

21        questions for you.

22                    CROSS-EXAMINATION

23    BY MS. FARRAR:

24    Q    Sergeant Price?

25    A    Yes, ma'am.

1    Q    Good afternoon.

2    A    Good afternoon.

3    Q    So Mr. Whitley had already been arrested for

4         methamphetamine, but his rights weren't read to

5         him, were they?

6    A    At that time we had no time to read him his

7         rights.  We were worried about the trailer

8         blowing up.

9    Q    If you know, did Mr. Whitley have his rights read

10        to him at all?

11   A    I believe once he got transported to the

12        sheriff's department, he would have had his

13        rights read to him if he was questioned.

14   Q    But you weren't present at that time; correct?

15   A    I don't recall, no, ma'am.

16   Q    So it's your testimony that when Mr. Whitley was

17        removed from the trailer that Wayne Meadows and

18        Caylene White were still inside; correct?

19   A    Yes, ma'am.

20   Q    And you said, in your opinion, to not go in would

21        have endangered other trailers in the trailer

22        park, but how many feet was the nearest trailer

23        away?  You stated from where you are to the bench

24        behind me.  That's probably at least 25 feet,

25        isn't it?

1   A   Approximately, yes.

2   Q   Might even be 50 feet, might it?

3   A   I don't think it's 50.  It's not that far.  I

4       mean, they're put in pretty tight.

5   Q   And your testimony is that the wrench fell out of

6       Mr. Whitley's pocket as you were pulling him out

7       of the trailer?

8   A   No.  I asked him to step out of the trailer.  He

9       had a wrench in his pocket.  I pulled the wrench

10      out of his pocket and when I did that, then the

11      methamphetamine fell on the ground.  He was

12      already jumping around kind of real nervous.

13  Q   So Mr. Whitley fell out of the trailer when the

14      wrench came out?

15  A   No.  He stepped out on his own.  I asked him to

16      step --

17  Q   Was that before or after you pulled the wrench

18      out of his pocket?

19  A   No.  He had already stepped down, and that's when

20      I took the wrench out of his pocket.

21  Q   And was he laying on the ground at that point?

22  A   He was never on the ground.

23  Q   Did you personally have any words with Caylene

24      White before she came out of the trailer?

25  A   I asked her if Jerry was there, and she turned

```
1        and said, Jerry, they want to talk to you.  Those

2        were the only words I had with her.

3   Q    And then what'd she do?

4   A    She turned and said, Jerry, they want to talk to

5        you, and then that's when Mr. Whitley stepped

6        out.

7   Q    He stepped out of the trailer?

8   A    Yes, he did.

9   Q    Do you remember an outside door?

10  A    An outside door?  He stepped out the door, came

11       down the steps.  First words were hey, Jim.

12  Q    So he acknowledged that he knew you; correct?

13  A    That's correct.

14  Q    What was the alleged methamphetamine contained in

15       that fell out of his pocket?

16  A    It was in a little piece of plastic.

17  Q    Did you struggle at all at the door?

18  A    I didn't struggle until I pulled the wrench --

19  Q    Yes or no?

20            MR. LANDREAU:  Judge, I object.  He's trying

21       to answer.

22            THE COURT:  Well, if he wants to give any

23       further response, you may bring it out on

24       cross-examination of this witness or redirect.

25       You may proceed, Ms. Farrar.
```

1   Q   Did you struggle at all at the door?

2   A   Not at the door.

3   Q   How long in minutes or hours were you watching

4       the residence in your surveillance?

5   A   It wasn't but a few minutes.  I'm not sure.

6   Q   Shorter than 10 minutes?

7   A   May have been 10, 15 minutes.

8   Q   What time of day was it that you first went to

9       the trailer?

10  A   I don't recall the exact time.  It was in the

11      afternoon.

12  Q   Was it before 5:00?

13  A   I don't recall.  I think it was after, but I'm

14      not sure.  It might have been right at five or a

15      little after.  I'm not sure.

16  Q   Did you personally talk to Sergeant Lawrence

17      concerning the informant?

18  A   No, ma'am.

19  Q   Have you talked to him since concerning the

20      informant?

21  A   No, ma'am, I haven't.

22  Q   Did you prepare a warrant before you went to the

23      Whitley house?

24  A   A warrant, as in a search warrant?

25  Q   Correct.

1   A    No, ma'am.  We didn't have an address.

2   Q    Did you have a form that you were going to use as

3        soon as you could fill in the blanks?

4   A    We had no search warrant whatsoever.  We went out

5        there under -- we went to pull surveillance on it

6        to see if there were any -- actually, to find the

7        trailer and then to see if there's any activity.

8   Q    Did you personally arrest Steve Moseson?

9   A    Did I actually arrest him?  I was present when he

10       was arrested, but I don't think I actually placed

11       the cuffs on him.

12  Q    Did you read him his rights?

13  A    At that time?  No, we didn't read him his rights.

14  Q    Did you personally observe the pat-down?

15  A    Yes.

16  Q    Did the person patting Moseson down reach into

17       any pocket?

18           MR. LANDREAU:  Judge, I object.  It's

19       irrelevant to this Defendant as to how some other

20       defendant was searched.  This Defendant has no

21       standing.

22           THE COURT:  Well, I think this was brought

23       out on direct examination that he was arrested

24       and it's part of -- I don't know that this

25       Defendant would have standing to challenge that

1     arrest.  It's part of the transaction that was

2     used to lead to the entry into the trailer, so

3     I'll overrule your objection.

4  Q   You can answer the question.

5  A   When he was patted down, I believe they did go in

6     his pocket.

7  Q   Did you -- withdraw.  Where did Moseson go when

8     he came out of the building, if anywhere, before

9     he went to the vehicle?

10  A   He came straight out and started walking straight

11     to the vehicle.  It's a red pickup truck.

12  Q   Where was the red pickup truck parked in relation

13     to the trailer?

14  A   Right on the street, right by the -- there were

15     several cars.  It was parked just kind of in the

16     driveway but facing away from the trailer, facing

17     north.

18  Q   So was he actually standing on the property or on

19     the road?

20  A   He was on the property.

21  Q   Did Metro Narcotics officers approach him by

22     walking onto the property?

23  A   Yes, we sure did.

24  Q   How many feet was it from the road, if you know?

25  A   It was like half on the road and half in the

1          street.

2    Q    I don't understand what you mean.

3    A    He wasn't all the way in the road and he wasn't

4         all the way in the yard.  He was like parked

5         right at the front of the driveway parallel.

6    Q    Was he actually standing on the --

7    A    Property?

8              THE COURT:  Well, Ms. Farrar, this is a

9         motion to suppress, not a discovery hearing.  If

10        you'll proceed on the issues involving your

11        motion to suppress.

12   Q    You testified that Moseson acted nervous and

13        looked toward the trailer.  Was there any other

14        action that he did that conveyed nervousness, in

15        your opinion?

16   A    He was --

17   Q    That you observed, I'm sorry?

18   A    He was just extremely nervous when we approached.

19   Q    Well, did his face turn red?

20   A    No, it kind of went white.

21   Q    He went white.  Did he shake?

22   A    Yes, he was shaking.

23   Q    Did he put his hand in his pocket?

24   A    I don't remember if he put his hand in his pocket

25        or not.

25

1   Q    Did you observe any other people that were out

2        when you approached Moseson?

3   A    No.  He was the only one that came out the

4        trailer.

5   Q    Were the windows open, if you remember?

6   A    On the trailer?

7   Q    Yes.

8   A    No, not that I noticed.

9   Q    Do you remember a storm door on the front of the

10       trailer?

11  A    No, ma'am, I don't remember that.  I know there

12      is, but I don't remember if it was open or

13      closed.

14  Q    Did you notice that there might have been a car

15      with a hood open or a vehicle with a hood open?

16  A    There were several cars in the yard.  I'm not

17      sure if one of them had the hood up or not.

18  Q    Did you personally take a statement from any of

19      the defendants?

20  A    I don't recall.  I don't think I did.

21  Q    What happened after the wrench was removed and

22      the seized item fell out of Mr. Whitley's pocket?

23  A    He tried to run from the trailer and that's why I

24      latched onto his arm, and he spun.  And then I

25      grabbed his other arm and I kind of held him, and

1        he was running in place all the time, yelling at

2        Caylene to blow it up.

3   Q   Did you hear any response from inside the trailer

4        to that?

5   A   I could see her at the door.  She was just

6        standing there, and that's when Agent Whitten

7        went and grabbed her.

8   Q   Agent Whitten entered the house?

9   A   He went upstairs, grabbed her from the door.  I

10       don't know if he went in.  He may have, but he

11       pulled her from the trailer.

12  Q   Was the wrench in the front or the rear pocket?

13  A   I believe it was a right front pocket.

14  Q   Did you go back in the trailer after you got

15       Caylene out?

16  A   The only time I went back in the trailer, they --

17       once they had removed Mr. Meadows, they had them

18       out there, and I didn't know if anybody else was

19       in there.  I asked was anybody else in the

20       trailer, I asked the subjects, and nobody said

21       anything, so I myself went in and the chemicals

22       were so strong, I made it to the kitchen and I

23       tried to open the back door.  I later found out

24       that they were screwed shut with steel screws.  I

25       couldn't breath anymore, and then I came back out

1    of the trailer.

2   Q    Where was the Metro -- where were the Metro

3        vehicles parked during this surveillance?

4   A    We were down from the trailer.  Probably one or

5        two trailers down.

6            MS. FARRAR:  That's all I have at this time,

7        Your Honor.

8            MR. LANDREAU:  Just a couple of questions.

9                    REDIRECT EXAMINATION

10  BY MR. LANDREAU:

11  Q    Did Mr. Whitley make any statements in your

12       presence?

13  A    About the methamphetamine?

14  Q    Yes.

15  A    Basically, he said -- you know, he was just

16       making general statements.  He was rambling the

17       whole time, and he said he knew he messed up and

18       stuff like that.  But as far as a written

19       statement or anything, no.

20  Q    These oral statements that he made, was it in

21       response to any questions that you or any other

22       officer asked?

23  A    No.

24  Q    Okay.

25           MR. LANDREAU:  No further from this

1    officer.

2        THE COURT:  Do you have anything further

3    from this witness, Ms. Farrar?

4        MS. FARRAR:  No, not at this time, unless

5    it's in rebuttal.

6        THE COURT:  All right.  You may step down.

7    Who is the State's next witness?

8        THE WITNESS:  Thank you, Your Honor.

9        MR. LANDREAU:  Judge, may this witness be

10   excused?

11       THE COURT:  He may be excused, but be where

12   we can call you in case we have to have you back.

13       THE WITNESS:  Yes, sir.

14       THE COURT:  Thank you.

15       THE WITNESS:  Thank you.

16       MS. FARRAR:  Your Honor, I have just

17   realized that Caylene White, whom I have

18   subpoenaed, is not here today.

19       THE COURT:  Well, I mean, you know, it's a

20   little late to be informing the Court of that.

21       MS. FARRAR:  Your Honor, with apologies, we

22   had just started the testimony when I realized

23   it.  I would just request that a deputy, at the

24   convenience of the Court, be sent to get her.  I

25   sent my subpoenas out, I believe, Friday.

1   Thursday or Friday.

2        THE COURT:  Is there any particular reason

3   why you waited to send them out?  Have they been

4   served?  The Court can't order an attachment if

5   she's not been served to be here.

6        MS. FARRAR:  I don't have that information,

7   Your Honor.

8        THE COURT:  Well --

9        MS. FARRAR:  I could get it on a break.

10       THE COURT:  Yeah.  I cannot order it unless

11   she has actually been served.

12       Who is the State's next witness?

13       MR. LANDREAU:  Agent Whitten.

14                    JASON WHITTEN

15       was sworn and testified as follows:

16                 DIRECT EXAMINATION

17   BY MR. LANDREAU:

18   Q   State your full name, please, sir?

19   A   Sergeant Jason Whitten.

20   Q   You're employed with who?

21   A   Phenix City Police Department.

22   Q   And how are you assigned?

23   A   I'm currently assigned to the Metro Narcotics

24       Task Force.

25   Q   Were you so assigned back on September 21st of

1       2001?

2    A  Yes, sir.

3    Q  On that day, Sergeant Whitten, did you receive

4       some information concerning a methamphetamine lab

5       in Rusk Trailer Park in Phenix City?

6    A  Yes, sir.

7    Q  And how did you receive that information?

8    A  From Sergeant Lawrence from the Phenix City

9       Police Department had called me.

10   Q  Did you call him back?

11   A  Yes, sir.

12   Q  And was there some other person you were talking

13      to in addition to Sergeant Lawrence?

14   A  Yes, sir.  There was a subject in his office.

15   Q  Now, what information did that subject give you?

16          MR. LANDREAU:  And, Your Honor, for the

17      record, we're introducing it for the same

18      purpose, to show the actions of the officers, not

19      for the truth of the matter.

20          THE COURT:  It would not be allowed in to

21      prove the truth of the matter asserted.

22          MS. FARRAR:  Still I'd renew my objection,

23      Your Honor.

24          THE COURT:  Okay.

25   A  Sergeant Lawrence told me what the informant said

```
 1            to him and then I got on the phone with the

 2            informant, and the informant went over the same

 3            information that Sergeant Lawrence had told me.

 4            He had stated --

 5    Q    Let me ask you this.  Did the informant give you

 6            a location for this lab?

 7    A    Yes, sir.

 8    Q    What did he tell you?

 9    A    He said it was about three quarters away down

10            Rusk Drive on the right, excuse me, on the left.

11            Described the yawning that was on the trailer and

12            the vehicles in the driveway.

13            MS. FARRAR:  Again, I object, Your Honor,

14            hearsay.

15            THE COURT:  Court has previously ruled that

16            it would allow this testimony in only to show the

17            reason for the officer taking his action, not to

18            prove the truth of the matter asserted, and the

19            same ruling will apply.

20            MS. FARRAR:  So I will be allowed a

21            continuing objection, Your Honor?

22            THE COURT:  Yeah.  You can keep objecting

23            all you want.  Go right ahead.

24    Q    So the informant gave you an approximate location

25            of the trailer and described some vehicles that
```

1     would be located there?

2   A   Yes, sir.

3   Q   Specifically, did the informant give you an

4     address?

5   A   No, sir.

6   Q   Did he give you the name of an occupant or the

7     person who was renting the trailer?

8   A   Yes, sir.

9   Q   And who was that?

10   A   Jerry Whitley.

11   Q   Now, did he give you any information as to

12     whether or not there were drugs located there?

13   A   Stated that there was a cook going on.

14   Q   Was he able to tell you how long it had been?

15   A   He said it was that day.

16   Q   And do you recall what time this was when you

17     spoke with this person?

18   A   Probably around noon, 1:00.  Maybe 2:00.

19   Q   Now, at that point, based on your experience and

20     training, did you feel like you had sufficient

21     evidence to obtain a search warrant?

22   A   No, sir.

23   Q   So what did you do?

24   A   Went to the trailer park and set up surveillance

25     on the trailer.

33

1   Q   What was the purpose of the surveillance?

2   A   Just to see if we could observe subjects coming

3      and going, observe odors of methamphetamine labs.

4   Q   Were you trying to confirm any of the information

5      that the informant had given you?

6   A   Yes, sir.

7   Q   And were you attempting to determine a street

8      address for this property?

9   A   Yes, sir.

10   Q   Or at least a better physical address?

11   A   Yes, sir.

12   Q   Now, do you recall what time you and the other

13      officers got to this area?

14   A   It was probably around 2:30 in the afternoon.

15   Q   And do you recall how long y'all set up

16      surveillance?

17   A   I would say 15, 20 minutes.  We weren't there

18      very long.

19   Q   And what happened after 15 or 20 minutes?

20   A   I observed a red-haired subject, later identified

21      as Steve Moseson, exit the trailer and walk to a

22      vehicle parked in the roadway.

23   Q   Now, this particular trailer, are there other

24      trailers around it?

25   A   Yes, sir.

1    Q    And how close, in your opinion, are the other

2         trailers?

3    A    In my estimation of it, probably two-and-a-half

4         to three car widths, not lengths, apart.

5    Q    Were there vehicles parked around this trailer?

6    A    Yes, sir.

7    Q    Now, this particular trailer, is it located on a

8         separate piece of land, or what's commonly called

9         a trailer park?

10   A    No, it's a trailer park.

11   Q    How many trailers all total do you think are in

12        there?

13   A    Maybe a hundred.  It's a pretty good size trailer

14        park.

15   Q    Did there appear to be other people present in

16        the trailer park?

17   A    Yes, sir, there was.

18   Q    And when you approached Mr. Moseson, where was he

19        standing?

20   A    I observed him exit the trailer and walk toward a

21        small pickup truck that was parked, I guess, in

22        the roadway and on the property, maybe the

23        easement, perpendicular to the trailer facing

24        toward the dead end of the street.  He --

25   Q    Let me stop you and ask you, the trailer he came

|   |   |   |
|---|---|---|
| 1 |   | out, did it approximately match the description |
| 2 |   | given by the informant? |
| 3 | A | Yes, sir. |
| 4 | Q | Did it have some vehicles around it? |
| 5 | A | Yes, sir. |
| 6 | Q | And did they match up with what the informant had |
| 7 |   | told you? |
| 8 | A | Yes, sir. |
| 9 | Q | Okay.  Did you approach Mr. Moseson? |
| 10 | A | Yes, sir, I did. |
| 11 | Q | Notice anything unusual about him? |
| 12 | A | Yes, sir.  When I first approached Mr. Moseson, I |
| 13 |   | told him who I was, and he became very nervous, |
| 14 |   | and at one point I thought he was going to |
| 15 |   | faint.  He was kind of queasy, acting like he was |
| 16 |   | about to be sick or faint.  I asked him was Jerry |
| 17 |   | inside the trailer, and he looked at one of the |
| 18 |   | windows and stared at the window, and I observed |
| 19 |   | him looking at what I thought was one of those |
| 20 |   | little infrared cameras.  He looked at the window |
| 21 |   | and reached toward one of his pockets.  At this |
| 22 |   | point, along with the -- he had a strong odor of |
| 23 |   | it was either ether or some type of solvent on |
| 24 |   | his person, he was detained. |
| 25 |   | I checked his pocket that he had reached |

1          for.  I did a pat-down search of him.  I felt

2          what appeared to be to me, in my experience, is a

3          plastic bag in his pocket.

4   Q   Let me stop you right there.  You said he was

5          looking towards what you took to be a camera?

6   A   Yes, sir.

7   Q   Had the informant given you any information about

8          surveillance equipment being there?

9   A   Yes, the informant did.

10  Q   Later on were you able to confirm whether or not

11         there were surveillance cameras?

12  A   Yes, sir.

13  Q   And where were those cameras situated?

14  A   There was --

15        MS. FARRAR:  Objection.  That's not in

16         evidence.  That would be from after the search

17         warrant.

18  Q   Well, let me ask it this way.  Were the cameras

19         visible from outside the trailer?

20  A   Yes, sir.

21  Q   Where were the cameras located?

22  A   They were mounted in the windows, one facing kind

23         of at an angle out one of the side windows.

24  Q   Would that have given someone -- that camera,

25         would it have been facing the roadway?

1   A   Yes, sir, if somebody had been watching it.

2   Q   Let me ask you.  Had the informant given you any

3       information about anything unusual about this

4       trailer as far as how it was rigged?

5   A   Yes, sir.

6           MS. FARRAR:  Objection.

7   Q   What had the informant told you?

8           THE COURT:  I'm going to sustain the

9       objection.  I don't think that's necessary at

10      this point, and especially since this is

11      apparently hearsay testimony that's given to

12      Officer Lawrence, not to this officer.  Is that

13      correct?

14          MR. LANDREAU:  Judge, my understanding --

15      let me ask that because that's not --

16  Q   Did the informant give this information directly

17      to you or to Sergeant --

18  A   Yes, sir.  I spoke on the phone with the

19      informant while he was in Sergeant Lawrence's

20      office.

21          MS. FARRAR:  I would object for relevance.

22          MR. LANDREAU:  Judge, it goes to the state

23      of mind of the officers in determining whether or

24      not they felt like they had exigent circumstances

25      and/or an emergency situation.

1      THE COURT:  Well, I would think that would

2  already be established by the fact that it's been

3  testified that two individuals were requested to

4  blow it up.

5      MR. LANDREAU:  Yes, sir.

6      THE COURT:  And I think that would be

7  sufficient.

8      MR. LANDREAU:  We'll move on.

9  Q  Now, did Mr. Moseson have any type of contraband

10     on him?

11  A  Yes, sir.

12  Q  After meeting with Mr. Moseson, did officers

13     approach the mobile home?

14  A  Yes, sir.

15  Q  Who all approached and where did they approach?

16  A  Agent Memmo went to the rear of the trailer, and

17     myself and Sergeant Price went to the front door.

18  Q  What was y'all's purpose in going to the front

19     door?

20  A  We were going to speak to Mr. Whitley.

21  Q  Were you trying to confirm something?

22  A  Yeah.  We were trying to establish if this was

23     where Mr. Whitley lived and get an address on the

24     trailer.

25  Q  Did someone knock on the door?

```
 1   A    Yes, sir.

 2   Q    And who was that?

 3   A    Sergeant Price.

 4   Q    How were you dressed, Agent?

 5   A    I had a gun belt on with accessories on the gun

 6        belt.  I had a mesh raid vest on with a Metro

 7        Narcotics star and symbol on the front, my badge

 8        hanging on my shoulder, and a Metro Narcotics

 9        Agent patch on my back.

10   Q    In your opinion, someone looking at you, would

11        they have been able to identify you as a law

12        enforcement officer?

13   A    Yes, sir.

14   Q    Who answered the door?

15   A    A female subject later identified as Caylene

16        White.

17   Q    And what happened when she answered the door?

18   A    Sergeant Price asked her if Jerry was home.  She

19        turned evidently to Jerry at the doorway and said

20        they want to talk to you.

21   Q    And then did someone else come to the door?

22   A    Yes, sir.

23   Q    And who was that other person?

24   A    Mr. Jerry Whitley.

25   Q    The same gentleman seated in the courtroom today?
```

1   A   Yes, sir.  Sitting at defense table with the blue

2       shirt on.

3   Q   And what did he say when he came to the door?

4   A   He came to the door and stepped out of the door

5       about halfway down the steps, tried to go through

6       Sergeant Price and myself.  At this point

7       Sergeant Price grabbed a wrench out of his

8       pocket.  I believe there was a wrench in each

9       of -- one front pocket and one of his back

10      pockets.  At that point when the wrenches come --

11      one of the wrenches were being pulled out of his

12      pocket, Mr. Whitley began to struggle to get past

13      agents and started yelling back at Caylene to do

14      it, set it off, blow it.

15   Q   Then what happened?

16   A   I pulled Caylene White off of the -- out of the

17      door frame, pulled her out.  She began to

18      struggle and fight with me.  She was placed under

19      arrest.  Then Mr. Whitley started screaming do

20      it, Wayne.  Do it.  Wayne, set it off.  Blow it,

21      Wayne.  Blow it.  At that time Agent Memmo went

22      into the residence, and I went in behind Agent

23      Memmo and cuffed a subject inside by the name of

24      Wayne Meadows.

25   Q   Now, at that point why did you and Agent Memmo

1       enter?

2   A   At that point we feared that they were going to

3       blow the trailer up and endanger ourselves and

4       the other members of the residence.

5   Q   You've had training in methamphetamine labs?

6   A   Yes, sir.

7   Q   Do such labs, based on your training, pose any

8       threat of explosion?

9   A   Yes, sir.

10   Q   And that would be a large explosion or --

11   A   Yes, sir, depending on the amount of chemicals

12       and --

13       MS. FARRAR:  Objection.  Proper foundation

14       has not been laid.

15       MR. LANDREAU:  Withdraw it.

16   Q   You entered the trailer?

17   A   Yes, sir.

18   Q   And you secured someone named Moseson?

19   A   No, sir, Meadows.

20   Q   Meadows.  Now, while you were in the trailer

21       securing him, was he in the front of the trailer

22       or the back?

23   A   When I went in, I believe Agent Memmo was kind of

24       pulling him toward the doorway from the kitchen

25       area.  When I assisted him in cuffing Mr.

1    Meadows, we were, I guess, in the living area of
2    the trailer, right near the door that we had
3    entered.  Mr. Meadows had some type of solvent or
4    ether spilled about his person while all this was
5    going on.  He was cuffed for officer safety and
6    his safety and brought outside the residence.  I
7    didn't go back in the trailer at this point due
8    to the fumes and due to, I guess, the chemical
9    vapors, and Sergeant Price and I believe --
10  Q  Okay.  Let me interrupt you.  In going back to
11     get Mr. Meadows, did you notice any unusual odors
12     or smells?
13  A  Yes, sir, I did.
14  Q  And what smells were those?
15  A  It was a solvent type ammonia, ether type
16     chemical smell.
17          MS. FARRAR:  Objection.
18          THE COURT:  Overruled.
19  Q  Have you had training on the smells associated
20     with methamphetamine labs?
21  A  Yes, sir.
22  Q  And did these smells that you noted that night,
23     were they the same as what you had been trained
24     on?
25  A  Yes, sir.

43

1    Q    In going back to secure Mr. Meadows, did you

2         notice any apparatus or equipment or anything

3         else that you've been taught to recognize as part

4         of a methamphetamine lab?

5    A    Yes, sir.

6              MS. FARRAR:  Objection.

7              THE COURT:  Overruled.

8    Q.   What did you see, Agent Whitten?

9    A    I saw compressed gas cylinders of various sizes,

10        shapes and colors, brass fitting hoses.  I saw a

11        canister in the kitchen area that had fumes

12        coming from inside of it.

13   Q    Anything else?

14   A    I also saw handguns throughout the living room.

15   Q    Okay.

16   A    And surveillance equipment.

17   Q    Did you withdraw?

18   A    Yes, sir.

19   Q    Now, let me ask you, at that point did you obtain

20        a search warrant?

21   A    Yes, sir, I did.

22   Q    Let me show you what I've marked as State's

23        Exhibit 1.  Is this the search warrant that you

24        obtained?

25   A    Yes, sir, it is.

1  Q   And that was signed, I believe, by Judge

2       Funderburk?

3  A   Yes, sir.

4         MR. LANDREAU:  Judge, we move to admit

5       State's Exhibit 1.

6         THE COURT:  Be admitted and received.

7           (State's Exhibit 1 was admitted in

8            evidence.)

9  Q   Now, Agent Whitten, did you note, in examining

10      this trailer after you got the search warrant,

11      did you note anything that appeared to be a

12      booby-trap in it?

13  A   Yes, sir.

14  Q   What did you see?

15  A   I saw a fishing line strung from the ceilings on

16      metal eye hooks going around all the walls and

17      windows and doors going to a candle in the back

18      bathroom, and in the back bathroom there were

19      several containers of solvents and other

20      flammable materials.

21  Q   Now, the way this fishing string was done, could

22      someone by grabbing that have tipped over the

23      solvents and so forth at the back?

24  A   Yes, sir.

25         MS. FARRAR:  Objection.  It calls for an

45

```
 1      opinion.
 2   Q  Well, let me ask it this way.  Did the fishing
 3      line run all the way back to these solvents?
 4   A  Yes, sir.
 5   Q  And was it a continuous line that went all the
 6      way back?
 7   A  It appeared to be.
 8   Q  And what end of the line was to the solvents?
 9      Where was the other end of the line?
10   A  I don't know.  Just strung through around the
11      ceiling and doorways.
12   Q  Let me ask you, there was some question about a
13      surveillance camera later on?
14   A  Yes, sir.
15   Q  Do you recognize this photograph?
16   A  Yes, sir.
17   Q  Does this photograph depict one of those
18      surveillance cameras?
19   A  Yes, sir, it does.
20          MR. LANDREAU:  Judge, we move to --
21          THE COURT:  Keep in mind this is a
22      suppression hearing.
23          MR. LANDREAU:  Yes, sir.  Judge, we were
24      going to ask for leave to substitute, but I'll
25      withdraw these at this point.
```