```
 1   Q    Did you, in fact, find chemicals that were later
 2        taken to the lab and tested?
 3   A    Yes, sir.
 4   Q    And did they contain methamphetamine?
 5   A    Yes.
 6             MS. FARRAR:  Objection, relevance.
 7             THE COURT:  Well, since that's the matter
 8        that's subject to being suppressed, I'll overrule
 9        the objection.
10   Q    In fact, there were approximately 2000 grams of
11        mixtures containing methamphetamine; is that
12        right?
13   A    Yes, sir.  That was the report I got.
14   Q    Did you see other or were other precursor
15        chemicals seized?
16   A    Yes, sir.
17   Q    Let me ask you, in your presence, did Mr. Whitley
18        make any statements?
19   A    Yes, sir.
20             MS. FARRAR:  Objection.
21             THE COURT:  Overruled.
22   Q    Prior to making that statement, had he been asked
23        any questions?
24   A    No, sir.
25   Q    And was this information volunteered, not in
```

1    response to a question by you or any other

2    officer?

3    A    No, sir.

4        MS. FARRAR:  Objection, leading.

5        MR. LANDREAU:  Okay.

6    Q    Prior to him making these statements, had you or

7    any other officer asked him any questions?

8    A    No, sir.

9    Q    What statements did he make?

10   A    He had made one statement that his life was over

11   and this stuff has ruined his life; something to

12   that effect.

13   Q    Okay.

14   A    And also he made one statement that he didn't

15   mean to -- he didn't mean it by to blow it up.

16   He meant for them to pour it down the sink.

17   Q    Well, did you hear him use the words blow it up?

18   A    Yes, sir.

19   Q    Didn't use the words pour it down the sink?

20   A    Yes, sir.  No, sir, he never said that.

21   Q    Officer, at the time you entered the trailer,

22   were you concerned about the safety of you and

23   your fellow police officers?

24   A    Yes, sir, I was.

25   Q    Were you concerned about the safety of neighbors

48

1        and residents of that trailer park?

2   A    Yes, sir, I was.

3   Q    And what was your concern specifically about it?

4   A    The hazardous waste, the explosion, the fire.  A

5        number of hazards.

6            MS. FARRAR:  Objection on the grounds that

7        there was no -- that was just an opinion.

8            THE COURT:  Objection overruled.

9            MR. LANDREAU:  Ms. Farrar may have some

10       questions for you.

11                    CROSS-EXAMINATION

12   BY MS. FARRAR:

13   Q    Hey.  When you stated just now that Jerry Whitley

14       offered a statement or several statements which

15       were not in response to anything that y'all said,

16       didn't you really say at one point to Mr. Whitley

17       I thought you was going to blow it up?

18   A    No, ma'am.

19   Q    Did you say anything to Mr. Whitley?

20   A    No, ma'am.  I believe he was making these

21       statements to Sergeant Price.

22   Q    So no statements were directed to you that you

23       recall?

24   A    Not that I recall.

25   Q    Do you remember Sergeant Price saying anything to

1       Mr. Whitley?

2  A   No, sir.

3  Q   Isn't it true when you went in the trailer that

4       the string was not attached to anything in the

5       ceiling?

6  A   No, that's not true.

7  Q   So if you said that in the preliminary hearing --

8  A   No.  What I'm saying is true.  What you're saying

9       is wrong.

10  Q   So in the preliminary hearing, if you stated to

11       the Court that the string was not attached to the

12       ceiling, then you would have been --

13  A   They were attached to eye hooks in the ceiling.

14  Q   But if you said that the string was on the floor,

15       you would have just not remembered?

16  A   No, sir.  No, ma'am.

17  Q   No, ma'am, you wouldn't have remembered?

18  A   I don't know what you're saying, really.

19  Q   Do you remember that you testified at the

20       preliminary hearing that the string was actually

21       on the floor?

22  A   No, ma'am.  I don't remember testifying to that.

23  Q   Did you personally go to Judge Funderburk to get

24       him to sign the search warrant?

25  A   Yes, ma'am.

COURT OF CRIMINAL APPEALS NO. _____ CR-02-0739

# Appeal To Alabama Court of Criminal Appeals

### FROM

### Circuit Court of Russell County, Alabama

CIRCUIT COURT NO _____ CC-02-186-188

CIRCUIT JUDG _____ HONORABLE GEORGE R. GREENE

Type of Conviction/ Order Appealed From: _____ TRAFFICKING METH ,POSS OF REC CONT SUBS, RESISTING ARREST

Sentence Imposed: _____ 35 YRS CONCUR,5 YRS CONCUR, 6 MTHS CONSEC

Defendant Indigent: ☐ YES  ☑ NO

JERRY E. WHITLEY

**Name of Appellant**

ATTY MICHAEL J WILLIAMS SR (205)-705-0200

(Appellant's Attorney)                    (Telephone No.)

P.O. BOX 1068

(Address)

AUBURN, AL 36831

(City)                (State)                (Zip Code)

### V.

STATE OF ALABAMA

**Name of Appellee**

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter

name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

```
 1   Q   Where did you have to go?

 2   A   To his residence.

 3   Q   What time of day was it, if you remember?

 4   A   It was sometime after 3:00.  The time should be

 5       on the search warrant.  I don't recall the exact

 6       time.

 7   Q   Would it have been 8:00?

 8   A   It could have been.

 9   Q   Would there be any reason that you know of why a

10       three was changed to eight in the time part of

11       the search warrant?

12   A   I'm not aware of that.

13   Q   When you first said that Caylene White answered

14       the door, did she come to the door and just speak

15       through the inner door?

16   A   No, ma'am.  She was face-to-face with us.

17   Q   So she actually propped open the door?

18   A   Yes.  Yes, ma'am.  The door was open.

19   Q   What do you mean the door was open?

20   A   It wasn't closed.

21   Q   It never was closed when you got there?

22   A   No, ma'am.  Sergeant Price knocked on the door

23       and she opened the door.

24   Q   Did she open it inside ways or outside ways?

25   A   I don't recall.  I believe it's inside.  Most
```

51

```
 1        trailers are, but I don't recall on that one.
 2   Q    How did you know that there was a surveillance
 3        camera in the window that you testified that
 4        Moseson looked at?
 5   A    I saw it.
 6   Q    Did you see a red light?
 7   A    No, ma'am.
 8   Q    So it wasn't actually a camera that was
 9        camouflaged?
10   A    No, ma'am.
11   Q    Is that your testimony?
12   A    No, ma'am.
13   Q    Was there any evidence before you actually
14        stopped Moseson or saw Moseson that anyone was
15        violating the law at the residence?
16   A    No, ma'am.
17   Q    When you saw Moseson come out of the house and
18        you were on the street, did you have any reason
19        to believe that he was violating the law?
20   A    No, ma'am.
21   Q    When you approached him, did you tell him that he
22        was free to leave?
23   A    No, ma'am.  I did not say you are free to leave.
24   Q    Did you reach into his pocket and pull out the
25        contraband?
```

52

1    A    At one point, yes, I did.

2    Q    When the alleged informant told you that there

3          was a cook going on, how did you know what that

4          meant?

5    A    How did I know what that meant?  I've worked meth

6          labs before and I've had some specific training

7          on clandestine methamphetamine laboratories.

8    Q    Did the informant know that you knew what that

9          meant?

10   A    I've never talked to him before or since.  I

11         don't know what he knew.

12   Q    How did -- did he give you any other information

13         which led you to believe that there was criminal

14         activity going on besides what you've testified

15         to, or she?

16   A    Stated that there was firearms in the house,

17         booby-traps, surveillance equipment, police and

18         sheriff's department scanners.  Made statements

19         to that effect.

20   Q    Did the individual state he had recently been in

21         the trailer?

22   A    Yes, sir.  Yes, ma'am.

23   Q    Okay.

24           MS. FARRAR:  That's all I have at this time,

25         Your Honor.

1    THE COURT:  You may step down.  Who is the

2    State's next witness?

3        MR. LANDREAU:  State rests, Your Honor.

4        THE COURT:  All right.  Would the Defendant

5    have anything to present at this time?

6        MS. FARRAR:  Yes, Your Honor.  Defense would

7    call Cindy Hoyle to the stand.

8        MR. LANDREAU:  Your Honor, Agent Whitten has

9    a case in the other courtroom.  May he step down

10    there?

11        THE COURT:  Yes, he may.

12                    CINDY HOYLE

13    was sworn and testified as follows:

14                DIRECT EXAMINATION

15    BY MS. FARRAR:

16    Q    Please state your name for the record?

17    A    Cindy Hoyle.

18    Q    I'm sorry?

19    A    Cindy Hoyle.

20    Q    How do you spell that last name?

21    A    H-o-y-l-e.

22    Q    And on September 31st of '01, where did -- I'm

23        sorry, September 21st of 2001, where did you

24        live?

25    A    24 Rusk Drive.

54

1    Q    And do you recall anything unusual happening that

2         afternoon?

3    A    I was standing outside and I seen one of the guys

4         pull out one of the guys in the house.

5    Q    What guys did you see?

6    A    It was -- there was a bald-headed guy.  There was

7         a long-headed guy.

8    Q    Did they have on Metro Narcotics Task Force gear?

9    A    Yes.

10   Q    Did you notice anything prior to that?

11   A    They pulled them out of that house, just jerked

12        them out of the house when they knocked on the

13        door.

14   Q    Who did they jerk out of the house?  Do you see

15        him in the courtroom, the person that was pulled

16        out of the house?

17   A    Huh-uh (negative response).

18   Q    Was it a female or male?

19   A    It was a male.

20   Q    And this was across the street from where you

21        live?

22   A    Diagonally from where I lived.

23   Q    Diagonal.  So how far away from you -- how far

24        away from that home were you when you were

25        watching?  Were you on the road?

1   A   Yeah.  I was watching on -- we was watching on

2         the road, me and my husband that I was married

3         to.

4   Q   What was the first thing you saw when you went

5         out there?

6   A   That he jerked one of the guys out of there, out

7         of that house.

8   Q   Could you identify who it was that jerked

9         somebody out of the house?  Is it anyone in this

10       courtroom?

11   A   It was a bald-headed guy, a real bald-headed guy.

12   Q   And did you watch him go up to the door of the

13       trailer?

14   A   Uh-huh (positive response).

15          MR. LANDREAU:  Judge, now I'm going to

16       object to her leading her own witness.

17         THE COURT:  Sustain the objection.

18   Q   What happened after somebody was jerked out of

19       the house?

20   A   Put in the police car.  That's the last thing I

21       seen.

22   Q   Did you watch the whole thing?

23   A   Huh-uh (negative response).

24   Q   How many people were arrested that you personally

25       saw?

1   A   The girl and one guy. That's all I seen.

2   Q   And do you recall any of the Metro Narcotics

3      officers saying anything to you?

4   A   Huh-uh (negative response).

5         MS. FARRAR:  I believe that's all I have.

6      Mr. Landreau may have a question or two for you.

7             CROSS-EXAMINATION

8  BY MR. LANDREAU:

9   Q   Your trailer, is it on the right or left as you

10      go down Rusk Drive?

11   A   It's the opposite side from where they got

12      busted.

13   Q   Well, is that on the right or is that on the

14      left?

15   A   It was on the left.

16   Q   So if I'm going east on 80 and turn in, your

17      trailer is on the left?

18   A   Uh-huh (positive response).

19   Q   How many trailers down?

20   A   Oh, I don't know.

21   Q   Best judgment?

22   A   Huh?

23   Q   What's your best judgment?

24   A   I don't count the trailers.

25   Q   Well, how long had you lived there at that time?

```
1    A    I lived there probably six months because I just
2         moved to town.
3    Q    Well, how many trailers are between your trailer
4         and Mr. Whitley's trailer?
5    A    Between?  There's no --
6    Q    Ma'am?
7    A    We was on the opposite side from where he lived.
8    Q    Well, actually, if your trailer is on the left,
9         so is his trailer.  So you're on the same side?
10   A    We was on opposite sides, I'm sorry.
11   Q    Well, how many trailers are between you on
12        opposite sides?
13   A    Probably -- you could see his house.
14   Q    That's not what I'm asking.  I'm asking you how
15        many more trailers do you have to go up to get to
16        his trailer?
17                          EXAMINATION
18   BY THE COURT:
19   Q    Let me ask you, do you remember what your address
20        was?
21   A    24 Rusk Drive.
22   Q    Did you have a specific lot number?
23   A    24.
24   Q    24.  Do you know what his lot number was?
25   A    Not really, because all of them was changed by
```

58

1          911 when I first moved there.

2     Q    Well, after it was changed, what was your lot

3          number?

4     A    I don't know.

5     Q    And how long has it been since you've lived

6          there?

7     A    Six months.

8     Q    Was it changed after you moved or while you still

9          lived there?

10    A    While I was living there.

11    Q    And it was 24 before it was changed, is that

12         correct, or after?

13    A    They all had different -- I don't really know.

14    Q    Well, were they numbered one, two, three, four

15         and five on to 24, or were even numbers on one

16         side of the street and odd numbers on the other

17         side of the street?

18    A    It was 24 when I first moved there.

19    Q    In other words, you don't know whether they were

20         numbered sequentially or not; is that correct?

21    A    Right, because they all had different numbers on

22         them.

23            THE COURT:  Okay.

24    Q    (By Mr. Landreau:)  Now, ma'am, you saw a Metro

25         Narcotics agent or someone grab a man?

60

```
1   Q    So how did she know your phone number?

2   A    Probably the lady that lives next door, used to

3        live next door to her, Carolyn.

4   Q    So somebody else talked to you about testifying

5        and then gave your number to Ms. Farrar?

6   A    Uh-huh (positive response).

7   Q    Who was it that talked to you about testifying?

8   A    Nobody talked to me.  She asked me about

9        testifying.

10  Q    Huh?

11  A    She asked me about testifying.

12  Q    And that was the first time?

13  A    That's the first time.

14  Q    When was that?

15  A    I don't remember.

16  Q    Well, was it a year ago?

17  A    Oh, it's been a year ago.

18  Q    Been at least a year?

19  A    (Witness nods head affirmatively.)

20          MR. LANDREAU:  No further questions.

21          THE COURT:  May this witness be excused?

22          MS. FARRAR:  No.  I have a question, Your

23       Honor.

24

25
```

1                          REDIRECT EXAMINATION

2    BY MS. FARRAR:

3    Q    Ms. Hoyle, I don't believe I talked to you -- I

4         won't lead.  I'll withdraw that.  When was the

5         first time you remember hearing from me by phone?

6    A    When you sent me the subpoena to court from

7         Carolyn.  Subpoena that you gave her you told her

8         to give to me.

9    Q    So I never called you before I sent the subpoena,

10        did I?

11   A    Yeah.  You talked to me and Carolyn.

12   Q    Okay.  Did I tell you -- do you remember what I

13        told you?

14   A    You asked me would I come and testify.

15   Q    Did I ask you to testify to anything in

16        particular?

17   A    No.

18   Q    Did I tell you what to say?

19   A    No, you didn't tell me what to say.

20   Q    Did I ask you what you'd probably say?

21   A    No.  You asked me what did I see.

22   Q    Did you tell me what you saw?

23   A    Yes.

24   Q    Is there anything else that you remember from the

25        conversation?

1    A    I told you I didn't really want to be here.

2    Q    And when was that conversation that you told me

3         that you really didn't want to be here?

4    A    The other day when you called.

5    Q    Did you -- there was some confusion, I believe,

6         earlier when I questioned you.  Do you know the

7         person sitting next to me?

8    A    Yes.

9    Q    Was he the one in the doorway?

10             MR. LANDREAU:  Judge, I object.

11   A    It's been awhile.  I really can't --

12             MR. LANDREAU:  The witness has already

13        testified she didn't recognize anybody in this

14        courtroom.

15             THE COURT:  All right.  I'll sustain the

16        objection.

17             MS. FARRAR:  I appreciate you being here,

18        Ms. Hoyle.  That's all.

19                    RECROSS-EXAMINATION

20   BY MR. LANDREAU:

21   Q    Ms. Hoyle, are you on any kind of medication

22        today?

23   A    No.

24             MR. LANDREAU:  No further.

25             THE COURT:  Who is the Defendant's next

1    witness?

2         MR. LANDREAU:  You may step down.

3         MS. FARRAR:  Steven Moseson.

4              (Brief pause.)

5         THE COURT:  Let's go ahead and take a

6    five-minute break.  Ms. White was not subpoenaed.

7         MS. FARRAR:  She did not get served?

8         THE COURT:  She was not served.

9         MS. FARRAR:  Okay.  Thank you.

10             (Recess.)

11                STEVE MOSESON

12    was sworn and testified as follows:

13             DIRECT EXAMINATION

14   BY MS. FARRAR:

15   Q    Please state your name?

16   A    Steve Moseson.

17   Q    And do you remember a day on September 21st,

18        2001, when you were approached by Metro Narcotics

19        agents?

20   A    Yes, I do.

21   Q    What was the first thing that you remember

22        happening?

23   A    I walked out the door and seen them pull up.

24        That was the first thing that happened.

25   Q    Do you remember walking to your vehicle?

1   A   I was walking down the steps coming out of the

2       door.  I was going to get in the truck.

3   Q   How far away was your truck from the trailer, if

4       you recall?

5   A   About from me to you.

6   Q   And, for the record, how many feet would you say

7       that is?

8   A   15.

9   Q   And did you make it to the truck?

10  A   No.

11  Q   How far away from the truck were you when

12      something else happened?

13  A   About halfway.

14  Q   And what happened then?

15  A   Mr. Whitten and there was another fella that was

16      driving, I believe, he's not in here now, but he

17      had a gun on me and got out of the car and told

18      me to get on my knees, and Mr. Whitten searched

19      me.

20  Q   What did they find?

21  A   I had $25.00 worth of meth in my pocket.  I was

22      trying to get my keys out of my pocket, and he

23      grabbed my hand and said what have you got there,

24      and I pulled my hand out and it come out.

25  Q   Did you say anything?

65

| 1 | A | No. |
|---|---|---|
| 2 | Q | Then what happened, if you remember? |
| 3 | A | They handcuffed me. |
| 4 | Q | Did they put you into any kind of car at that |
| 5 | | point? |
| 6 | A | No. They set me to the side. |
| 7 | Q | Where were you sitting in relation to the |
| 8 | | trailer? |
| 9 | A | Right there between him and my truck. |
| 10 | Q | So it was maybe eight feet from the trailer; is |
| 11 | | that halfway? |
| 12 | A | Probably. |
| 13 | Q | Did you have a full view of the front door? |
| 14 | A | Yes. |
| 15 | Q | What happened next that you saw? |
| 16 | A | They went to the door, knocked on the door, and |
| 17 | | Caylene opened the door. |
| 18 | Q | They being who? |
| 19 | A | Officer Whitten and the other one. |
| 20 | Q | Can you describe the other one? |
| 21 | A | Bald-headed. |
| 22 | Q | And after Caylene answered, what happened? |
| 23 | A | They pulled her out of the front door. |
| 24 | Q | And then where did they put her? |
| 25 | A | Off to the side. |

1    Q    Did they go back to the front door at that point?

2    A    Yes.

3    Q    And were their guns drawn?

4    A    Yes.

5    Q    Did they say anything?

6    A    Metro Narcotics.  I remember them saying Metro

7         Narcotics.

8    Q    Was the door shut at that point?

9    A    Yes.

10   Q    What kind of door was it, if you remember?

11   A    It's a trailer door.

12   Q    Was it the kind you can see through?

13   A    No.

14   Q    And then what happened?

15   A    The door opened.

16   Q    Could you see who was on the other side?

17   A    I didn't see them till they pulled him out.

18   Q    Who pulled who out?

19   A    I can't remember exactly who pulled who out.  I

20        know Jerry came out of the door.  There were two

21        officers at the door.

22   Q    The same two you described before?

23   A    Right.

24   Q    What else happened?

25   A    After they pulled him out, they went inside and

1     got Wayne out.

2  Q  Did you hear any talk?

3  A  I heard -- I couldn't make out the words, but I

4     heard hollering and yelling, but there was a

5     bunch of voices, you know, a conglomeration of

6     voices.  I mean, there was a big disturbance

7     there.  There was a lot going on at that moment.

8     I was on my hands and knees in the front yard

9     handcuffed.

10        MS. FARRAR:  That's all I have.  Mr.

11  Landreau may have a question or two.

12        MR. LANDREAU:  No questions for this

13  witness.

14        THE COURT:  Who is the Defendant's next

15  witness?

16        MR. LANDREAU:  You may step down, Mr.

17  Moseson.

18        MS. FARRAR:  Your Honor, Wayne Meadows.

19            (Brief pause.)

20            <u>WAYNE MEADOWS</u>

21     was sworn and testified as follows:

22            <u>DIRECT EXAMINATION</u>

23  <u>BY MS. FARRAR:</u>

24  Q  Please state your name?

25  A  Wayne Meadows.

1   Q   On September 21st of 2001, do you recall when

2       Metro Narcotics Task Force came to where you

3       were?

4   A   Yes, ma'am.

5   Q   Or do you recall that day?

6   A   Yes, ma'am.

7   Q   And where were you that day?

8   A   At the residence of Mr. Whitley.

9   Q   The person next to me; correct?

10   A   Yes, ma'am.

11   Q   And do you recall any kind of disturbance while

12       you were over there?

13   A   Yes, ma'am.

14   Q   What was the first thing you remember?

15   A   I was sitting in the living room with Caylene

16       White and there was a knock on the door, and she

17       went to the door and asked who was there and they

18       said police, and I don't know if the door was

19       pushed open or if she opened the door. I don't

20       know.

21   Q   Did you get a chance to look through the door?

22   A   No, I didn't.

23   Q   So after the door was opened, did you see what

24       happened next?

25   A   No.  I walked kind of down the first part of the

1    hallway, and Mr. Whitley was in the back part of

2    the house, and I told him that the police were

3    outside.

4  Q    And then what happened?

5  A    Then he came by me in the doorway going to the

6    door to see what they wanted, and I just heard

7    some banging, you know, like the storm door

8    banging back and forth and a bunch of commotion

9    right there at the door.  I was looking out the

10    back door.  I was going to run out the book door

11    of the house, but there was an agent in the

12    backyard, so I just turned around and came back

13    to the living room and sat back down.

14  Q    Did you look at the front door at all after that?

15  A    When I returned to the living room, the front

16    door was just partially open.

17  Q    Did you get to see out that front door at that

18    point?

19  A    No, ma'am.

20         MS. FARRAR:  That's all the questions I

21    have.  Mr. Landreau may have some for you.  Thank

22    you.

23              CROSS-EXAMINATION

24  BY MR. LANDREAU:

25  Q    Mr. Meadows, was Jerry Whitley operating a

1    methamphetamine lab in there?

2         MS. FARRAR:  Objection, Your Honor.

3    Relevance.

4         THE COURT:  Well, this is a motion to

5    suppress hearing at this point, and I'll sustain

6    the objection.

7    Q    Did you notice some fishing line in that trailer?

8    A    No, sir, not really, no.

9    Q    Mr. Meadows, wasn't there some line that ran from

10   the front door to a candle or some type of flame

11   in the back?

12   A    Not that I'm aware of.

13   Q    Do you recall Jerry Whitley telling you to blow

14   the trailer up?

15   A    No, sir.  I don't recall him telling me to blow

16   the trailer up, no, sir.

17   Q    Do you remember the plea agreement you entered

18   into?

19   A    Yes, sir.

20   Q    You remember testifying in front of the Court?

21   A    I heard -- I heard someone on the outside of the

22   house say light it.  That's what I heard.  I

23   didn't hear anybody say anything about blow

24   anything up.

25   Q    Well, you recognize the voice that said light it?

1   A    Yes, sir.  I believe it was Mr. Whitley.

2   Q    The man you've known for a long time, hadn't you?

3   A    Approximately a year.

4   Q    And shortly after you heard that voice say light

5        it, the officers came in and got you and got you

6        out of the trailer; is that right?

7   A    It was probably two minutes after that.

8   Q    Where were you standing when they came in and got

9        you?

10  A    I was sitting on a bar stool there.  There was

11       like a little counter between the kitchen and the

12       living room, and I was sitting on a bar stool

13       right there by that counter.

14  Q    Mr. Meadows, on that same counter where you were

15       sitting, were there not a great many coffee

16       filters and Ephedrine bottles and residue of the

17       Ephedrine?

18           MS. FARRAR:  Objection.

19           THE COURT:  I'm going to overrule the

20       objection.

21  Q    You may answer the question, Mr. Meadows.

22  A    I really don't recall.

23  Q    Well, do you recall the large canisters that were

24       in the kitchen about three or four feet from you?

25  A    Yes, sir.  That was like jars.

1    Q    Do you recall glass jars with a white mixture in

2         them?

3    A    Yes, sir.  I saw the jars on the kitchen floor.

4    Q    All of those were clearly visible from where you

5         were sitting; correct?

6    A    Yes, sir.

7    Q    And the officer that came in to secure you, it

8         would have been in his plain view, wouldn't it?

9    A    Well, he would had to have step around that

10        counter I was sitting at.

11   Q    Okay.

12   A    They was on the kitchen floor.

13   Q    Now, would the officers have had any way of

14        knowing that you were the only other person in

15        the trailer?

16   A    No, no.

17            MS. FARRAR:  Objection.

18   A    I wouldn't think so.

19   Q    Let me ask you this.

20            THE COURT:  I'll sustain the objection.

21   Q    Did you tell them there was nobody else in the

22        trailer?

23   A    They asked if there was anybody else in the

24        trailer.  I told them no.

25   Q    Did you hear anybody else say that?

```
1    A    No, sir.

2    Q    This trailer, did it belong to Mr. Whitley?

3         MS. FARRAR:  Objection.

4    A    I'm not sure who it belonged to.

5    Q    Well, who was living there?

6    A    Mr. Whitley.

7         MS. FARRAR:  Objection.

8    Q    Let me ask you something.

9         THE COURT:  Objection is overruled.

10   Q    How long have you known Mr. Whitley?

11   A    Oh, approximately -- before this incident,

12        probably about six or eight months.

13   Q    Do you recall seeing Mr. Moseson there earlier?

14   A    Yes, sir.

15   Q    Did Mr. Moseson buy some methamphetamine from

16        Jerry Whitley?

17   A    I'm not sure.

18   Q    Did you see a transaction between them?

19   A    No, sir, I didn't.

20   Q    Okay.

21        MR. LANDREAU:  No further questions for this

22        witness.

23        THE COURT:  Any further questions, Ms.

24        Farrar?

25        MS. FARRAR:  No, Your Honor.
```

<u>EXAMINATION</u>

<u>BY THE COURT:</u>

Q    Mr. Meadows, there's been some testimony in this
      courtroom prior to your testimony today that
      there was a strong smell of ether or other
      substance on or about your person as if something
      had been spilled on you.  Had you had something,
      either ether or something else, spilled on you
      immediately before the police raid on that
      trailer?

A    No, sir.  Nothing was spilled on me.

Q    Did you smell ether in the trailer or something
      similar to ether?

A    Yes, sir.

          THE COURT:  Thank you.

          MS. FARRAR:  Your Honor, I would have
      recross, I mean, redirect.

          THE COURT:  Okay.

              (Brief pause.)

          MS. FARRAR:  I'll withdraw, I'm sorry.

          THE COURT:  All right.  Who is your next
      witness?

          MS. FARRAR:  That's all, Your Honor.

          THE COURT:  All right.  Anything further on
      behalf of the State?

75

1          MR. LANDREAU:  No, sir, unless the Court

2     wishes some type of closing argument.

3          THE COURT:  You may do so if you want to,

4     but I'm not going to require it.

5          MR. LANDREAU:  Judge, I'll keep it very

6     brief.  This is a classic case of exigent

7     circumstances.  The officers received information

8     that was insufficient for a search warrant.  They

9     went there to set up surveillance.  They

10    encountered an individual who smelled strongly of

11    the precursor chemicals to methamphetamine.  They

12    went to the door in an attempt to verify who

13    lived there, and at that point they were

14    confronted by people screaming to light it or

15    blow it up, and they entered the trailer to

16    protect themselves and the citizens from the

17    threat of an explosion.  Also, obviously, it

18    would serve the dual purpose to preserve

19    evidence.  They went in there and secured Mr.

20    Meadows, brought him out, and then immediately

21    got a search warrant.

22          We think it's a classical case of probable

23    cause that coexists with exigent circumstances.

24          THE COURT:  Ms. Farrar, do you have anything

25    you'd like to add?

1      MS. FARRAR:  Just really briefly, Your

2  Honor.  Police officers cannot create their own

3  exigent circumstances.  Rather than in

4  encountering an individual, they went up to him

5  and actually arrested him illegally and guns were

6  drawn, and they actually did raid the residence

7  of my client.  It was an illegal arrest, and

8  anything that stems from it would be poisonous

9  fruits.

10     Also, even though perhaps it could be argued

11  that my client, Mr. Whitley, does not have

12  standing to use the Moseson arrest, it actually

13  is what was used to create the exigent

14  circumstances, so I believe this would be

15  allowable.  That's all I have, Your Honor.

16     THE COURT:  All right.  The Court would deny

17  the motion to suppress.  Thank you.

18     MS. FARRAR:  Your Honor, I would like to ask

19  during the trial if I might be able to have a

20  continuing objection to the admission of any of

21  the arrests itself, the search warrant, any

22  statements or seized contraband as a result of

23  what we would like to preserve our objection as

24  an illegal arrest.

25     THE COURT:  Yeah.  I'll let you have a

1        continuing objection.

2            MS. FARRAR:   Thank you, Your Honor.

3                (End of proceedings.)

STATE OF ALABAMA

IN THE CIRCUIT COURT FOR THE COUNTY OF RUSSELL

TWENTY-SIXTH JUDICIAL CIRCUIT

CRIMINAL

STATE OF ALABAMA

     v.                      Case Nos. CC 02-186, 187 188

JERRY E. WHITLEY,

       Defendant.

_____/


REPORTER'S OFFICIAL TRANSCRIPT

Before:

        Honorable George R. Greene and Jury
           Phenix City, Alabama - December 5, 2002


APPEARANCES:

        For the State:
           Buster Landreau, Esq.
           Chief Deputy District Attorney

        For the Defendant:
           Laural Farrar, Esq.
           Phenix City, Alabama


Linda S. Wilson
Official Court Reporter

1    (Jury venire present.)

2    THE COURT:  Which case would the State call

3    for trial at this time?

4    MR. LANDREAU:  Your Honor, the State would

5    call State of Alabama versus Jerry Whitley, Case

6    Number 2002-186 on a charge of trafficking in

7    methamphetamine, Case Number 2002-187 on a charge

8    of possession of methamphetamine, and 2002-188 on

9    a charge of resisting arrest.

10    THE COURT:  State ready to proceed?

11    MR. LANDREAU:  State is ready, Your Honor.

12    THE COURT:  Defendant ready to proceed?

13    (Bench conference, off record.)

14    (Brief pause.)

15    THE COURT:  All right, ladies and gentlemen

16    of the jury.  The State has called for trial the

17    cases styled the State of Alabama versus Jerry

18    Whitley.

19    Is the Defendant ready to proceed at this

20    time?

21    MS. FARRAR:  Ready, Your Honor.

22    (Jury venire sworn.)

23    THE COURT:  Ladies and gentlemen, the State

24    has called for trial the cases that are styled

25    the State of Alabama versus Jerry Whitley.

80

1    In Case Number CC 2002-186, this case comes

2    to the Court by way of an indictment returned by

3    a grand jury impaneled here in Russell County.

4    The indictment is not evidence in the case and

5    may not be considered by you as evidence in the

6    case.  This particular indictment charges the

7    Defendant, Jerry E. Whitley, with the offense of

8    trafficking in methamphetamine and alleges that

9    he did, on or about the 21st day of September,

10   2001, knowingly sell, deliver or bring into the

11   State of Alabama or was knowingly in actual or

12   constructive possession of 28 grams or more of

13   methamphetamine or any mixture containing

14   methamphetamine, in violation of Section

15   13A-12-231 of the Code of Alabama of 1975, as

16   amended.  To this charge, the Defendant has

17   entered a plea of not guilty.

18   In Case Number CC 2002-187, the Defendant,

19   Jerry E. Whitley, is charged with the offense of

20   unlawful possession of a controlled substance.

21   The indictment in this case alleges that the

22   Defendant did unlawfully possess methamphetamine,

23   a controlled substance, contrary to and in

24   violation of Section 13A-12-212 of the Code of

25   Alabama of 1975, as amended, and against the

1    peace and dignity of the State of Alabama.    To

2    that charge, the Defendant has entered a plea of

3    not guilty.

4        And the third charge in Case Number

5    CC 2002-188 also comes to the Court by way of an

6    indictment returned by a grand jury impaneled

7    here in Russell County, and the Defendant is

8    charged with the offense of resisting arrest and

9    alleges that on or about the 21st of September,

10    2001, the Defendant did intentionally prevent or

11    attempt to prevent Agents Whitten, Price, Memmo

12    and Spear from effecting a lawful arrest of

13    himself, in violation of Section 13A-10-41 of the

14    Code of Alabama.    To this charge, the Defendant

15    has entered a plea of not guilty.

16        The Defendant is presumed to be innocent

17    until proven guilty in all three of these

18    charges.

19            (Voir dire of jury venire.)

20            (Jury not present.)

21        THE COURT:    Do we have any challenges?

22        MR. LANDREAU:    Judge, I have to confess I'm

23    not sure that this is grounds for a challenge for

24    cause, but Ms. Jessie Smith indicated she is

25    allergic to ammonia.    I've been told by my lab

82

1    person that some of this evidence does smell of

2    ammonia, and I'm worried about if they take it

3    into a jury room, which is a fairly small

4    confined space, and I'd move to challenge her for

5    that reason.  I think there may be a problem with

6    her being able to view this evidence.

7        THE COURT:  Health hazard to a juror I don't

8    know is listed as one of the challenges for

9    cause.

10       MR. LANDREAU:  I don't know if it is either,

11    Judge.

12       THE COURT:  I would decline to strike her as

13    a challenge for cause.  Ms. Farrar, do you have

14    anything?

15       MS. FARRAR:  Yes.  I would move to strike

16    Gordon Eugene Cox.  He stated that he has not yet

17    received an order back on the modification or a

18    final order where the members of my firm

19    represent his ex-wife, so there's still a pending

20    representation.

21       THE COURT:  Well, he's indicated that that

22    would not affect his or influence him in his

23    decision, and I will decline to strike him on a

24    challenge for cause.  Anything further?

25       MR. LANDREAU:  No, Your Honor.

1    THE COURT:  All right.  There are some

2  motions, Ms. Farrar, you have at this time?

3    MS. FARRAR:  Yes, Your Honor.  I believe

4  there's an outstanding motion to continue based

5  on --

6    THE COURT:  Well, I denied that yesterday

7  afternoon.  And you were called and informed that

8  I had denied the motion to continue?

9    MS. FARRAR:  That's right.

10    THE COURT:  I didn't see it until yesterday

11  afternoon.  When was it filed?

12    MR. LANDREAU:  I believe Tuesday, Your

13  Honor.

14    MS. FARRAR:  Your Honor, I received the

15  laboratory report, with apologies, the day before

16  Thanksgiving.  And also was still waiting, and I

17  understand the circumstances completely, but Ms.

18  Wilson had not had an opportunity to prepare the

19  requested transcripts I ordered.

20    THE COURT:  I think she prepared those and

21  delivered them to you yesterday.

22    MS. FARRAR:  I received them, Your Honor, in

23  the afternoon.  But concerning the expert

24  witness, the independent laboratory analysis, I

25  would still move to be able to get that analysis

1    into evidence, and I realize I can't do that

2    without my expert here.  He's not here.  But if I

3    were allowed the continuance and the

4    extraordinary expenses, and that's the other

5    motion, motion for extraordinary expenses, which

6    I understood you denied yesterday, I would like

7    to put on my offer of proof about what I would

8    expect to prove to preserve that for appeal, Your

9    Honor.

10         THE COURT:  Well, had you made any

11   arrangements to bring him here for this week?

12        MS. FARRAR:  No, Your Honor.

13        THE COURT:  And you understood the case was

14   set for trial this week; did you not?  Is there

15   any particular reason why you made no

16   arrangements to have him here for this week?

17        MS. FARRAR:  I was waiting for the results

18   of the laboratory analysis.

19        THE COURT:  Well, you had informed the Court

20   that they would be ready for this week, did you

21   not, at the last motion that you made and at the

22   last term of court in which you -- which was

23   September?

24        MS. FARRAR:  Yes, Your Honor.  And I did

25   file a motion for his --

1          THE COURT:  Which was a two full months

2     ago.

3          MS. FARRAR:  I filed the motion for his

4     expenses to fly out here, and I was told -- I

5     believe that the Court said let's wait on what

6     the results are and then I will decide whether to

7     grant the extraordinary expenses for him to

8     travel out here, and then I did the motion for

9     extraordinary expenses as soon as I got the

10    results.

11         THE COURT:  Which shows that there was

12    methamphetamine present?

13         MS. FARRAR:  Yes, Your Honor.  It was -- my

14    offer of proof would be that --

15         THE COURT:  And you would want to fly the

16    witness here to show that there was

17    methamphetamine present?

18         MS. FARRAR:  To show that it was in such

19    small a quantity related to the liquid substance,

20    that that would be preserved for the record.

21         THE COURT:  Well, do you have a written

22    report from this individual?

23         MS. FARRAR:  Yes, Your Honor.

24         THE COURT:  Will the State stipulate to that

25    report?

86

 1        MR. LANDREAU:  Your Honor, we have no

 2   problem with her introducing the report in terms

 3   of an appellate record.  Our position is under

 4   Alabama law, the ratio of meth to other

 5   substances in the mixture is immaterial and

 6   irrelevant, so we would object to it going to the

 7   jury.  But if she wants to place it there for

 8   some purposes of an issue down the road, we don't

 9   have any objection to that.  We just don't think

10   it should go to the jury.

11        THE COURT:  Well, there's been a Motion in

12   Limine that has been filed --

13        MR. LANDREAU:  Yes, sir.

14        THE COURT:  -- in this matter in which the

15   State is asking that the argument not be made as

16   being impermissible.  Do you have any response to

17   that, Ms. Farrar?

18        MS. FARRAR:  Your Honor, I would object to

19   the Motion in Limine.  The jury has a right to

20   know the total circumstances surrounding this

21   alleged methamphetamine lab drug bust, and my

22   client has received information that was prepared

23   by the expert witness, and I believe that it

24   would be in the interest of justice that this

25   information and report be preserved for the

1    record and placed in the file.  If it's the

2    Court's ruling that the jury doesn't see it,

3    that's one thing, but I would want it in the file

4    to be preserved.

5        THE COURT:  Let me say that I think it would

6    be permissible for the defense to show the

7    percentage of methamphetamine in any

8    controlled -- in any volume of material other

9    than what is there.

10        MS. FARRAR:  I don't understand.

11        THE COURT:  Well, what I'm saying is your

12    client is being charged with possession of 28

13    grams or more of methamphetamine; is that

14    correct?

15        MR. LANDREAU:  Yes, Your Honor.

16        THE COURT:  And if you have something to

17    show there is not 28 grams in there, in this case

18    you have a mixture that has methamphetamine in

19    it, according to your report.  Does it state the

20    actual amount of methamphetamine in that

21    mixture?

22        MS. FARRAR:  Yes, Your Honor.

23        MR. LANDREAU:  Your Honor, in response,

24    State's position is, under case law, if it's in a

25    mixture such as this, it is the total weight of

88

1    the mixture, not the weight of the active

2    ingredient within the mixture.

3        MS. FARRAR:  And I have two arguments about

4    that.  The case law is certainly that a mixture

5    is defined as containing the drug and containing

6    other substances, but there has been case law

7    about what other substances can be defined as

8    being part of the mixture and what are excluded.

9        THE COURT:  Do you have that for me to look

10    at?

11        MS. FARRAR:  Yes, Your Honor.

12        MR. LANDREAU:  Ms. Farrar, are you referring

13    to the Fletcher case?

14        MS. FARRAR:  Yes.

15        MR. LANDREAU:  Your Honor, we submit that's

16    not applicable.  That case says if you have two

17    substances that are together that do not combine

18    into one mixture, in the Fletcher case it was

19    crack cocaine and soap chips, that's not a

20    mixture.  But Fletcher also holds that if the

21    methamphetamine or drugs are comingled and

22    diffused among a liquid or other substance, then

23    you do count the entire weight of the mixture.

24        MS. FARRAR:  Our position would be that it's

25    possible in our case that it's slightly different

1    than that.  It's not soap certainly, but that

2    there could be new law by the Alabama Court of

3    Criminal Appeals up to the Supreme Court.  There

4    is a Federal law where mixtures are analyzed to

5    determine the amount of alleged controlled

6    substance.

7         THE COURT:  Do you have the Fletcher case

8    that you have cited?

9         MS. FARRAR:  Yes, sir.

10         MR. LANDREAU:  Here it is, Judge.

11            (Brief pause.)

12         THE COURT:  All right.  Do you have

13    something further, Ms. Farrar?

14         MS. FARRAR:  I do not have the case with me

15    or the case name, but in my research I found a

16    case where the Defendant had appealed or had a

17    Rule 32 for ineffective assistance of counsel.

18    One of the allegations was that the defense

19    attorney asked the question of the forensic

20    scientist did you check the ratio of the alleged

21    controlled substance to the other ingredients of

22    the mixture which was weighed.  The scientist

23    said in the presence of the jury, no, because I

24    didn't have to.  The Defendant was arguing that

25    that was a showing that the attorney was not

1    learned in the law, but the Justices said, no,

2    that was not an example of ineffective assistance

3    of counsel.  That was something that was

4    appropriate, so I would just offer that.

5         THE COURT:  May I see the report that you

6    have from your --

7         MS. FARRAR:  Yes, Your Honor.

8         THE COURT:  -- testing?

9         MS. FARRAR:  I believe Mr. Landreau has a

10   copy, and I've marked it as Defendant's Exhibit

11   1.  It has five pages.

12        THE COURT:  Now, this is his result just of

13   the sample?

14        MS. FARRAR:  Of the samples.  They each

15   contained five milliliters.  There were two

16   samples.  One was found to have approximately

17   point three milligrams per milliliter, and the

18   other sample was found to have 1.8 milligrams per

19   millileter.  Attached to the report is the CV of

20   the independent expert, Dr. John Hiatt.

21        THE COURT:  I don't see any problem with

22   this report being entered into evidence and being

23   presented to the jury.  There's been a Motion in

24   Limine that has been filed, and the Court would

25   grant the State's Motion in Limine to the extent

1    that it would be impermissible for you to argue

2    to the jury that a mixture containing

3    methamphetamine is not sufficient for conviction.

4         MR. LANDREAU:  Judge, just for

5    clarification, as I understand it, the Court is

6    telling defense counsel they cannot argue that

7    there was really less than 28 grams of meth

8    regardless of the weight of the mixture; is that

9    correct?

10        THE COURT:  No.  What I'm telling you is she

11   cannot bring up that there is -- that a jury

12   cannot convict upon the fact that there is less

13   than the actual 28 grams of methamphetamine; that

14   it is clearly the law that it is a mixture

15   containing methamphetamine of 28 grams or more.

16   And the Court is going to instruct the jury as to

17   what the definition of the mixture as cited by

18   the Court in the Fletcher opinion.

19        MR. LANDREAU:  Judge, do you want to keep

20   the Fletcher --

21        THE COURT:  I wrote down the definition.

22        MR. LANDREAU:  Oh, okay.  I was just going

23   to let you keep the case because I didn't think I

24   would be needing it again.

25        MS. FARRAR:  But, Your Honor, I would be

92

1    allowed to argue to the jury simply the fact that

2    there was found to be this much proportion?

3        THE COURT:  Yeah.  I think you are entitled

4    to ask of the State's witness what the proportion

5    of methamphetamine is to that as well as present

6    the proportion from your expert analysis.

7        MS. FARRAR:  Your Honor, I don't have my

8    expert to get this evidence in.  I don't know how

9    I can get it in without laying the foundation

10   of --

11       THE COURT:  Well, I don't see any problem

12   with there being a stipulation that that be

13   entered into evidence.

14       MR. LANDREAU:  No problem with that.

15       THE COURT:  And it has his background as

16   well as --

17       MS. FARRAR:  Thank you, Your Honor.

18       THE COURT:  -- education and training and

19   experience to show that he is an expert.

20       MS. FARRAR:  Yes, sir.  And we need to get

21   that on the record before the jury, or is it

22   sufficient to have it on the record now?

23       THE COURT:  Well, I mean, you'll be able to

24   read that out to the jury as part of your

25   exhibit.

1      MS. FARRAR:  Yes, sir.

2      THE COURT:  All right.  You have 30 minutes

3   to strike a jury.

4           (Counsel and the circuit court clerk

5            struck the jury without the presence

6            of the court reporter.)

7           (Jury impaneled.)

8           (Rest of jury venire dismissed.)

9           (Jury sworn.)

10      THE COURT:  Ladies and gentlemen of the

11   jury, there are three cases that are before you

12   for trial today, and the Court has read out the

13   indictments that bring these cases to the Court

14   for trial, and I'm not going to reread the

15   indictments, but I want to remind you that the

16   indictments are not evidence in the case.  They

17   are merely the written means by which the cases

18   are brought before the Court for trial.  The

19   indictments also serve the purpose of notifying a

20   defendant with particularity of the offenses with

21   which he is charged, and it sets out the elements

22   of the offense which must be proved by the State

23   of Alabama.

24      Before proceeding with the trial of the

25   case, it may be helpful to you and to the Court

1    that you understand the rules of procedure that

2    will be followed by you and by the Court in these

3    cases.  These cases are criminal cases.  The

4    procedure for the trial of these cases, as in

5    criminal cases of the same character, will be as

6    follows.

7        Mr. Landreau on behalf of the State will

8    make an opening statement outlining the State's

9    case.  Ms. Farrar will then make an opening

10   statement outlining the defense.  Each side in

11   the opening statement will be confined to an

12   outline of the case and a statement of what they

13   expect the evidence to show.  Their statements

14   are intended to inform you and the Court about

15   the cases, so that we will both be familiar with

16   the theories and contentions of each side from

17   the beginning.

18       Following these opening statements by the

19   attorneys, witnesses will first be called by the

20   State to testify.  After the State has presented

21   witnesses, the Defendant will then be permitted

22   to call witnesses to testify.  All witnesses will

23   be sworn and will testify under oath.  Their

24   testimony will be evidence.  There may be

25   exhibits offered which, if received by the Court,

1    will also be evidence.  It will be upon all of

2    this evidence, the testimony and the exhibits,

3    that you may consider in arriving at your final

4    verdict, and you may consider only the testimony

5    from the stand and the exhibits that have been

6    entered into evidence in reaching your final

7    verdict.

8         Following the close of evidence in the case

9    or presentation of evidence, the attorneys will

10   again have the privilege of addressing you, and

11   this is referred to as summation or closing

12   argument.  The attorneys have the right to

13   discuss the evidence and all the reasonable

14   inferences to be drawn therefrom to help you

15   arrive at a just and true verdict.  Mr. Landreau

16   on behalf of the State will have the right to

17   open the arguments, followed by Ms. Farrar on

18   behalf of the Defendant.  Mr. Landreau will then

19   have the right to a second closing argument, and

20   this is primarily based upon the fact that the

21   burden of proof is upon the State of Alabama in

22   all three of these cases to prove the Defendant

23   guilty as charged.  The Defendant is innocent

24   until proven guilty.

25        Following the arguments of the attorneys, it

1   will be the duty of the Court to state to you the

2   applicable rules to guide you in arriving at your

3   verdict.  The case will then be submitted or

4   cases will be submitted to you for your

5   deliberation.  Upon retiring to the jury room to

6   consider your verdict, you elect one of your

7   number as foreperson to moderate your discussion

8   and to sign and return the verdicts chosen by you

9   to the Court.

10       It is my duty as judge to see that the trial

11   progresses in an orderly fashion, to rule upon

12   all legal matters that are presented, to define

13   the issues involved, and instruct the jury as to

14   the law applicable in the particular cases.  It

15   is your duty as jurors to follow the law as so

16   stated to you by the Court.  You will, therefore,

17   render a verdict in accordance with the facts as

18   you determine them from the evidence and the law

19   as given to you by the Judge.

20       In determining what the true facts are from

21   the evidence, you may take into consideration any

22   natural interest or bias a witness may have as a

23   result of any connection with the case.  You may

24   take into consideration the interest or bias a

25   witness may have shown while testifying.  And you

may take into consideration the demeanor of any
witness, as to whether the witness has apparently
testified frankly or evasively.  You may take
into consideration any matter which you would in
your everyday affairs in passing upon the
truthfulness and accuracy of the testimony.
Weigh the testimony in the light of your common
observation and experience and reach a verdict
that will be based upon the truth as you
determine it from all of the evidence.

During the course of the trial, I may rule
on objections by the attorneys as to the
admissibility of testimony or other evidence.  It
is the duty of an attorney to make such
objections to the offer of evidence which he or
she deems illegal or improper.  You must not
concern yourselves with the reasons for my
rulings since they are controlled and required by
rules of law.  You are not to speculate as to
possible answers to questions which I do not
require to be answered.  The overruling of
objections to evidence is not intended to
indicate the weight to be given that admitted
evidence.  The admitted evidence is to be
considered along with all the other evidence.

You are to disregard any evidence or offer of evidence which the Court has excluded.

An attorney is an officer of the court. It is the attorney's duty to present evidence on behalf of the client, to make such objections as the attorney deems proper, and to fully argue the client's case. An attorney's statements and arguments are intended to help you understand the evidence and apply the law. However, their arguments are not evidence, and you should disregard any remark, statement or argument which is not supported by the evidence or by the law as given to you by the Court. Likewise, statements made by the Court are not evidence and are not to be considered by you as evidence.

No juror should attempt to make an individual investigation of the facts or of anyplace testified about. You are not authorized to gather evidence on your own account or on behalf of any of the parties to the case. You should not visit the scene of any alleged incident or attempt to inspect or examine any object or property unless that object or property has been received in evidence and your inspection is made either in the courtroom or in the jury

room.

As a juror, you have a legal right to take notes during the trial, but the Court does not generally recommend the taking of notes by jurors. If notes are taken by you, they should be taken simply as an aid to your memory and for your assistance in that regard, and they may not be exhibited to the other jurors as an authoritative record.

During the course of the trial there may be some words or phrases used that need to be defined. The Court will give to you a legal definition of these words or terms. The legal definition sometimes is different from the definition that is customarily ascribed to the word or term. If this should happen, you should accept the Court's definition. In no event should you seek any definition of any word or phrase by consulting any dictionary, encyclopedia or other book. That would be improper for you to do so.

Until this case is submitted to you for your deliberations, you must not discuss the case with anyone, nor permit anyone to discuss the case with you or in your hearing. You are to keep an