1   open mind, and you shall neither discuss nor

2   decide any issue in this case among yourselves

3   until the case is submitted to you for your

4   deliberations under the instructions of the

5   Court.  If members of your family or friends or

6   anyone else should ask you about the case, you

7   should tell them that you are under the Court's

8   instruction not to discuss it.  When the trial is

9   over and your verdict rendered, you will then be

10  released from this instruction and you will then

11  be free to discuss the case and your experiences

12  as a juror if you so desire.

13      The attorneys, parties and witnesses are not

14  permitted to talk to you during the trial.  Even

15  a discussion which has no relation to the case

16  might give a bad appearance.  If the participants

17  in the trial fail to greet you or converse with

18  you during the course of the trial, it will be

19  due to this rule.

20      That concludes the Court's opening statement

21  of the procedure and the law to be followed in

22  this matter.  We will now begin with opening

23  statements by the attorneys, first by Mr.

24  Landreau, then by Ms. Farrar.

25      Mr. Landreau?

1    MR. LANDREAU: May it please the Court, Ms.

2    Farrar, ladies and gentlemen of the jury. This

3    is not the time for lawyers to argue. What the

4    opening statements are about is to tell you what

5    we expect the evidence to be in this case.

6        Jerry Whitley, the Defendant, is charged

7    with three offenses. He is charged with

8    trafficking in methamphetamine; that is, that he

9    possessed either 28 grams or more of

10   methamphetamine or any mixture containing

11   methamphetamine. He is charged separately with

12   possessing some additional methamphetamine that

13   he had in a pocket, and he's charged with

14   resisting arrest. Here's what the evidence will

15   be.

16       On September 21st of last year, 2001, Agent

17   Jason Whitten, who is employed by the Phenix City

18   Police Department and assigned to the Metro

19   Narcotics Task Force, a unit which, as the name

20   applies, concentrates on drug offenses. Jason

21   received a phone call from a citizen, and he said

22   I want to give you some information. He said a

23   guy named Jerry Whitley is running a

24   methamphetamine lab in Rusk Trailer Park. This

25   caller said, look, I don't know the exact trailer

1   number, but here's a description of the trailer

2   and here's a description of some cars that are

3   parked in front of it.  And the caller said and

4   oh, by the way, I think you need to know

5   Whitley's got surveillance cameras, closed

6   circuit television surveillance cameras set up so

7   he can see outside the trailer.  He's got a bunch

8   of guns, and he's booby-trapped that trailer so

9   he can blow it up if the police show up.

10       You'll find that or the evidence will be

11  that Rusk Trailer Park is located just off

12  Highway 80.  As the name implies, it's a place

13  where people have mobile homes.  There are mobile

14  homes within 20 feet of either side of the

15  trailer Whitley was using.  There's families,

16  there are children out there.

17       Jason Whitten, together with other officers

18  of Metro Narcotics Task Force, went out to Rusk

19  Drive back on September 21st to see if they could

20  verify this information they had been given.

21  Sure enough, they found a trailer that matches

22  the description.  Sure enough, in the yard of

23  that trailer are the exact cars that the caller

24  indicated.  So Agents Whitten, Price and Memmo

25  decide that they would just watch this trailer a

little while, see if there was anything unusual
going on.

Sat there for a little while.  A guy came
out of the trailer by the name of Steve Moseson.
Agent Whitten walks up to Moseson, and the first
thing he notices, Moseson smells of ammonia and
ether.  Now, you will learn today that ammonia
and ether are two key ingredients used in
manufacturing methamphetamine.  Moseson was also
acting extremely nervous.  Officer Whitten pats
him down and finds methamphetamine on Moseson,
and the evidence will be he was charged and that
case has been disposed of.

Officers then got a little concerned about
were we seen talking to Moseson, what's going on,
so they walk up to the door of the trailer and
they knock on the trailer door, and a woman named
Caylene White comes to the door, and the officers
say is there a Jerry Whitley here.  Lo and
behold, this Defendant steps out of the trailer.

Now, by a remarkable coincidence, Whitley
knows one of the police officers, Sergeant Jim
Price.  It turns out they grew up near one
another.  They are familiar with each other and
known to each other.  The minute Whitley sees

that, sees Jim Price and recognizes him, he tries
to run, and Jim Price grabs him.  As they
struggle, Price notices that Whitley has a wrench
sticking out of his back pocket, so Sergeant
Price grabs the wrench to keep Whitley from using
it.  When he pulls the wrench out of Whitley's
pocket, a bag of methamphetamine falls out of
Whitley's pocket.  That's the possession charge.

When that happens, Whitley starts screaming
at the woman to blow it up, do it, blow it up.
So Agent Whitten grabs Caylene White and gets her
out of the trailer.  Remember, the trailer is
supposed to be booby-trapped.  When that happens,
Whitley starts screaming to someone else, Wayne,
do it, blow it up, do it, blow it up.  So another
agent rushes into the trailer.  There is another
person in that trailer, a gentleman by the name
of Wayne Meadows.  They get Meadows out.  They
get a search warrant and they go back in.  Let me
tell you what they found.

First thing, this trailer, which is a
single-wide trailer, rented trailer, has
surveillance cameras and closed circuit T.V.'s
hooked up.  The cameras are pointed out so you
can see somebody coming up, so you can see the

1    roadway.  It's got police scanners in it with

2    Russell County's radio frequency and Phenix

3    City's radio frequency so they can listen to the

4    police.  It's got -- there's guns everywhere.  A

5    22 rifle, a 308 rifle, a 357 pistol, a

6    Derringer.  They're all over the house.  A

7    crossbow even.  There are tanks of oxygen and

8    nitrogen and other things there, and that's just

9    in the living room.

10        When you start moving to the kitchen, there

11   are coffee filters and cold tablet boxes

12   everywhere.  You'll find out that one of the ways

13   or the way you make methamphetamine, you take

14   common cold capsules, you dissolve them so that

15   you can get the active ingredient called

16   ephedrine out of it, filter that through coffee

17   filters, take that active ingredient, combine it

18   with some more chemicals and create meth.

19        There are coffee filters.  We expect the

20   evidence to be those filters show traces of

21   meth.  There were the cold tablets that were

22   used.  There were bottles and bottles of liquids

23   in there.  You will hear from the lab.  The lab

24   will tell you that some of those bottles

25   contained ephedrine, the precursor to

1  methamphetamine.  10,000 or, excuse me, eight

2  thousand grams of the predecessor.  Two of the

3  jars contained a liquid that has methamphetamine

4  in it, a total of 2000 grams.  For those of you

5  who are not into the metric system, that's over

6  four pounds of liquid containing

7  methamphetamine.

8      They found a booby-trap.  It turned out

9  there's a fishing line that runs from the door

10  across the ceiling back to the back where there's

11  a candle tied to this line.  Underneath the

12  candle is a vat of flammable fluids.  The concept

13  was light the candle, pull the line as you go

14  out, it falls over and blows the trailer up.  You

15  will hear from Wayne Meadows.  He will tell you

16  there were flammable liquids soaking all around

17  the lab and that he presumed when Whitley was

18  screaming blow it, he meant light a match to it,

19  burn it down, burn the evidence up.

20      Ladies and gentlemen, you will hear that

21  after being arrested, Mr. Whitley tells an

22  officer, look, my life's over because of this,

23  but I want you to know I meant for them to pour

24  all the meth down.  When I was screaming blow it

25  up, I meant for them to pour the meth.  I didn't

107

really mean for him to blow y'all up.  Yep.

Ladies and gentlemen, after you hear the evidence, there will be no question in your mind that this man is guilty of each and every crime that he's accused of.

THE COURT:  Ms. Farrar?

MS. FARRAR:  On behalf of my client, Jerry Whitley, I want to really thank y'all for serving this week and thank you for being here.  This is a very important day for my client, for Jerry. He's charged with three crimes:  The trafficking crime, trafficking in methamphetamine, possession of methamphetamine, and resisting arrest.  Those are all very serious charges, and Mr. Landreau has spoken to you about what he hopes to prove today by introducing witnesses, certain evidence that might be in the form of perhaps a video or photographs.  There might be some chemicals that are brought into the courtroom, and there will probably be testimony from a scientist today.  I expect that there would be.

I want y'all to remember, and I'm sure you know, that the evidence is what you consider, not what I say, not what Buster Landreau says.  The Judge will instruct you on the law.  The Judge

will instruct you that it is your job to
determine what the facts are in this case, in
these three cases, and they're all wrapped up
into one fact situation.  But you're going to be
hearing from several individuals.  You're going
to be listening to Buster.  I might object, but
our objections shouldn't really throw you either
way.  What's important is whether the Judge rules
that their answer is going to go into evidence or
not, and that's what you need to pay attention
to.

I like to be nice.  I'm a female raised in
the South, and sometimes it's hard for me to
object.  I don't want people to not like me, so
sometimes I seem like -- I know I seem like I
come across kind of funny, and it may just be my
self-consciousness, but four or five years of
doing this I've gotten used to just going ahead
and doing my job and not worrying about if I'm
interrupting someone.  You know, all my life my
parents would say don't interrupt when people are
talking.  Well, I have to interrupt all day every
day.

I wanted to tell you a little bit about
Jerry.  He was raised in Columbus.  He did go to

school with Agent Price. He's a mechanic, and he is divorced and has two daughters. He works on cars sometimes right now, and he has had very good jobs where he has been employed in larger cities and major projects. And Jerry's charged with a serious crime today, and my job is to make sure that the law is followed. My job is to represent him to the very best of my ability, and I would ask that you please take this very, very seriously and also use a reason to approach to listen to the evidence.

Decide what you believe. Decide what sounds reasonable. And a reasonable person, if they have a doubt about a guilt of either of these three crimes, well, that doubt is a reasonable doubt. And how do you come up with whether it's a reasonable doubt? Well, use your common sense, and I believe that will be in Judge Greene's instructions to the jury that common sense is just from living day-to-day. We just all have picked it up. And sometimes I don't use my common sense, but today I'm asking for you to use your common sense.

It's very important for you to just sort out what you see to be the facts and ask yourself is

1   this reasonable. Does my common sense tell me

2   something's wrong here. And then if something's

3   wrong with the facts, if they don't all go

4   together right, then ask yourself why, what's

5   missing.

6   Now, the statute trafficking in

7   methamphetamine, it does require a minimum weight

8   of a controlled substance of 28 grams, so you

9   would need to be satisfied from the evidence that

10  there was that much found on September 21st of

11  2001. Possession doesn't require a minimum

12  amount of drugs. The scientists that the State

13  will --

14  MR. LANDREAU: Your Honor, I'm sorry to

15  interrupt, but I object on the grounds that we're

16  into argument now instead of showing what the

17  evidence will be.

18  THE COURT: All right. If you would -- I'm

19  going to allow her to have a very limited

20  explanation to the jury at this point.

21  MS. FARRAR: Okay. That was really all I

22  was going to say, Your Honor.

23  THE COURT: All right.

24  MS. FARRAR: At any rate, I just want to go

25  through levels of proof, and I was here on

1  Monday.  Many of you remember when the attorney,
2  Mr. Adams, was explaining about the grand jury
3  process.  People are indicted based on probable
4  cause.  This is a higher level of proof, a higher
5  standard of proof.  The State doesn't only have
6  to prove probable cause.  They have to prove this
7  crime was committed by this person beyond a
8  reasonable doubt, and that's a very high level of
9  proof.
10      But the other side of that is that coming
11  into the courtroom, my client is wearing a cloak
12  of innocence, and that cloak of innocence stays
13  on him throughout the trial, and I'm asking you
14  to keep that in mind as you listen to the
15  evidence.
16      This case basically is about a narcotics
17  raid.  We have a Metro Narcotics Task Force that
18  is made up of law enforcement from Harris County,
19  Columbus, Phenix City, Russell County, and that's
20  what happened that day.  And the police officers,
21  when you hear them speak, I will be
22  cross-examining them and they will have an
23  opportunity to tell you what they see as the
24  facts, but just keep in mind that a person may
25  possibly be mistaken about facts, and just try to

1    sort out what you hear today.  Focus on Jerry's

2    case, make a decision only on what's in the

3    evidence.

4         And before you leave today, I just want to

5    thank you in advance.  I know we've got a day

6    ahead of us.  It's a rainy, cold day.  I

7    appreciate you coming.  My client, Jerry, has

8    very, very important rights, the right to a trial

9    by a jury, a right to have the State prove its

10   case.  And I would ask you to look at the

11   evidence with all the scrutiny that Jerry

12   deserves, and that's all I have right now.  Thank

13   you, Your Honor.

14         THE COURT:  Ladies and gentlemen, that would

15   conclude the opening statements.  Who would the

16   State call as its first witness?

17         MR. LANDREAU:  Call Chris McKinstry.

18                 CHRIS MCKINSTRY

19         was sworn and testified as follows:

20                 DIRECT EXAMINATION

21   BY MR. LANDREAU:

22   Q    Tell us your full name, please, sir?

23   A    Christopher Scott McKinstry.

24   Q    And where do you work, Mr. McKinstry?

25   A    The Monarch Company.

1   Q   Are you affiliated in any way with Rusk Trailer

2       Park?

3   A   Yes, sir.

4   Q   And what is that affiliation?

5   A   I own the park.

6   Q   You own Rusk Trailer Park?

7   A   Yes.

8   Q   Did you own it back in September of last year?

9   A   Yes.

10  Q   Are you familiar with a gentleman by the name of

11      Jerry Whitley?

12  A   I know he was a resident there, yes.

13  Q   Do you see Mr. Whitley in the courtroom?

14  A   Yes, I do.

15  Q   Would you point him out to us?

16  A   In the blue shirt.

17  Q   What lot did he live at; was that 29?

18  A   Number 29.

19  Q   And he was the owner or he was the resident at

20      that trailer?

21  A   He was the resident, yes, sir.

22  Q   To your knowledge, was he the sole resident?

23  A   To my knowledge, yes.

24  Q   And where is Rusk Trailer Park located?

25  A   It's on Highway 80 West.

1    Q    Out in the Ladonia area?

2    A    It's in the Ladonia area.

3    Q    How many mobile homes are in that park?

4    A    34.

5    Q    And, on average, how far apart are the mobile

6    homes?

7    A    10 or 15 feet, on average.

8    Q    Are there families that live there?

9    A    Yes.

10    Q    Are there small children present in that park?

11    A    Yes.

12    Q    Ms. Farrar may have some questions for you.

13                  CROSS-EXAMINATION

14    BY MS. FARRAR:

15    Q    Who actually -- withdraw that.  Do you know

16    whether Jerry rented the trailer directly from

17    the trailer park or whether it might have been

18    subleased?

19    A    It was subleased.

20    Q    Who was the individual, if you know, from whom

21    Jerry rented the trailer?

22    A    Steve Holton.

23           MS. FARRAR:  That's all, Your Honor.

24           MR. LANDREAU:  Your Honor, may this witness

25    be excused?

1          THE COURT:  Yes, he may.  Who is your next

2     witness?

3          MR. LANDREAU:  Jody Williford.  Chris, I

4     appreciate you coming.  You're free to go.

5          THE WITNESS:  All right.

6               (Brief pause.)

7                  JODY WILLIFORD

8     was sworn and testified as follows:

9               DIRECT EXAMINATION

10   BY MR. LANDREAU:

11   Q    State your full name, please, sir?

12   A    Jody Williford.

13   Q    Where are you employed, Mr. Williford?

14   A    I'm employed with the Russell County Sheriff's

15        Department assigned to Metro Narcotics.

16   Q    And Metro Narcotics, what is their primary area

17        of focus or crimes that they focus on?

18   A    Drug activity.

19   Q    Now, do you have any duties dealing with the

20        transportation of evidence?

21   A    Yes.  I'm the drug custodian for both Alabama

22        agents.

23   Q    And when did you join Metro, by the way?

24   A    October of 2001.

25   Q    Now, with that duty of transporting the drugs to

1     the lab, would that include returning them back?

2  A  Yes, it would.

3  Q  Have you went to the lab and got some drugs that

4     have been analyzed for them in this case?

5  A  Yes, sir, I have.

6  Q  Do you have those with you?

7  A  Yes, sir, I do.

8  Q  I'm going to mark this as State's Exhibit 1 for

9     purposes of identification.  Mr. Williford, when

10    did you pick up those drugs?

11  A  January 31st of 2002.

12  Q  And where have they been since then?

13  A  Stored in my evidence locker at the Russell

14    County Sheriff's Department.

15  Q  Does anyone else have access to that evidence

16    locker?

17  A  I'm the only one that has access to it.

18  Q  Since you got the drugs from the lab, have you

19    changed or altered the drugs in any way?

20  A  No, sir, I have not.

21  Q  Have you added anything to it or taken anything

22    from it?

23  A  No, sir.

24  Q  Are they in substantially the same condition

25    today as when you picked them up?

117

1    A    Yes, sir, they are.

2    Q    Ms. Farrar may have some questions.

3        MS. FARRAR:  That's all I have.  I don't

4    have any questions, Your Honor.

5        THE COURT:  May this witness be excused?

6        MR. LANDREAU:  Yes, Your Honor.

7        THE COURT:  Who's your next witness?

8        MR. LANDREAU:  Call Agent Jim Price.

9                    JIM PRICE

10       was sworn and testified as follows:

11                DIRECT EXAMINATION

12   BY MR. LANDREAU:

13   Q    Tell us your full name, please, sir?

14   A    James H. Price, III.

15   Q    Where are you employed, Mr. Price?

16   A    I'm currently employed with the Harris County

17       Sheriff's Department.

18   Q    In Harris County, Georgia?

19   A    Yes, sir.

20   Q    And where are you assigned or what duties are you

21       assigned?

22   A    I'm currently assigned to the Metro Narcotics

23       Task Force.

24   Q    Could you briefly tell us what the Metro

25       Narcotics Task Force is?

1    A    It's a multi-jurisdictional task force comprised

2         of several different police agencies, like Harris

3         County, Muscogee County, Columbus Police

4         Department, Russell County and Phenix City Police

5         Department.

6    Q    Now, what's your rank or position within the task

7         force?

8    A    I'm a sergeant.

9    Q    And is that a supervisory position?

10   A    Yes, sir, it is.

11   Q    Let me ask you, are you familiar with a Jerry

12        Whitley?

13   A    Yes, sir, I am.

14   Q    You see Mr. Whitley in the courtroom today?

15   A    Yes, sir, I do.

16   Q    How long have you known Mr. Whitley?

17   A    I've known --

18             MS. FARRAR:  Objection, relevance, Your

19        Honor.

20             MR. LANDREAU:  Just as to his ability to

21        identify.

22             THE COURT:  Overrule the objection.

23   Q    How long?

24   A    At least 20 plus years.

25   Q    Were y'all relatives at one time or not

1      relatives, but were you living relatively close

2      to each other at some point?

3  A   Yes, sir.  He used to live on the street behind

4      my mother's house.

5  Q   Is that when y'all were growing up?

6  A   Yes, sir.

7  Q   Back on September 21st of 2001, did you have an

8      occasion to go to Rusk Trailer Park as part of an

9      investigation?

10  A   Yes, sir, I did.

11  Q   And what prompted you to go there?

12  A   We had received information from a confidential

13      informant that Mr. Whitley was --

14         MS. FARRAR:  Objection, hearsay.

15         MR. LANDREAU:  It's not offered for the

16      truth of the matter, Your Honor, but simply to

17      explain why the officers went there.

18         THE COURT:  Court will sustain the objection

19      in part and overrule the objection in part.

20      Ladies and gentlemen of the jury, this officer

21      has been asked a question in which he has

22      received information from someone else and was

23      told something, and that is what's known as

24      hearsay evidence where you're quoting what

25      somebody else said, and that's normally not

1  allowed into evidence.  However, I'm going to

2  allow the officer to answer the question in this

3  matter not to prove the truth of the matter

4  asserted that what was told him is actually true,

5  but just to show that he received this

6  information and as a consequence he acted upon

7  that information.  You may proceed.

8  Q  What did the informant tell you?

9  A  The informant stated that Mr. Whitley was cooking

10  methamphetamine at his trailer at Rusk Trailer

11  Park.

12  Q  Now, did the informant give you an address?

13  A  No, sir.

14  Q  What information -- how were you going to

15  identify the right trailer?

16  A  Well, he provided us with --

17  MS. FARRAR:  Objection again, Your Honor,

18  hearsay.

19  THE COURT:  It will be the same ruling.

20  It's not -- I'm going to allow it in, but not to

21  prove the truth of the matter asserted.

22  MS. FARRAR:  May I have a continuing

23  objection, Your Honor?

24  THE COURT:  Yes, you may.

25  Q  How were you going to identify the trailer when

1     you got there?

2  A   The informant had provided descriptions of

3     vehicles that were located at the trailer.  Also,

4     a few weeks prior to this, we had set up on the

5     same trailer.

6  Q   Were you provided with any other information

7     concerning the contents or physical layout of

8     this trailer?

9  A   We were told that the trailer that Mr. Whitley

10    was cooking in was supposed to be booby-trapped.

11    It was also supposed to have video surveillance

12    cameras.

13  Q  Now, do you recall what time of day or night on

14    the 21st that y'all got out to Rusk Trailer Park?

15  A  It was approximately around five p.m.

16  Q  And let me ask you, is Rusk Trailer Park, is that

17    a trailer park that has multiple streets in it,

18    or what is the street layout?

19  A  The best of my recollection, it's just straight

20    in.  It goes all the way to like a dead end.  You

21    have to turn around and come back out.

22  Q  So it's one lane in and one lane out?

23  A  Yes, sir.

24  Q  And are there trailers throughout that?

25  A  Yes, sir, there are.

1  Q  Were you looking for a trailer that matched the

2     description that the informant had given you?

3  A  That's correct.

4  Q  Did you locate one?

5  A  Yes, sir, we did.

6  Q  And were you also looking for a trailer that had

7     vehicles in front of it that matched what the

8     informant --

9        MS. FARRAR:  Objection, leading.

10       THE COURT:  I'll sustain the objection.

11  Q  Let me ask you, were you looking for anything in

12     front of the trailer to confirm the

13     identification of it?

14  A  We were told that there was supposed to be a

15     truck parked in front of it with Texas plates.

16  Q  The trailer that y'all eventually began to watch,

17     did it have a truck in front of it?

18  A  Yes, sir, it did.

19       MS. FARRAR:  Objection, leading.

20       THE COURT:  Sustain the objection.

21  Q  What type of plates?

22  A  It had Texas plates.

23  Q  Now, you said we set up and started watching

24     this?

25  A  That's correct.

1    Q    Who is we?

2    A    It was myself, Agent Whitten, and Agent Memmo.

3    Q    Are those agents all members of law enforcement?

4    A    Yes, sir.

5    Q    What happened next, Jim?

6    A    We set up on surveillance for probably around 10

7         minutes, I'm going to go with approximately maybe

8         10 minutes, and we saw the trailer door open and

9         a subject walk out towards the red pickup truck.

10   Q    Were you later able to identify that subject?

11   A    Yes, sir.

12   Q    Who was it?

13   A    His name was Steve Moseson. I'm not sure if I'm

14        pronouncing it right, but it was Moseson.

15   Q    And when this Steve Moseson came out of the

16        trailer, what did y'all do, being law

17        enforcement?

18   A    We exited our vehicles and walked up to Mr.

19        Moseson and identified ourselves.

20   Q    Who specifically spoke to Mr. Moseson?

21   A    I think it was Agent Whitten.

22   Q    Then what happened?

23   A    He was acting real nervous. He kept looking over

24        his shoulder back at the trailer, and we smelled

25        a strong chemical odor on his person, so at that

124

```
1    time we placed him in cuffs for officer safety

2    and conducted a pat-down.

3  Q  You said he had a strong chemical odor on his

4    person?

5  A  Yes, sir.

6  Q  Were you able to identify the chemicals?

7  A  It smelled like ether and ammonia.

8  Q  Have you received any training or specialized

9    training in the identification of drug --

10    methamphetamine laboratories?

11  A  Yes, sir.  I've been to two schools on

12    clandestine methamphetamine labs.

13  Q  Based on your training and experience, does

14    ammonia have any role in the manufacture of

15    methamphetamine?

16  A  They use many different solvents to break down in

17    the --

18        MS. FARRAR:  Objection, not answering the

19    question.

20        THE COURT:  Sustain the objection.

21  Q  Is ammonia used in the manufacture --

22  A  It can be.

23  Q  -- of methamphetamine?

24  A  Yes, sir, it can be.

25  Q  What about either?
```

1   A    Yes, sir.

2   Q    And you smelled ammonia and ether on Mr. Moseson?

3   A    That's correct.

4   Q    You said y'all conducted a pat-down search?

5   A    That's correct.

6   Q    Was anything found during this search?

7   A    Yes, sir.  Agent Whitten removed a small plastic

8        bag from Mr. Moseson's pocket that contained a

9        quantity of suspected methamphetamine.

10  Q    Was Moseson arrested?

11  A    He was placed in handcuffs prior to the pat-down

12       for officer safety, and he was arrested at that

13       time.

14  Q    What did y'all do next?

15  A    At that time we sat Mr. Moseson down and we went

16       to the trailer.

17  Q    What was your purpose in going to the trailer?

18  A    To see if Mr. Whitley was actually in the

19       trailer.

20  Q    How did y'all go about doing that?

21            MS. FARRAR:  Objection, assumes facts not in

22       evidence.  There's been no testimony of Mr.

23       Whitley owning the trailer or that they knew Mr.

24       Whitley owned the trailer.

25            MR. LANDREAU:  Judge, I believe his answer

1     was that he went to the door to see if Mr.

2     Whitley was there.

3           THE COURT:  Well, I'll allow you to ask him

4     what he did next.

5   Q   Let's kind of backtrack.  Y'all searched Moseson,

6     you found the meth.  What did you do next?

7   A   We sat Mr. Moseson down in a chair.  At that time

8     myself and Agent Whitten went to the front door.

9     I sent Agent Memmo to the back door, and I

10    knocked on the door.

11  Q   Did somebody answer the door?

12  A   Yes, sir.

13  Q   Who answered the door?

14  A   A lady later identified as Caylene White.

15  Q   And when she answered the door, what did y'all do

16    next?

17  A   I asked Ms. White if Jerry Whitley was in the

18    trailer.

19  Q   And then what happened?

20  A   She said yes, and at that time Mr. Whitley

21    appeared at the door.

22  Q   Did he step out of the door, or did he remain in

23    the trailer?

24  A   He stepped -- he was in the door and came out.

25    He saw me.  He said hey, Jim.  I said hey, Jerry,

1     I need to talk to you.  He stepped down the

2     stairs, and at that time he turned back to Ms.

3     White and said set it off.  And he tried to -- he

4     had a big wrench in his front right pocket which

5     I removed.  It was about maybe a foot to

6     foot-and-a-half long, and I removed it from his

7     pocket.

8   Q   So you asked for Jerry Whitley, he comes to the

9     door?

10   A   That's correct.

11   Q   He says hey, Jim?

12   A   Yes, sir.

13   Q   And then he turns to --

14   A   Ms. White.

15   Q   And says what?

16   A   Set it off.

17   Q   How did you react to that when he said set it

18     off?

19   A   I reached -- first thing I did, I reached and

20     grabbed -- he had a long crescent wrench in his

21     front pocket.  He also had another one in his

22     back pocket.  I pulled the long one out of his

23     front right pocket and when I did, a bag of meth

24     came out.  I then grabbed him by the arms, and he

25     started trying to run in place yelling the whole

1    time set it off, Caylene, set it off, you know

2    what you got to do.

3 Q    Well, what did Officer Whitten who was with you

4    do?

5 A    He went to the front -- well, we were at the

6    front door.  He went and started talking to Ms.

7    White and told her to step out.  Well, at that

8    time she started backing into the trailer.  I

9    then cuffed Mr. Whitley.

10 Q    He was struggling during that time?

11 A    He was trying to run the whole time.

12 Q    He was trying to run away from you?

13 A    Yes, sir.

14 Q    Well, after Agent Whitten got Ms. White, did the

15    Defendant say anything else?

16 A    He kept screaming blow it up, set it off, set it

17    off.  And about that time Agent Memmo had come

18    around to assist us at the front door, and they

19    cuffed Ms. White.  And then Mr. Whitley started

20    yelling Wayne, set it off, Wayne, set it off,

21    blow it up.

22 Q    So Whitley first tells Caylene White to blow it

23    up, and after y'all cuff her, he starts yelling

24    for somebody named Wayne?

25 A    That's correct.

1    Q    What did the agents do then?

2    A    At that time they set Ms. White in a chair that

3         was outside the door of the trailer.  They gained

4         entry.  I heard a brief struggle.  I stayed out

5         with Mr. Whitley, and I had to hold onto Mr.

6         Whitley.  He kept trying to run.  I had to

7         actually lay him down on the back of a car that

8         was parked up under the carport, and he still

9         struggled with me.  Ms. White, we had no further

10        trouble with her.  She sat in the chair next to

11        Mr. Moseson.  And I heard a brief struggle in the

12        trailer, and then they came out with the subject

13        later identified as Wayne Meadows.

14   Q    So there was somebody named Wayne in the trailer?

15   A    That's correct.

16   Q    Now, Sergeant Price, you said you got some

17        marijuana that fell out of Mr. Whitley's pocket?

18   A    Some methamphetamine.

19   Q    Methamphetamine, I'm sorry.  I want you to take a

20        look at State's Exhibit 1 and ask if you can

21        identify that?

22   A    Yes, sir.  There's a large plastic bag in here

23        that contains a quantity of methamphetamine.

24   Q    Is that the methamphetamine you retrieved or got

25        after it fell out of Mr. Whitley's pocket?

1   A   Yes, sir.

2   Q   And what did you do with it?

3   A   After everybody was secured, I turned all

4       evidence over to Agent Whitten.

5   Q   From the time you recovered it from Mr. Whitley

6       until the time you gave it to Agent Whitten, did

7       you change or alter it in any way?

8   A   No, sir.

9   Q   Add anything to it or subtract anything from it?

10  A   No, sir.

11  Q   Was Exhibit 1 in essentially or substantially the

12      same condition when you gave it to Agent Whitten

13      as when you got it from Mr. Whitley?

14  A   The only difference is there is a piece of tape

15      on it, I think, with a crime lab number now.

16  Q   Other than that, it's identical?

17  A   Yes, sir.

18  Q   Let me ask you, after y'all got everything

19      settled down, after you got all these people

20      secured, did y'all obtain a search warrant or any

21      authority to search this trailer?

22  A   Agent Whitten obtained a search warrant for the

23      residence.

24  Q   Were any drugs or evidence of drug activity found

25      inside the trailer?

1    A    There were all kinds of chemicals used to cook

2         methamphetamine. After they had the subjects

3         placed outside the trailer, I actually -- they

4         couldn't stay inside more than a few seconds.

5         When they came out, they were gasping for breath

6         after they went in after Mr. Meadows.

7    Q    That's your agents?

8    A    Yes. Then I went in because I didn't know if

9         anybody else was in there. As soon as I got into

10       the kitchen area, my eyes just shut because of

11       the chemicals. And I tried to open the rear door

12       right by the kitchen, and it was screwed shut

13       with metal screws we found out later. I tried to

14       kick it open just to ventilate, and I couldn't

15       stay in there. I couldn't breath anymore. I

16       came out, my eyes were teared up. And then we

17       secured, and then Agent Whitten went and got a

18       search warrant.

19    Q    You said the chemicals were the reason you

20       couldn't stay in there?

21    A    You couldn't breathe.

22    Q    Could you identify any particular smell of any

23       particular chemical?

24    A    It was a strong ether and ammonia smell.

25    Q    Same smell as on Moseson when he came out?

```
 1   A    That's correct.

 2   Q    Okay.

 3   A    But a lot stronger.

 4   Q    Now, who actually collected the evidence inside

 5        the trailer?

 6   A    We had to contact the DEA clean-up crew, and we

 7        also contacted the Alabama Department of Forensic

 8        Sciences.  And Sherwin Boswell and an assistant

 9        came out, and I believe they did the actual

10        collections.

11   Q    Let me ask you, after this, after y'all had

12        secured Mr. Whitley, did Mr. Whitley ever say

13        anything to you?

14   A    The whole time he just kept saying --

15   Q    Hang on.  Just yes or no first?

16   A    Yes.  Yes, he did.

17   Q    Now, was this in response to you questioning, or

18        was this something he just said?

19   A    No.  He was just rambling, just rambling on.

20   Q    And what did he say to you, Jim?

21   A    He kept saying his life was over.

22   Q    Did he say why?

23   A    That he had messed up.

24   Q    Did he make any statements concerning the blowing

25        up of the trailer?
```

1  A    No, not that I recall. All he kept saying was

2      over and over my life is over, my life is over.

3  Q    Ms. Farrar may have some questions.

4                CROSS-EXAMINATION

5  BY MS. FARRAR:

6  Q    You testified that two weeks prior, you had set

7      up on the same trailer. Would that be a

8      surveillance you were referring to?

9  A    Yes, ma'am.

10  Q    And did you also have a confidential informant

11      call you at that time?

12  A    Yes, ma'am, we did.

13  Q    Who was that confidential informant two weeks

14      prior?

15         MR. LANDREAU: Object, Your Honor. That's

16      not discoverable in this.

17         THE COURT: I will sustain the objection.

18  Q    Two weeks prior when you received a call from an

19      informant concerning a trailer belonging to Jerry

20      Whitley, had you ever heard from that person

21      before?

22  A    That person had provided information before, yes,

23      ma'am.

24  Q    Had the information that that person had

25      previously provided turned out to be reliable

1      information?

2   A   Yes, ma'am.

3   Q   And when the person called, did you personally

4      speak to that person, the two weeks prior?

5   A   No.  I received that from another agent that was

6      working that informant.

7   Q   And who was that agent?

8   A   That was Agent Mike Loyless.

9   Q   You said Mike Loyless was working that informant?

10  A   He was working the informant that provided him

11     that information.

12  Q   What do you mean by working the informant?

13  A   By producing cases for us, giving us information.

14  Q   Was this a way for the informant to work off a

15     charge?

16  A   I believe the informant did have a case on him.

17  Q   And this isn't really unusual for Metro, is it,

18     that an informant might be avoiding prosecution

19     by helping Metro?

20  A   They provide information.  We can't make them any

21     promises on what they get through the D.A.'s

22     office, but yes, a lot of time they'll come and

23     try to get help for themselves.

24  Q   And this was one of those cases, wasn't it?

25  A   Yes, ma'am.

Q    Now, the case that we're talking about now on the 21st of September, was the information that you received that day from this same person from two weeks prior?

A    No, ma'am.

Q    The informant from the 21st of September, was that individual also working off a charge?

A    I believe Agent Whitten took that information.    I have no idea who that person is.

Q    So you don't have any idea about the reliability of the informant from the 21st of September; is that right?

A    I believe Agent Whitten received the information from another police officer who passed it onto Agent Whitten.    I don't know all the details.

Q    When you went to the place where Jerry lived and there was a Texas plate on a truck, do you recall if there was a hood open on any of the vehicles in the yard?

A    I think there was a Camaro in the yard that had the hood up.    I'm not sure.    It was either a Camaro or another vehicle, maybe a Nissan.    I'm not sure.

Q    Is it possible maybe there were two vehicles with the hoods up?

1    A    I don't recall.

2    Q    Now, you stated Caylene White was led out of the

3         trailer.  Was she gasping for air?

4    A    No.

5    Q    And was Jerry gasping for air?

6    A    No, ma'am.

7    Q    And Steve Moseson, he didn't seem like he was

8         overcome with fumes either, did he?

9    A    No, ma'am.  We've learned in the clandestine meth

10        labs --

11             MS. FARRAR:  Objection, asked and answered.

12             THE COURT:  All right.

13             MS. FARRAR:  That's all I have of this

14        witness.  Thank you.

15             THE WITNESS:  You're welcome.

16                  REDIRECT EXAMINATION

17   BY MR. LANDREAU:

18   Q    You've raided other labs; is that correct?

19   A    Several, yes, sir.

20   Q    Is it unusual for the people who are running the

21        labs to be more acclimated to these chemicals

22        than you are?

23   A    Yes, sir.

24             MR. LANDREAU:  No further.

25             MS. FARRAR:  No more, Your Honor.

1    THE COURT:  May this witness be excused?

2    MR. LANDREAU:  Yes, Your Honor.

3    THE COURT:  All right, ladies and

4    gentlemen.  It's about 10 minutes to 12.  It's

5    probably a good time to break for lunch.  I'll

6    excuse you to 1:15.  Please report back to the

7    jury room by 1:15.  Mr. Mitchell will be in the

8    hallway and direct you which jury room to report

9    to, and we hope to promptly resume the trial at

10   1:15.  Thank you.  Do not discuss the case, nor

11   allow it to be discussed in your presence.

12                    (Lunch recess.)

13                    (Jury present.)

14   THE COURT:  Welcome back, ladies and

15   gentlemen of the jury.  Thank you for being

16   prompt, and we will resume trial of the case.

17         Who would the State call as its next

18   witness?

19         MR. LANDREAU:  Melissa Kelly.

20                 <u>MELISSA KELLY</u>

21      was sworn and testified as follows:

22               <u>DIRECT EXAMINATION</u>

23   BY MR. LANDREAU:

24   Q    State your full name, please, ma'am?

25   A    Melissa Marie Kelly.

138

```
1    Q    Where are you employed, Ms. Kelly?

2    A    The Alabama Department of Forensic Sciences.

3    Q    And, physically, where do you work?

4    A    I work in the Auburn laboratory.

5    Q    And what is your job there?

6    A    I am a forensic scientist in the drug chemistry

7         section.

8    Q    What training or education do you have for that

9         job?

10   A    I received a Bachelor's of Science in chemistry

11        from Clemson University.  I received a Master's

12        of Education from Boston College, and I'm

13        currently completing a Master's of Chemistry from

14        California State University.  I attended and

15        graduated from the drug chemistry training center

16        in Jacksonville, Alabama, and have also had

17        additional training at the Auburn laboratory.

18   Q    Would it be fair to say that your job consists of

19        analyzing substances to determine if there are

20        illegal narcotics present?

21   A    Yes.

22   Q    And how long have you been doing that job?

23   A    A little over two-and-a-half years.

24   Q    And during that time, do you have a judgment as

25        to how many substances you have analyzed, how
```

1       many separate pieces of evidence?

2  A   Over 3,000.

3  Q   And have you testified as an expert witness in

4       other jurisdictions in this state?

5  A   Yes, I have.

6  Q   Have you testified in this court as an expert?

7  A   Yes, I have.

8       MR. LANDREAU:  Your Honor, at this time we

9       tender Ms. Kelly as an expert witness in her

10      field.

11      THE COURT:  She may be allowed to testify as

12      an expert witness.

13  Q   Ms. Kelly, let me show you State's Exhibit 1.

14       Are you familiar with it?

15  A   Yes, I am.

16  Q   Within that exhibit there is an item that I think

17       has a lab number, number one, which is identified

18       as substances taken from the person Jerry

19       Whitley.  Are you familiar with that item?

20  A   May I open this up?

21  Q   Yes, you may.

22         (Brief pause.)

23  A   Yes.

24  Q   Have you at some point had that item which I'm

25       going to mark as State's Exhibit 1A in your

```
 1        possession?

 2   A    Yes, I did.

 3   Q    And when and where did you receive it?

 4   A    I received it at the Auburn laboratory on October

 5        3rd, 2001.

 6   Q    And from whom did you receive it?

 7   A    From Jason Whitten.

 8   Q    Ms. Kelly, were you requested to do anything with

 9        regards to State's Exhibit 1A?

10   A    Drug analyses.

11   Q    And tell me how you do that.

12   A    The first thing I do is I weigh the sample.  I

13        perform a color test of inquiry and then multiple

14        instrumental analyses.

15   Q    What was the weight of this particular sample?

16   A    This sample weighed 1.94 grams.

17   Q    And what type of tests did you perform on it, or

18        what specific tests did you perform on this

19        substance?

20   A    I performed a color test of inquiry.  I also used

21        two instrumentations, the infrared

22        spectrophotometer and the gas chromatograph mass

23        spectrometer.

24   Q    Did you perform those tests with the intent of

25        trying to determine if there were any illegal
```

| | | |
|---|---|---|
| 1 | | narcotics in Exhibit 1A? |
| 2 | A | Yes, I did. |
| 3 | Q | And based on your tests and your experience and |
| 4 | | training, did you form an opinion as to whether |
| 5 | | or not there were? |
| 6 | A | Yes, I did. |
| 7 | Q | And what is that opinion, please, ma'am? |
| 8 | A | That there was methamphetamine in the sample. |
| 9 | Q | Now, is methamphetamine a controlled substance |
| 10 | | under Alabama law? |
| 11 | A | Yes, it is. |
| 12 | Q | Do you know what the effect of methamphetamine on |
| 13 | | the body is? |
| 14 | A | There are numerous effects. |
| 15 | Q | And what are they? |
| 16 | A | Some people take it and can stay up 48, 36 hours |
| 17 | | straight, jittery, loss of appetite.  I know |
| 18 | | there are more.  I just can't remember all of |
| 19 | | them. |
| 20 | Q | Does it affect the thought processes in any way? |
| 21 | A | I'm honestly not sure. |
| 22 | Q | But based on your experience and training, that |
| 23 | | is, in fact, methamphetamine in Exhibit 1A? |
| 24 | A | Yes. |
| 25 | Q | Ms. Farrar may have some questions for you. |

1        MS. FARRAR:  No, Your Honor.  No questions.

2        MR. LANDREAU:  Judge, if I may, there are a

3   couple of questions I need to ask her.

4        THE COURT:  All right.

5  Q  (By Mr. Landreau:)  From the time you received

6   these items from Mr. Whitten until you performed

7   the tests on them, did you change or alter

8   Exhibit 1A in any way?

9  A  No, I did not.

10  Q  When you performed the tests, was it in the same

11   condition as when you received it from Agent

12   Whitten?

13  A  Yes, it was.

14  Q  And afterwards, what did you -- after you

15   finished your tests, what did you do with the

16   substance?

17  A  I put it back in the bag, sealed it up, initialed

18   the seal and put it in our evidence return room.

19  Q  Did you change or alter it at any time during

20   that process?

21  A  No, I did not.

22  Q  So it was in substantially the same condition

23   when you tested it as when you received it and

24   then in the same condition when you returned it

25   back to the Metro Narcotics people?

1    A    Yes, it was.

2            MR. LANDREAU:  No further questions.

3            THE COURT:  All right.  May this witness be

4        excused?

5            MR. LANDREAU:  Yes, Your Honor.

6            THE COURT:  Who is the State's next

7        witness?

8            MR. LANDREAU:  Sherwin Boswell.

9                        SHERWIN BOSWELL

10        was sworn and testified as follows:

11                    DIRECT EXAMINATION

12    BY MR. LANDREAU:

13    Q    State your full name, please, sir?  Your full

14        name, please, sir?

15    A    My name is Sherwin Keith Boswell.

16    Q    Where are you employed, Mr. Boswell?

17    A    I am employed with the Alabama Department of

18        Forensic Sciences, Auburn laboratory.

19    Q    And what is your position with that laboratory?

20    A    My position there is the laboratory director and

21        section chief of the drug chemistry section.

22    Q    So you're in charge of the entire laboratory?

23    A    Yes, I am.

24    Q    And, specifically, you're also over the drug

25        testing part of it?

1    A    That's correct.

2    Q    And what is your education and background as far

3         as drug testing is concerned?

4    A    My education background includes a B.S. Degree in

5         biology with a minor in chemistry and math. I've

6         taken additional chemistry courses at Auburn

7         University. I've attended numerous seminars,

8         lectures and classes on identification of

9         controlled substances. I was trained directly by

10        the drug chemist coordinator for our department.

11        I have worked numerous cases. I've testified

12        numerous times in different forms of court of

13        law.

14             MR. LANDREAU:  Your Honor, at this time we

15        offer Mr. Boswell as an expert witness.

16             THE COURT:  All right. You may qualify him

17        as an expert or have met the qualification to do

18        so. Thank you.

19    Q    Mr. Boswell, have you received any specific

20        training in the area of methamphetamine

21        laboratories?

22    A    Yes, I have.

23    Q    What is that training?

24    A    I have spent a week up in the DEA clan lab school

25        up in Quantico, Virginia.

1    Q    What's the DEA?

2    A    That's the Drug Enforcement Administration.

3    Q    And what was your training geared towards, Mr.

4         Boswell?

5    A    My training was geared toward going out,

6         processing illegal laboratories that could be set

7         up anywhere in the state.  Also being able to go

8         in and collect evidence and process that

9         evidence.

10   Q    And is that something you do on a regular basis?

11   A    I wouldn't say on a regular basis, but we've done

12        it enough.

13   Q    Would you go to the scene where the lab is

14        located and collect evidence there, or would it

15        be brought to you some way?

16   A    We will go to the scene.

17   Q    Briefly, Mr. Boswell, can you describe how

18        methamphetamine is made?

19   A    Yes, I can.  The first thing that -- first

20        ingredient that you would need would be the

21        pseudoephedrine tablets which are your common

22        cold tablets.  Normally, they would take those

23        tablets, soak them in some type of chemical

24        solution which could be methanol or acetone or an

25        alcohol or even in some cases water.  Once they

1    have done that, the drugs that are found in the

2    pseudoephedrine tablets is the pseudoephedrine.

3    So once it's soaked in the tablet, the drug will

4    usually leave from the tablet and go into the

5    liquid.

6        Once they have done that, then they will dry

7    that liquid down which usually gives them like a

8    paste or I guess you could say more like a

9    residue or a bunch -- a lot of powder.  And from

10   that powder they will place it in another

11   container, they will take Lithium strips from

12   your regular Lithium type batteries, place that

13   in the solution and then they would add ammonia

14   to it.

15       As these three reagents or these three

16   chemicals come together, a chemical reaction

17   takes place, and actually what's happening the

18   pseudoephedrine is now being transferred or

19   changed over to methamphetamine in the base

20   form.

21       From that -- usually, they will add a little

22   water to make sure that all the Lithium has

23   reacted or has dissolved or has -- well, has

24   reacted.  Once they have done that, then they

25   will take another chemical, usually diethyl ether

1   which can usually be found at Wal-Mart or in some

2   of the -- I guess what you would say the starting

3   fluids or the stuff that you may see a mechanic

4   use to spray in the engine to get it started.

5   They will take some of that, soak that solution

6   in there, then they will filter that out, and

7   from that ether solution you will have your

8   methamphetamine in the base form.

9        Once they've done that, then they would take

10  what we call a gas generator which is usually

11  made from sulfuric acid and regular table salt.

12  You mix that together and that will form

13  hydrochloric acid.  And they will take this

14  generator, and they'll run it from the generator

15  into that ether solution which will cause the

16  methamphetamine base to convert to

17  methamphetamine hydrochloride.  Once that will

18  happen, then they will dry that solution down,

19  thus giving you methamphetamine hydrochloride.

20  Q   Is there any danger in this process?

21  A   Yes, there is.

22  Q   What is that danger?

23  A   First of all, the chemicals being used are very

24  high explosive and very toxic.

25  Q   They're explosive and toxic?

```
 1   A   Yes, they are.
 2   Q   Mr. Boswell, back on September 21st of last year,
 3       were you requested to go to 29 Rusk Drive
 4       concerning a methamphetamine lab?
 5   A   Yes, we were.
 6   Q   And that location, is that in Russell County?
 7   A   Yes, it is.
 8   Q   Now, do you recall what time of day or night you
 9       got to that location?
10   A   We arrived at the scene at 8:59 p.m.
11   Q   And were you or did you collect some evidence
12       there?
13   A   Yes, I did.
14   Q   And have you brought that evidence with you
15       today?
16   A   Yes, I did.
17   Q   And has the evidence been with you since
18       September 21st of 2001 until today?
19   A   Yes, it has.
20   Q   Has it been under your exclusive control?
21   A   Yes, it has.
22   Q   Have you changed or altered the items you seized
23       in evidence in any way?
24   A   Yes, I have.
25   Q   And how is that?
```