1   A    Once I did my analysis, I had to remove samples

2         from those.  Also, the defense attorney requested

3         samples to be sent to Las Vegas, so I had to go

4         back in, open up the evidence and give her the

5         samples so that she could send it out to Las

6         Vegas.

7   Q    There were some liquids there in what you seized;

8         is that correct?

9   A    That's correct.

10   Q    And you said you removed some of it for testing

11         purposes?

12   A    Yes, I did.

13   Q    And you removed some of it to give to Ms. Farrar?

14   A    Yes, I did.

15   Q    Now, this liquid, is all the substances in the

16         liquid comingled?

17   A    They're pretty much, yes.

18   Q    And diffused through it?

19   A    Somewhat, on one of them.

20   Q    Now, did you bring those items with you today?

21   A    Yes, I did.

22   Q    Specifically, do you have an item, I believe,

23         that you had marked as item two for laboratory

24         purposes?

25   A    Yes, I did.

1  Q    Would you open your or get item two for me,
2       please?
3  A    Sure.
4            MR. LANDREAU:  Your Honor, because there's a
5       large container, it might be easier if Mr.
6       Boswell is allowed to not have to go back and
7       forth to the stand each time.  We'd ask the Court
8       permission to do that.
9            THE COURT:  Okay.  That will be fine.
10 Q    If you would, place this evidence sticker which
11      I'm now marking as State's Exhibit 2 for purposes
12      of identification, and would you open that, Mr.
13      Boswell?
14           (Witness complies.)
15 Q    Mr. Boswell, can you tell us what item two is?
16 A    Item number two is a sealed manila envelope
17      containing paper coffee filters which was holding
18      residue.
19 Q    Are coffee filters used in some way in the
20      manufacture of methamphetamine?
21 A    Yes, they are.
22 Q    And how are they used?
23 A    They're actually used to filter the solutions,
24      especially in your first step where you have the
25      solution of the pseudoephedrine, the Lithium, and

```
 1        the ammonia, because usually you have a paste, so

 2        you want to filter off the clear liquid from the

 3        paste.

 4    Q   Did you test item two to determine whether or not

 5        there were any illegal drugs present on State's

 6        Exhibit 2?

 7    A   Yes, I did.

 8    Q   What were the results of your tests?

 9    A   My laboratory analysis of the residue removed

10        from the coffee filters revealed the presence of

11        methamphetamine hydrochloride and

12        pseudoephedrine, and methamphetamine is a

13        Schedule II controlled substance.

14    Q   Were you able to determine a weight on that?

15    A   No, I was not.

16            MR. LANDREAU:  Your Honor, at this time we

17        move to introduce State's Exhibit 2 into

18        evidence.

19            THE COURT:  Be admitted and received.

20            MS. FARRAR:  I would object because there's

21        no measurable amount for the Court.

22            THE COURT:  I'll overrule your objection

23        based upon that basis.

24                (State's Exhibit 2 was admitted in

25                  evidence.)
```

152

1   Q   Mr. Boswell, did you seize or take into evidence

2       at 29 Rusk Drive an object that you labeled as

3       three for your purposes of your lab results?

4   A   Yes, I did.

5   Q   Would you show us Exhibit 3, please?

6               (Witness complies.)

7   Q   You can leave one in evidence on the table.  I've

8       now placed a sticker, State's Exhibit 3, on that

9       one for purposes of identification.  Would you

10      open it, please?

11              (Witness complies.)

12          MS. FARRAR:  Your Honor, may I move so I can

13      see what Mr. Boswell is doing?

14          THE COURT:  You certainly may.

15  Q   By the way, Mr. Boswell, can you tell us from

16      what part of the trailer you got State's Exhibit

17      2 and 3?

18  A   Yes, I can.  I removed it from the bar area of

19      the mobile home.

20  Q   Was that both two and three?

21  A   Two, yes, was also removed from the bar area.

22  Q   This is a bar between the kitchen and the living

23      room, or what kind of bar?

24  A   Yes.  It's a bar-like area between the kitchen

25      and the living room.

1   Q   What is State's Exhibit 3?

2   A   State's Exhibit 3 was a sealed manila envelope

3       containing one partially charred piece of

4       aluminum foil which held a beige residue.

5   Q   And did you test that for the presence of illegal

6       drugs?

7   A   Yes, I did.

8   Q   What were the results of your tests?

9   A   My laboratory analysis revealed that the residue

10      was, in fact, d-methamphetamine hydrochloride and

11      pseudoephedrine.

12  Q   And d-methamphetamine hydrochloride, is that a

13      controlled substance?

14  A   Yes, it is.

15          MR. LANDREAU:  Your Honor, at this time we

16      move to admit State's Exhibit 3.

17          THE COURT:  Be admitted and received.

18              (State's Exhibit 3 was admitted in

19              evidence.)

20  Q   Mr. Boswell, did you seize from the trailer an

21      item labeled as four for your purposes of

22      gathering evidence?

23  A   Yes, I did.

24  Q   And what item was that, please, sir?

25  A   Item number four was a plastic container sealed

1      with a blue plastic lid holding a bi-layered

2      liquid.

3    Q   And would you take that out of your box, please?

4              (Witness complies.)

5    Q   I'm going to attach a label of State's Exhibit 4

6      onto that item.  Can you tell us what State's

7      Exhibit 4 is, and where did you take that into

8      evidence, from what part of the trailer?

9    A   State's Exhibit 4 is a plastic container, like I

10     said, sealed with a blue plastic lid.  It was

11     holding a bi-layered liquid.  It was removed from

12     the top of the file cabinet in the kitchen.  The

13     file cabinet was located next to the

14     refrigerator.

15   Q   And did you test the liquid to determine whether

16     or not an illegal narcotic was present?

17   A   Yes, I did.

18   Q   And what were the results?

19   A   My laboratory analysis of the bottom layer of the

20     liquid revealed the presence of methamphetamine

21     and pseudoephedrine.  Laboratory analysis of the

22     top layer of the liquid failed to reveal the

23     presence of any prohibited or controlled

24     substance.

25   Q   So there was methamphetamine in the bottom layer

1    of the liquid but not in the top?

2  A  That's correct.

3  Q  And did you make any weight or weigh that liquid

4    in any manner?

5  A  Not on this one.

6        MR. LANDREAU:  Your Honor, move to introduce

7    State's Exhibit 4.

8        THE COURT:  Be admitted and received.

9          (State's Exhibit 4 was admitted in

10          evidence.)

11  Q  Was there an item that you took in -- I'm sure I

12    asked you, but I'm not sure.  Where in the

13    trailer did you get State's Exhibit 4?

14  A  Like I said, it was removed from a cabinet, a

15    file cabinet which was in the kitchen area

16    located next to a refrigerator.

17  Q  Did you seize an item that you labeled as number

18    five?

19  A  Yes, I did.

20  Q  And would you get that for me, please?

21          (Witness complies.)

22  A  That would be this one.

23  Q  Let me place a sticker on there, State's Exhibit

24    5.  From where in the trailer was this item

25    seized?

1    A    This item was removed from the kitchen floor next

2         to some cabinets.

3    Q    And did you test that item to determine if there

4         were any drugs present?

5    A    Yes, I did.

6    Q    And were there?

7    A    Actually, the laboratory analysis revealed the

8         presence of pseudoephedrine, and pseudoephedrine

9         is a precursor used in the manufacture of

10        methamphetamine.

11   Q    You told us before that the pseudoephedrine is,

12        through this process, turned into

13        methamphetamine; correct?

14   A    That's correct.

15   Q    This is pseudoephedrine that has not been turned

16        yet; is that correct?

17   A    That's correct.

18             MR. LANDREAU:   Move to introduce State's

19        Exhibit 5.

20             THE COURT:   Be admitted and received.

21                 (State's Exhibit 5 was admitted in

22                   evidence.)

23   Q    Is there an item there that you labeled as

24        Exhibit 6 or --

25   A    Yes, there is.

1   Q   Would you remove that from your box, please?

2           (Witness complies.)

3   Q   Since I'm not wearing the gloves, I'm going to

4      let you put the marker State's Exhibit 6 on.

5           (Witness complies.)

6   Q   From where in the trailer was State's Exhibit 7

7      seized?

8   A   State's Exhibit 6?

9   Q   I'm sorry, six.

10   A   It was removed from the bar area also.

11   Q   And this is the bar in the kitchen between the

12      kitchen and the living room?

13   A   That's correct.

14   Q   And what does State's Exhibit 6 contain?

15   A   State's Exhibit 6 is a sealed manila envelope

16      containing paper coffee filters holding beige

17      residue.

18   Q   Now, as you've told us, these coffee filters are

19      used in the straining process?

20   A   Yes, they are.

21   Q   And did you test the coffee filters to determine

22      if there were any illegal drugs present on the

23      filters?

24   A   Yes, I did.

25   Q   What were the results of your tests?

1    A    State's Exhibit 6, my laboratory analysis

2         revealed that the coffee filters did have

3         methamphetamine and pseudoephedrine hydrochloride

4         present.

5    Q    And methamphetamine is a controlled substance;

6         correct?

7    A    Yes, it is.

8              MR. LANDREAU:  Move to introduce State's

9         Exhibit 6, Your Honor.

10             THE COURT:  Be admitted and received.

11                  (State's Exhibit 6 was admitted in

12                  evidence.)

13   Q    Did you take into evidence an item you labeled as

14        Exhibit 7?

15   A    Yes, I did.

16   Q    And would you remove that from your box, please?

17                  (Witness complies.)

18   Q    Would you place the State's Exhibit 7 marker on

19        that item, please?

20                  (Witness complies.)

21   Q    From where in the mobile home did you get that

22        item?

23   A    This item was removed from the cabinet which was

24        located in the kitchen area, and the cabinets are

25        like in the bottom part of the -- well, bottom

1       section of the cabinet.

2    Q    And when you seized that item, did it have a

3       liquid in it, or what did it have in it?

4    A    It was just holding a beige, off-color looking

5       residue.

6    Q    Did you test the residue for the presence of

7       illegal drugs?

8    A    Yes, I did.

9    Q    What were the results of your tests?

10    A    Laboratory analysis of the residue removed from

11       the glass jar revealed the presence of

12       d-methamphetamine and pseudoephedrine

13       hydrochloride.

14    Q    Were you able to ascertain a weight of this

15       residue?

16    A    No, I was not.

17       MR. LANDREAU:  Judge, we move to introduce

18       State's Exhibit 7.

19       MR. FARRAR:  Your Honor, I object because

20       there was no weight.

21       THE COURT:  Would overrule your objection.

22       Exhibit 7 will be admitted and received.

23          (State's Exhibit 7 was admitted in

24          evidence.)

25    Q    Would you remove from your box an item that you

1    had marked Exhibit 8 for your testing purposes?

2              (Witness complies.)

3    Q    Would you place the State's Exhibit 8 marker upon

4    it, please?

5              (Witness complies.)

6    Q    Mr. Boswell, from where in the trailer did you

7    seize Exhibit 8?

8    A    This item was also removed from under the kitchen

9    cabinet.

10   Q    And did State's Exhibit 8 contain any liquid or

11   residue?

12   A    State's Exhibit 8 was a glass jar holding a

13   yellow substance.

14   Q    Did you test the yellow substance for the

15   presence of methamphetamine?

16   A    Yes, I did.

17   Q    What were the results of your tests?

18   A    Laboratory analysis of the yellow substance

19   revealed the presence of pseudoephedrine

20   hydrochloride, and it had a weight in grams of

21   16.50.

22   Q    Now, that would be the precursor to

23   methamphetamine; correct?

24   A    That's correct.

25              MR. LANDREAU:   Judge, we move to introduce

1    State's Exhibit 8.

2        THE COURT:  Be admitted and received.

3        MS. FARRAR:  Your Honor, I would object.  I

4    know I'm late, but precursor would not be

5    relevant as to the trafficking or possession

6    charge.

7        MR. LANDREAU:  Judge, it goes to what was

8    taking place in that trailer, whether or not this

9    was a meth manufacturing lab.

10        THE COURT:  Court would overrule your

11    objection.  You may proceed.

12            (State's Exhibit 8 was admitted in

13             evidence.)

14  Q  Did you seize an item nine?

15  A  Yes, I did.

16  Q  And would you remove that from your box and place

17    State's Exhibit 9 upon that item?

18            (Witness complies.)

19  Q  From where in the trailer was State's Exhibit 9

20    seized?

21  A  State's Exhibit 9 was removed from an open glass

22    jar that was located under the kitchen cabinet.

23  Q  And did it contain the liquid that it contains

24    now?

25  A  Yes, it does.

```
 1    Q    Now, did you test that liquid for the presence of

 2         any illegal narcotics?

 3    A    Yes, I did.

 4    Q    What were the results of your tests on State's

 5         Exhibit 9?

 6    A    Laboratory analysis of the liquid revealed the

 7         presence of d-methamphetamine and

 8         pseudoephedrine.  It had a weight in grams of

 9         500.

10    Q    So this contained methamphetamine; correct?

11    A    That's correct.

12    Q    That is a controlled substance?

13    A    Yes, it is.

14    Q    And the total weight of State's Exhibit 9, the

15         liquid, is 500 grams?

16    A    That's correct.

17    Q    Could you put that into pounds or ounces for us?

18    A    Sure.  That will be -- give me a second.

19    Q    You need a pen?

20    A    I may be able to do it on my watch.  That will be

21         about 17.6 ounces.

22    Q    A little over a pound then?

23    A    That's correct.

24             MR. LANDREAU:  Move to introduce State's

25         Exhibit 9.
```

1          THE COURT:  Be admitted and received.

2                (State's Exhibit 9 was admitted in

3                evidence.)

4    Q    Did you seize an item 10?

5    A    Yes, I did.

6    Q    And would you place a marker, State's Exhibit 10,

7         upon that item?

8                (Witness complies.)

9    Q    Where in the trailer did you seize State's

10        Exhibit 10?

11   A    This was removed from a glass jar which was

12        located on the cabinet.

13   Q    And was the liquid in it?

14   A    Yes, it was.

15   Q    Did you do any laboratory analysis to determine

16        if the liquid contained an illegal drug?

17   A    Yes, I did.

18   Q    And what were the results of the analysis?

19   A    The results were negative.

20        MR. LANDREAU:  Move to introduce State's 10,

21   Your Honor.

22        MS. FARRAR:  Objection, irrelevant, not

23   material.

24        MR. LANDREAU:  Judge, we submit it simply

25   goes to the thoroughness of the testing that was

```
 1         done on the substances seized.
 2              THE COURT:  Well, was there a determination
 3         of what was in the contents?
 4    Q    (By Mr. Landreau:)  Mr. Boswell, were you able to
 5         determine what the liquid is?
 6    A    Based on odor, I would assume that it was diethyl
 7         ether.
 8    Q    I'm sorry, what?
 9    A    It was diethyl ether.
10    Q    It was ether.  And is ether used in the process
11         of manufacturing methamphetamine?
12    A    Yes, it is.
13              THE COURT:  Court would overrule the
14         objection.
15                   (State's Exhibit 10 was admitted in
16                    evidence.)
17    Q    Is there an item 11?
18    A    Yes, there is.
19    Q    And would you withdraw that from your container
20         and place State's Exhibit 11 marker upon it?
21                   (Witness complies.)
22    Q    Mr. Boswell, how would you describe State's
23         Exhibit 11?
24    A    State's Exhibit 11 was a plastic container sealed
25         with a blue plastic lid that held a cloudy liquid
```

```
 1        with an off-white looking substance.
 2   Q    And from where in the trailer was it seized?
 3   A    This was actually removed from a cylinder which
 4        was located in the kitchen.
 5   Q    From a metal cylinder?
 6   A    Yes.
 7   Q    And was State's Exhibit 11 tested for the
 8        presence of illegal narcotics?
 9   A    Yes, it was.
10   Q    And did that testing reveal the presence of any
11        illegal narcotics?
12   A    It actually revealed the presence of
13        pseudoephedrine.
14   Q    And, again, pseudoephedrine is the precursor drug
15        that is produced during the manufacturing of
16        methamphetamine?
17   A    Yes, it is.
18            MR. LANDREAU:  Move to introduce State's --
19        or one other question.
20   Q    Did you weigh Exhibit 11 to determine a weight?
21   A    Yes, I did.
22   Q    And what was the weight of the pseudoephedrine in
23        that?
24   A    The whole entire container, the liquid and the
25        off-white substance had a weight of 760 grams.
```

1            MR. LANDREAU:  Move to introduce State's

2    Exhibit 11.

3            MS. FARRAR:  Objection, materiality and

4    relevance.

5            THE COURT:  Would overrule your objection.

6                (State's Exhibit 11 was admitted in

7                evidence.)

8  Q    Did you seize an item 12?

9  A    Yes, I did.

10  Q    Would you place a State's marker or State's

11     Exhibit marker 12 upon that item?

12            (Witness complies.)

13  Q    Would you describe that item for us?

14  A    State's Exhibit Number 12 is a sealed manila

15     envelope containing one blister seal package

16     which was labeled in part antihistamine tablets,

17     pseudoephedrine HCL, 60 milligrams, triprolidine

18     HCL, 2.5.  Inside the envelope, like I said, it's

19     a blister seal package holding 17 circular white

20     tablets, each had the number 257 printed on one

21     side, and it had a single score on the opposite

22     side.

23  Q    And did you do any tests to perform or to

24     determine what the substance was that was in

25     there?

1   A   Yes, I did.

2   Q   And what was it?

3   A   Laboratory analysis of the tablets revealed the

4       presence of pseudoephedrine.  These tablets are

5       consistent with the product containing

6       pseudoephedrine and triprolidine manufactured by

7       Granutec.  Pseudoephedrine is a precursor used in

8       the manufacture of methamphetamine.

9   Q   Based on your experience and training, how would

10      those products be used in the manufacturing of

11      methamphetamine?

12   A   The pseudoephedrine tablet is one of the main

13      ingredients that's used to manufacture it.

14   Q   You earlier described the process where tablets

15      are dissolved in some type of liquid to get

16      ephedrine; is that correct?

17   A   That's correct.

18   Q   And would those tablets be involved in that

19      process in any way?

20   A   Yes, they would.

21   Q   And how would they be involved?

22   A   You would take the tablets --

23          MS. FARRAR:  Your Honor, I would object.

24      This is not a manufacturing case.  This is simply

25      trafficking, and that is possession of a large

1    quantity.  And this is not material or relevant.

2         THE COURT:  I would overrule your

3    objection.

4  A  The pseudoephedrine tablets, what you would do is

5    take them and, like I said, just soak them in an

6    alcohol, methanol, water, acetone, which is the

7    same thing as fingernail polish remover, and the

8    pseudoephedrine drug will then go from the

9    tablets into the liquid.

10  Q  And from where in the trailer were these items

11    taken?

12  A  This was located -- removed from a kitchen

13    cabinet that was located near the hallway.

14         MR. LANDREAU:  Move to admit State's Exhibit

15    12, Your Honor.

16         MS. FARRAR:  Objection, materiality and

17    relevance.

18         THE COURT:  Objection is overruled.  Will be

19    admitted and received.

20              (State's Exhibit 12 was admitted in

21               evidence.)

22  Q  Did you seize a piece of evidence that you

23    labeled item 13?

24  A  Yes, I did.

25  Q  Would you remove that from your box and attach

1    State's Exhibit marker 13 to it?

2         (Witness complies.)

3  Q  Would you describe State's Exhibit 13 for us?

4  A  Item Number 13 is a glass jar sealed with a

5     wooden lid.  At the time it was holding a clear

6     liquid and off-white substance.

7  Q  And from where in the trailer was that seized?

8  A  This was removed from the kitchen near the

9     hallway.

10 Q  And did you test the contents of it for the

11    presence of drugs?

12 A  Yes, I did.

13 Q  And what were the results of your tests?

14 A  Laboratory analysis of the liquid and off-white

15    substance revealed the presence of

16    pseudoephedrine which at the time had a total

17    weight in grams 204.

18 Q  204 grams?

19 A  Yes.

20 Q  Again, this is the precursor drug; correct?

21 A  That's correct.

22 Q  Did you --

23         MR. LANDREAU:  Move to admit State's Exhibit

24    13, Your Honor.

25         MS. FARRAR:  Objection, relevance and

1    materiality.

2          THE COURT:  Overrule the objection.  Will be

3    admitted and received.

4                (State's Exhibit 13 was admitted in

5                evidence.)

6    Q    Did you seize an item that you labeled item 14?

7    A    Yes, I did.

8    Q    And would you remove it from the box, please?

9                (Witness complies.)

10   Q    Would you place State's Exhibit marker Number 14

11   upon that?

12               (Witness complies.)

13   Q    Would you describe for the record State's Exhibit

14   14?

15   A    It's a large blue plastic jug which was sealed

16   with a white plastic lid holding a cloudy liquid

17   and white powder.

18   Q    Then did you do any analysis to determine what

19   the substance inside State's Exhibit 14 is?

20   A    Yes, I did.

21   Q    And what is that?

22   A    Based on laboratory analysis, the liquid

23   contained pseudoephedrine.

24   Q    And did you weigh the liquid to determine the

25   total weight of the pseudoephedrine?

1   A    I weighed the sample, and the liquid had a weight

2         of 7,778 grams.

3   Q    Again, roughly, what is that in pounds or ounces

4         or in English measurement?  Tell you what, we'll

5         come back to that so you don't have to remove

6         your gloves.  We've got one other item.  Do you

7         have an item 15?

8   A    Yes, I do.

9   Q    And would you remove it from your box and attach

10        State's Exhibit marker 15 to it?

11              (Witness complies.)

12          MR. LANDREAU:  Your Honor, while he's

13        looking for that, we move to admit State's

14        Exhibit 14.

15          THE COURT:  Be admitted and received.

16          MS. FARRAR:  I'm sorry, I missed that.

17          MR. LANDREAU:  14.

18          MS. FARRAR:  Objection based on relevance.

19          THE COURT:  All right.  Objection overruled.

20             (State's Exhibit 14 was admitted in

21             evidence.)

22   Q    Again, would you hold up what's now marked as

23         State's Exhibit 15?

24              (Witness complies.)

25   Q    And would you describe that item to us?

1   A   This was one glass jar which was sealed with a
2       white plastic lid containing a cloudy liquid and
3       off-white powder.
4   Q   And from where did you seize that?
5   A   This item was removed from the bedroom.
6   Q   Were the contents of State's Exhibit 15 tested by
7       you?
8   A   Yes, they were.
9   Q   What were the results of your tests?
10  A   My analysis of the liquid and off-white powder
11      revealed the presence of d-methamphetamine and
12      pseudoephedrine.  At the time it had a total
13      weight in grams of 1,435.
14  Q   The substance contains methamphetamine?
15  A   That's correct.
16  Q   And the substance in -- the methamphetamine in
17      State's Exhibit 15, is that a controlled
18      substance?
19  A   Yes, it is.
20  Q   And, again, the total weight was what?
21  A   Total weight was 1,435 grams.
22          MR. LANDREAU:  Move to admit State's Exhibit
23      15.
24          THE COURT:  Be admitted and received.
25              (State's Exhibit 15 was admitted in

1           evidence.)

2    Q    Mr. Boswell --

3           MR. LANDREAU:  Your Honor, if I may, there

4     is an odor that's kind of attached to those

5     items.  I'd ask permission to have Mr. Boswell

6     put them back in the blue container and seal the

7     container and leave them there, if that's

8     permissible with the Court.

9           MS. FARRAR:  I have no objection.

10          THE COURT:  All right.  You may do so.

11          (Witness complies.)

12   Q    You may have a seat again, Mr. Boswell.

13          (Witness complies.)

14   Q    Mr. Boswell, after doing these analyses, did you

15    produce a written report?

16   A    Yes, I did.

17   Q    Let me show you State's Exhibit 16.  Is this the

18    report you did on these items?

19   A    Yes, it is.

20          MR. LANDREAU:  Move to admit State's Exhibit

21    16.

22          MS. FARRAR:  Improper foundation.  It's not

23    been explained.

24          THE COURT:  All right.  Well, if you'll show

25    how the form was repaired, I mean, was prepared.

1    Q    Mr. Boswell, did you prepare this form?

2    A    Yes.  A written report is done, then handed to

3         the secretary, the secretary then types it up.

4    Q    And what is the purpose of this report and what's

5         the process for producing it?

6    A    That is our certificate of analysis, and the

7         purpose of doing it is so that we can report our

8         results out to the law enforcement or the

9         District Attorney's office as to what our

10        findings were and as to what type of evidence was

11        received as to who may have been involved in the

12        chain of custody.

13   Q    Did you review State's Exhibit 16 before and sign

14        State's Exhibit 16?

15   A    Yes, I did.

16   Q    Did you review it for accuracy before signing it?

17   A    Yes, I did.

18   Q    And is it accurate?

19   A    Yes, it is.

20   Q    Does it fairly and accurately report your

21        findings of the tests you did on the items that

22        have already been admitted into evidence here

23        today, items two through 15?

24   A    That's correct.

25             MR. LANDREAU:  Your Honor, at this time we

```
 1        move to admit State's Exhibit 16.

 2             THE COURT:  Be admitted and received.

 3                  (State's Exhibit 16 was admitted in

 4                  evidence.)

 5   Q    Mr. Boswell, of the 15 items that have been

 6        admitted into evidence, several of them had an

 7        appreciable weight that you're able to determine

 8        of a mixture containing methamphetamine; is that

 9        correct?

10   A    That's correct.

11   Q    And what specifically are the items that you were

12        able to determine a weight of?

13   A    Well, item number nine, like I said, was 500

14        grams, and I believe I had given you the

15        conversion to pounds on that one.  Item number

16        15 -- no, item number 14 you asked for the

17        conversion of pounds, and if I calculated right,

18        that's about 77 pounds.

19   Q    Okay.

20   A    No, that's wrong.

21   Q    And did the item 15 contain methamphetamine?

22   A    Item number 15 did contain methamphetamine, and

23        that was 1,435 grams.  Roughly, I would say,

24        about two pounds.

25   Q    You have -- in item nine you have 500 grams of a
```

```
 1        mixture containing meth; is that correct?
 2   A    Correct.
 3   Q    And then in item 15 you have 1,435; is that
 4        correct?
 5   A    That's correct.
 6   Q    So together that would be roughly 2,000 grams?
 7   A    Roughly, yes.
 8   Q    And 2,000 grams translates to how many pounds?
 9   A    Well, one kilo gram equals 2.2 pounds.
10   Q    And, Mr. Boswell, I have to confess that I'm
11        still struggling with the English system, much
12        less the metric.  How many grams is a kilo gram?
13   A    One kilo gram, it will be 2.2 pounds.
14   Q    How many grams to make a kilo gram?
15   A    A thousand grams.
16   Q    And what you have here were 2,000 grams is
17        roughly how many kilograms?
18   A    Roughly four pounds.
19   Q    So we're talking about four pounds total --
20   A    Yes.
21   Q    -- of liquid and mixture that contains
22        methamphetamine?
23   A    Yes.
24   Q    And just to be sure, you personally collected
25        items one through 15?
```

1    A    Yes, I did.

2    Q    You kept them in your possession and custody

3         until you tested them?

4    A    Pretty much, other than the time they were in the

5         evidence room for storage.

6    Q    And in the evidence room, would anybody else have

7         access to them other than you?

8    A    The other scientists in the department within our

9         laboratory would.

10   Q    And did you seal them in any way to see if they

11        had been -- so you could determine if they had

12        been tampered with or looked at?

13   A    Eventually, the evidence was placed in the

14        plastic container which was sealed.

15   Q    And they are in the -- when you tested them, they

16        were in the same condition as when you seized

17        them?

18   A    Yes, they were.

19   Q    Now, let me ask you this, Mr. Boswell.  You

20        entered this trailer, you said, about what time

21        that night when you got there?

22   A    I may have said 8:59.  Give me a second and let

23        me check my -- we arrived at the scene

24        approximately about 8:00 p.m.

25   Q    Now, do you use Eastern Time or Central Time in

1      your reports?

2   A   Normally, I use Central Time.

3   Q   So that would have been 8:00 Eastern Time or

4      Central Time that you arrived?

5   A   That would have been 8:00 Central Time.

6   Q   So 9:00 our time?

7   A   That's correct.

8   Q   When you entered that trailer, were you able or

9      did you notice any unusual smells or odors?

10   A   Yes, I did.

11   Q   And what did you notice?

12   A   First of all, we noticed there was a high odor of

13      ether that was floating around in the room.  When

14      we got there, the sheriff's department had

15      already pretty much started ventilating the

16      trailer which is a common practice for illegal

17      laboratories.

18   Q   So you detected a strong odor of ether?

19   A   Yes, I did.

20   Q   This was after the doors and windows had been

21      open and ventilated?

22   A   That's correct.

23   Q   Did that have any significance to you based on

24      your training?

25   A   Yes, it did.

1    Q    What was the significance?

2    A    First of all, it indicated, like I said, that

3         ether or some other type of chemicals were being

4         used.  Also, the fact that the mobile home had

5         been ventilated, and as to how long it had been

6         ventilated, I do not know, but that it was

7         ventilated.  In my opinion, had it not been, we

8         were looking at a potential explosion or

9         potential dangers.

10   Q    Let me ask you, in the course of collecting these

11        items, did you notice any fishing line on the

12        walls or a line on the walls of this trailer?

13             MS. FARRAR:  Objection, relevance to the

14        charges.

15             THE COURT:  Well, I'll sustain his leading.

16   Q    Did you notice anything unusual upon the walls or

17        ceiling of this trailer?

18   A    Yes, I did.

19   Q    And what did you notice?

20   A    As we entered the mobile home, there was a

21        fishing line going from probably the front area

22        going all the way to the back near the bathroom

23        or bedroom area.

24   Q    Did you follow the line all the way to the back?

25   A    We actually did, yes.

180

1    Q    What was at the end of the line in the back?

2    A    If I remember correctly, the line was rigged to a

3         tray that held a candle --

4              MS. FARRAR:  Objection, Your Honor.  This is

5         not relevant to the trafficking case or the

6         possession or the resisting arrest.

7              THE COURT:  Overrule the objection.

8    A    The line ended up at like a little tray or lid or

9         something that was holding the candle, and if I

10        remember correctly, that had been tilted or

11        appeared to have been tilted over.  I'm not quite

12        sure exactly.

13   Q    Was there anything near this candle?

14   A    There may have been some reagents and some

15        liquids and stuff near there.

16   Q    Were these flammable liquids, or were they water,

17        or what were they?

18             MS. FARRAR:  Objection, Your Honor.  The

19        witness said there may have been, so he would not

20        have knowledge to even know what might have been

21        in it.

22             MR. LANDREAU:  Judge, I'll withdraw the

23        question.

24             THE COURT:  Okay.

25             MR. LANDREAU:  Ms. Farrar may have some

1      questions for you, Mr. Boswell.

2                    CROSS-EXAMINATION

3    BY MS. FARRAR:

4    Q    Hi, Mr. Boswell.  Let's start with I did come to

5         pick up some samples, didn't I?

6    A    Yes, you did.

7    Q    And do you recall that I brought my own

8         materials?  I had brought double boxes,

9         cushioning materials and unbreakable plastic

10        containers?

11             MR. LANDREAU:  Your Honor, we would

12        stipulate that the State furnished to Ms. Farrar

13        a sample of each of State's Exhibit 9 and 15 for

14        her testing.

15             THE COURT:  All right.  I'll let her

16        proceed, though.

17             MS. FARRAR:  Pardon?

18             THE COURT:  You may proceed.

19   Q    Mr. Boswell, I'm looking at a five piece of paper

20        exhibit marked Defendant's Exhibit 1, and I

21        furnished the State a copy.  This has been

22        admitted into evidence as a copy of the analysis

23        furnished by the expert witness which the

24        Defendant was able to procure.  Have you had a

25        chance to review it?  I know you only had it for

1          30 seconds, but --

2    A     Yes, I have.

3    Q     It states that there is methamphetamine in both

4          samples; does it not?

5    A     Yes, it does.

6    Q     Do you recall the particular samples that were

7          sent?

8    A     Yes, I do.

9    Q     They were nine and 15; is that correct?

10   A     That's correct.

11   Q     And those were the rather large quantities of

12         liquids which your analysis found did contain

13         methamphetamine; correct?

14   A     That's correct.

15   Q     500 grams was how much the liquid weighed in

16         number nine.  Was that with or without the

17         container?

18   A     Without the container.

19   Q     Please explain to the jury how you weigh that

20         without the container?

21   A     What I would do, I would take a beaker or

22         whatever container that we have available in the

23         laboratory that would hold that particular

24         amount.  I would place that beaker on a triple

25         beam balance.  That balance is then adjusted so

```
 1            that the weight of that container will equal
 2            zero.  Then I will pour the liquid into that
 3            particular container, thus giving me the weight
 4            of the liquid.
 5    Q       And the sample 15 you weighed in the same manner;
 6            correct?
 7    A       That's correct.
 8    Q       Now, together these weigh quite a bit.  What
 9            would have been the approximate corresponding
10            volume for these two samples, if you could
11            estimate, please?
12    A       On the item number nine, item number nine, the
13            volume was about 800 milliliters.
14    Q       And there's a thousand milliliters in a liter; is
15            that correct?
16    A       Yes.
17    Q       So it would be eight-tenths of a liter; correct?
18    A       Correct.
19    Q       And how about item number 15?
20    A       Item number 15, I failed to record the volume.
21            Roughly guessing, I would say it may have been
22            less than a liter because there was powder and
23            stuff involved.
24    Q       So you're saying part of the weight of item 15
25            more than item nine would have been the powder?
```

1    A    That's correct.

2    Q    Did you do an analysis of the weight of the

3         powder all by itself in these two samples?

4              MR. LANDREAU:  Your Honor, we object.  Under

5         Alabama law, that's immaterial.  It is the weight

6         of the mixture, not of any independent --

7              THE COURT:  Well, he's been qualified as an

8         expert, and I'm going to allow him to testify as

9         to what he did or did not do.

10   Q    Did you do an analysis of the weight of the

11        powder by itself without the liquid?

12   A    No, I did not.

13   Q    But our independent expert witness did do an

14        analysis of that.  He found that in item --

15             THE COURT:  Well, are you testifying, or are

16        you asking a question?

17             MS. FARRAR:  Well, I was going to say.

18   Q    If this witness found that there was 1.8

19        milligrams per milliliter, that would be the same

20        as about 1.8 grams per liter; would it not?

21             MR. LANDREAU:  Your Honor, we object to the

22        relevance of that.

23             THE COURT:  Well, I'll allow him to answer

24        the question?

25   A    Could you repeat the question?

1   Q   If our expert found that there was 1.8 milligrams

2        per milliliter, that would be the same as if

3        there were 1.8 grams per liter; would it not?

4   A   In so many words, yes.

5   Q   And the same with if our expert found that there

6        were approximately point three milligrams per

7        milliliter, that would be about point three grams

8        per liter?

9   A   Just about.  I'm not -- you're confusing me with

10       your numbers.

11   Q   How much is a gram?  I've got -- I looked for

12       something that was marked with grams rather than

13       ounces, and I found a packet of Sweet'N Low?

14          MR. LANDREAU:  Your Honor, I object.

15       Defense counsel is beginning to testify as

16       opposed to ask questions.

17          MS. FARRAR:  If I could finish, Your Honor.

18          THE COURT:  Well, I'm going to allow her to

19       try to establish a question.

20   Q   I'm handing a packet of Sweet'N Low to the

21        witness, a pink package.  It says on the wrapper

22        that it contains one gram.  Do you see that?

23   A   Yes.

24   Q   And so that would be quite a small amount for an

25        entire liter; would it not?

```
1   A    Yes.
2   Q    How many doses, based on your knowledge and
3        experience, is a gram of methamphetamine?
4   A    A gram of methamphetamine, we're talking about
5        0.035 ounces.
6   Q    And do you have an opinion, based on your
7        experience and knowledge, about how many -- how
8        much does an ad exhibit take when they take meth
9        or whatever they do with it?
10            MR. LANDREAU:   Judge, could I have a
11       continuing objection to the relevance of this,
12       plus I'm not sure it's been established Mr.
13       Boswell is familiar with what the individual
14       habits of drug addicts are.
15            THE COURT:   I will sustain your objection to
16       this particular question.   That would be
17       speculation on the part of this witness as to how
18       much an addict would take.   Obviously, that
19       amount would vary.
20  Q    Would you agree, Mr. Boswell, that this is a very
21       small amount of methamphetamine, which it's not,
22       it's Sweet'N Low, but if it were methamphetamine,
23       would you agree that it would be a small amount?
24  A    If you're referring to the Sweet'N Low package,
25       to me, that would be relatively not a small
```

1    amount, but a decent amount for usage.

2  Q    Does meth weigh more than Sweet'N Low per gram?

3         MR. LANDREAU:  Judge, I'm going to object.

4    A gram is a measurement of weight.  Like an

5    ounce.  Everything that weighs an ounce is the

6    same weight.

7         THE COURT:  Well, I think the question would

8    be would methamphetamine weigh approximately the

9    same as Sweet'N Low or weigh a lesser or greater

10    amount, if he knows.  He might not be familiar

11    with the density of Sweet'N Low.

12         MS. FARRAR:  I'll withdraw the question.

13  Q    I just -- along this line, I've got one more

14    question and then I'll quit the Sweet'N Low.  Is

15    mass the same as weight?

16  A    Yes.

17  Q    Okay.

18  A    Wait a minute.  You said is mass --

19  Q    Mass.  It's a measurement of density, I thought?

20  A    Density, right.  My mistake.

21  Q    And so it might possibly be that meth is more

22    dense than -- that's it.

23         MS. FARRAR:  I withdraw the question, Your

24    Honor.  I apologize.

25         THE COURT:  All right.

```
 1              MS. FARRAR:  I do have one or two more

 2         questions, Your Honor, for Mr. Boswell.

 3              THE COURT:  Okay.

 4    Q    When you were doing a -- when you were finding

 5         these samples in the trailer, did you find or pay

 6         any attention to any other items other than

 7         containers or what you would see to be possible

 8         contraband?  Did you pay attention to papers or

 9         other personal items?

10    A    There were a lot of evidence in the trailer.

11         Some of the evidence was collected by us for

12         analysis.  The other evidence or that we consider

13         evidence relative to the illegal manufacture of

14         methamphetamine was turned over to hazardous

15         waste for disposal.  We did not collect it.  Some

16         of it we did on-the-spot tests just to confirm

17         that this was there and that this was used in the

18         manufacture of methamphetamine.

19    Q    What sort of on-the-spot tests did you use?  Just

20         give me one sample, please.

21    A    First of all, there was like a propane tank

22         cylinder which had blue to green fittings on it.

23         We tested it for the presence of ammonia, and it

24         was positive for ammonia.

25              MS. FARRAR:  I would object.  Well, I
```

1    can't.  I asked.

2  Q    Did you find any evidences of Mr. Whitley

3       actually owning the trailer?  Did you see any

4       power bills, water bills; anything of that

5       nature?

6  A    That was not my job to do.

7  Q    And when you got all the evidence that you were

8       going to take back to Auburn, if there was

9       anything uncovered, did you cover it before

10      placing it in the case?

11  A    All items of evidence that we collected that

12       contained some type of liquid was either covered

13       with a lid, or it was transferred from the

14       container in which it was in to another container

15       and a lid was placed on it.

16  Q    But these items you brought today are the

17       original containers taken from the trailer;

18       correct?

19  A    Except for maybe one or two of them.

20  Q    And those would be containers from your

21       laboratory?

22  A    One, if I'm not mistaken, is the mason jar which

23       may have held item number nine.  I believe we

24       transferred it from a jar into that particular

25       container.  There is another -- there may be a

1     couple of others that were in different

2     containers.  And we also used containers that we

3     found there in the trailer that we considered

4     that was clean and used those also.

5  Q  Is it possible that during the collection of

6     these items that there might have been some

7     slight spillage from one container into another?

8  A  Yes.

9  Q  And that would have possibly caused a chemical

10    reaction?

11 A  No.

12 Q  Now, why was the bi-layered liquid not measured?

13 A  If you read the report, which is my item number

14    four -- let me check my worksheet.  On my

15    worksheet, I have listed about 16 ounces.

16 Q  But on this sample also on number four, you did

17    not measure the methamphetamine separate from the

18    liquid; correct?

19 A  If I understand your question correctly, I did

20    analysis on the bottom layer.  The bottom layer

21    was separated from the top layer.

22 Q  Now, what instruments did you use to determine

23    that methamphetamine was present in these

24    samples?

25 A  In our analysis on methamphetamine, we have two

1    instruments that are available to us.  The first

2    instrument is the infrared spectrophotometer.

3    The second instrument would be the gas

4    chromatograph mass spectrometer.

5  Q  And the gas chromatograph, that's something about

6    color?

7  A  No.

8  Q  Are there any levels of error that are present in

9    this measurement device?

10 A  In the instruments?

11 Q  Yes, in the instruments.

12 A  The instrument, every morning we perform an auto

13    tune to make sure or check to see if the

14    instrument's performing correctly, and if there

15    is a problem with the instrument, the auto tune

16    will usually indicate that.  Also, we will run a

17    known standard and what we call a test mix to

18    make sure that we are able to identify those

19    particular prescribed drugs that we are putting

20    on that particular instrument.

21 Q  So did you perform those tests on that day?

22 A  It's performed every morning.  Yes, we did.

23 Q  Every morning?

24 A  Yes, we did.

25 Q  And how about the other instrument, does it have

192

```
1        similar tests to make sure that it's working
2        properly?
3   A    On the infrared spectrophotometer, we would run
4        what we call a polystyrene every morning or
5        anytime the instrument is going to be used that
6        particular day.  That will usually give us, I
7        guess you would say, a diagram of that particular
8        polystyrene.  And from there we can look at it
9        and tell whether or not the instrument is
10       performing properly.
11  Q    And how would I be able to know if there is 1.8
12       milligrams in a milliliter of a sample of the
13       seized substance?  How would I be able to know
14       about how much was the quantity of meth in that
15       particular sample?
16  A    The only way I could have determined that was to
17       do a quantitation on that particular sample.
18  Q    Based on the data that was arrived at by our
19       independent expert, can you give a ballpark
20       figure of about how much was in the samples which
21       we have before us today?
22            MR. LANDREAU:  Your Honor, same objection
23       previously stated.
24            THE COURT:  Overrule the objection.
25  A    Based on the report from your independent
```

```
 1          scientist expert, I cannot conclude as to whether

 2          his results are correct because I have no idea

 3          what instrumentation he used.  I have no idea how

 4          he may have performed his extractions or his

 5          analysis of the samples.

 6     Q    I'm only asking you if they're correct, what

 7          would his analysis have come up with as far as

 8          how many grams were present in the quantity of a

 9          liquid as by volume, grams per volume?

10     A    Based on his analysis, I cannot say because, like

11          I just testified, I do not know what he did and

12          how he did it.

13     Q    Thank you.  I've got one more.  Did you find any

14          methamphetamine in any of these samples that you

15          seized that was in a form suitable for ingesting

16          based on your experience and scientific

17          knowledge?

18     A    Based on the evidence that I collected and on my

19          analysis, the residue that was found on the

20          aluminum foil, it's a possibility it could have

21          been smoked, ingested, or used at any particular

22          time.  Based on some of the residue, something I

23          removed from the filter papers, you could

24          actually go back and take those filter papers and

25          maybe extract it with an alcohol and then dry it
```

1      down, and you may come up with a finished product

2      or enough powder to smoke, ingest, or do whatever

3      you want to do with it.

4    Q   And would it be fair to say that if my expert,

5      and that's if this expert was correct in his

6      analysis, that there's approximately three grams

7      in the whole sample that was sent, the nine and

8      the 15?

9          MR. LANDREAU:  Your Honor, I object.  The

10     witness has testified twice that not knowing what

11     method this expert hired by the defense may have

12     used, he can't answer that question.  We object

13     to it being repetitive.

14         THE COURT:  I'll sustain the objection.

15         MS. FARRAR:  Your Honor, I would just want

16     to put on the record that I believe the method is

17     irrelevant.  It's just a hypothethical question

18     on if the method was correct.

19         THE COURT:  Okay.  What's your next

20     question?

21         MS. FARRAR:  That's all at this time, Your

22     Honor.

23         MR. LANDREAU:  Two questions on redirect.

24

25

1                    REDIRECT EXAMINATION

2    BY MR. LANDREAU:

3    Q    Mr. Boswell, why didn't you go through and try to

4         quantify how much of this liquid is this and how

5         much is that and so on?

6    A    Because the State of Alabama does not require us

7         to do quantitations on methamphetamine.  The

8         State -- to my knowledge, the law says the

9         mixture thereof.

10   Q    And your understanding is the law simply says

11        that if there's methamphetamine in a mixture, it

12        doesn't matter what the breakdown is; is that

13        right?

14   A    That's correct.

15   Q    So you don't routinely do those tests?

16             MS. FARRAR:  Your Honor, leading, object.

17   Q    Do you routinely do those tests?

18   A    No, I don't.

19   Q    You mentioned there may be spillage.  When you're

20        talking about spillage, you're talking about

21        what?

22   A    When she mentioned the fact about spillage, I'm

23        talking about if we had to transfer -- let's say

24        there was the container with our lid, and we have

25        to pour it into another container so that we can

1    put a lid on it.  Well, we use a funnel.

2    However, as you know, if you try to pour soda or

3    water into a glass from a can, you do spill a

4    little bit.

5    Q    Was there any spillage from one exhibit to the

6    other?

7    A    There may have been.  We didn't record whether or

8    not there was spillage.  Now, as far as

9    contaminating one sample to the other sample, no,

10    because we only do one thing at a time.

11    Q    That's what I'm trying to get at.  You didn't

12    take something from one liquid and pour it into

13    another one, a different exhibit number?

14    A    Oh, no.

15    Q    Let me ask you, Mr. Boswell, based on your

16    training and experience, had there not been a

17    police raid, could these other -- these 8,000

18    grams of pseudoephedrine been turned into

19    methamphetamine?

20    A    Yes --

21        MS. FARRAR:  Objection, relevance and

22    materiality.

23        THE COURT:  I'll sustain the objection.

24    MR. LANDREAU:  No further questions.

25        THE COURT:  Any further questions of this

1  witness, Ms. Farrar?

2      MS. FARRAR: No, thank you.

3      THE COURT: May he be excused?

4      MR. LANDREAU: Yes, Your Honor.

5      THE COURT: All right, ladies and

6  gentlemen. This will be a good time to take a

7  break. I'll send you to the jury room, probably

8  about 10 minutes, and we'll come back and resume

9  the trial. Do not discuss the case, nor allow

10  anyone to discuss the case in your presence until

11  such time as the case is submitted to you under

12  the instructions of the Court. Thank you. Mr.

13  Mitchell will escort you to the jury room.

14          (Jury not present.)

15      THE COURT: Ms. Farrar, do you have any

16  objection to the evidence being taken back to the

17  Auburn lab?

18      MS. FARRAR: No objection.

19      THE COURT: All right.

20          (Recess.)

21          (Jury present.)

22      THE COURT: We didn't lose any of the jurors

23  during the break. Thank you. And we'll resume

24  with the next witness.

25      MR. LANDREAU: We call Wayne Meadows to the

1    stand, Your Honor.

2                    WAYNE MEADOWS

3        was sworn and testified as follows:

4                 DIRECT EXAMINATION

5    BY MR. LANDREAU:

6    Q    Mr. Meadows, I want you to speak up so that this

7         gentleman in the very rear can hear you.  Tell us

8         your full name?

9    A    Wayne Marcus Meadows.

10   Q    And how old are you, Mr. Meadows?

11   A    36.

12   Q    Do you know a Jerry Whitley?

13   A    Yes, sir.

14   Q    Do you see Mr. Whitley here in the courtroom?

15   A    Yes, sir, sitting right over there (witness

16        indicating).

17   Q    Point him out to us?

18   A    Right there (witness pointing).

19   Q    The gentleman in the blue shirt?

20   A    (Witness nods head affirmatively.)

21   Q    How long have you known Mr. Whitley?

22   A    I'd say a little more than a year.

23   Q    Back on September 21st of last year, do you know

24        where Mr. Whitley was living?

25   A    Yes, sir, at Rusk Mobile Home Park.