1          MS. FARRAR:  Objection, Your Honor, facts

2    not in evidence.

3          THE COURT:  Overrule the objection.

4  Q   The question, Mr. Meadows, was did you know where

5    Mr. Whitley was living back on September 21st of

6    2001?

7  A   As far as I know, Rusk Mobile Home Park.

8  Q   And was he living in a mobile home or a house

9    there?

10  A   A mobile home.

11  Q   And did he live there by himself?

12  A   As far as I know.

13  Q   And were you a visitor to that trailer from time

14    to time?

15  A   Yes, sir.

16  Q   Now, were you a visitor on the night of September

17    21st?

18  A   Yes, sir.

19  Q   Do you recall the police coming that night?

20  A   Yes, sir, I do.

21  Q   How long did you arrive before the police

22    arrived?

23  A   Probably five minutes.

24  Q   When you walked into that trailer, did you notice

25    any unusual smells or odors inside the trailer?

1    A    Yes, sir.

2    Q    What did you smell?

3    A    It smelled like flammable liquid.

4    Q    Did you go into the kitchen area of -- let me ask

5        you, when you first walk into the mobile home

6        through the front door, what room do you walk

7        into?

8    A    The living room.

9    Q    And what's the next room to the living room?

10    A    Kitchen.

11    Q    Did you go into the kitchen that night?

12    A    Yes, sir.

13    Q    Did you notice anything unusual in the kitchen of

14        Mr. Whitley's home?

15    A    Just jars sitting on the floor.

16    Q    Various glass jars?

17    A    Yes, sir.

18    Q    Did you smell anything unusual around those jars?

19    A    Like I said earlier, it just smelled like a

20        flammable liquid in there.

21    Q    Did you go into any other part of the house?

22    A    I walked to the back door when the police knocked

23        on the door.

24    Q    Okay.  When the police knocked on the door, what

25        did you hear?

1   A   I heard a knock on the door, and Ms. White opened

2       the door and they said police.  And Mr. Whitley

3       was in the back part of the trailer, and I walked

4       down the hallway and told him that the police

5       were there and they wanted to see him.

6   Q   And what did he do when you told him that?

7   A   He walked to the front door.

8   Q   What did you hear or see next?

9   A   I was standing by the back door.  At that time I

10      just heard like banging noise, like something

11      banging against the screen door or something.

12  Q   Then what did you hear?

13  A   I heard them -- I guess they were pulling Mr.

14      Whitley out of the house or he exited the house,

15      and there was a bunch of shouting going on.

16  Q   Do you recall what was being shouted?

17  A   I don't recall all of it.  I recall hearing

18      someone shout light it, light it, or something to

19      that effect.

20  Q   Did you ever hear your name being mentioned?

21  A   No, sir.  I didn't hear my name specifically

22      called out.

23  Q   You heard someone yelling light it, light it?

24  A   Yes, sir.

25  Q   Was that a male voice or a female voice?

1   A   A male voice.

2   Q   Was the voice of Jerry Whitley?

3   A   I assumed it was.

4   Q   Did you attempt to light anything?

5   A   No, sir.

6   Q   Were there flammable liquids near you or in the

7       house that you could have lit or set on fire if

8       you had wanted to?

9   A   Yes, sir.

10  Q   But you did not do that?

11  A   No, sir.

12  Q   How did you come to go out of the house?

13  A   I started to run out the back door, but I looked

14      out the blinds and there was an officer in the

15      backyard with his weapon drawn, so I just walked

16      back out to the living room and sat back down.

17  Q   Okay.  Did you have any methamphetamine on your

18      person?

19  A   I had a short plastic piece of tubing in my

20      pocket and that was it.

21  Q   And do you know from whom you received that?

22  A   Sir?

23  Q   Who did you get that from?

24  A   I picked it up there.

25  Q   Were you charged with possession of the

1       methamphetamine on that piece of tubing?

2  A    Yes, sir.

3  Q    Did you enter a plea of guilty to it?

4  A    Yes, sir.

5  Q    Was part of your agreement then or plea of guilty

6       is that you would testify against Mr. Whitley?

7  A    Testify truthfully at his trial.

8  Q    Has anyone ever asked you to testify to anything

9       other than the truth?

10  A    No, sir.

11  Q    Are you aware that a methamphetamine lab was

12       found in the kitchen of that mobile home?

13  A    Yes, sir.

14  Q    Was that your lab?

15  A    No, sir.

16  Q    Did you set it up in any way?

17  A    No, sir.

18  Q    And the only person you knew that lived in that

19       house or was in that house was Jerry Whitley; is

20       that correct?

21  A    Yes, sir.

22  Q    Let me ask you, was those glass jars and all that

23       comprised the lab, was there any way to walk

24       through the kitchen and not see them? Were they

25       visible?

1    A    Yes, sir, they were visible.

2         MR. LANDREAU:  No further questions.

3         THE COURT:  Ms. Farrar?

4              CROSS-EXAMINATION

5    BY MS. FARRAR:

6    Q    Mr. Meadows, were you originally charged with

7         another offense other than possession of

8         methamphetamine?

9    A    Originally, I was charged with trafficking and

10        possession, and resisting arrest, too, I believe.

11   Q    And what sentence did you come up -- did you get

12        a plea agreement for pleading guilty?

13   A    Yes, ma'am.

14   Q    What was the agreement?

15   A    I pled guilty to two counts of possession.  They

16        dropped the trafficking charge to possession.

17   Q    And what was the sentence supposed to be that you

18        agreed to?

19   A    I got 10 years on one count of possession and

20        seven years on the other count.

21   Q    So which count was the 10 years, if you know?

22   A    I'm not sure.  I mean, they were both possession

23        charges.  I got 10 years on one and seven on the

24        other.

25   Q    But you're out of jail already, aren't you?

1    A    Yes, ma'am.

2    Q    Do you know what you might have been looking at

3        if you had been found guilty or pled guilty of

4        trafficking in methamphetamine as far as time?

5    A    I don't know for sure, but I was told anywhere

6        from 10 to 99 years.

7    Q    Were you offered an agreement prior to the

8        agreement that you accepted?

9    A    Yes, ma'am.

10        MR. LANDREAU:  Judge, I object to that as

11    being irrelevant.

12        THE COURT:  I'll sustain the objection.

13        MS. FARRAR:  Your Honor, I'm just offering

14    it as far as to the weight of the testimony.

15    Q    You got a much better deal by pleading and

16        accepting the offer, didn't you, and, in fact,

17        you're already out of jail; correct?

18    A    Yes, ma'am.

19    Q    You and Jerry were actually friends; were you

20        not?

21    A    Yes, ma'am.

22    Q    How long had you been coming over to the house?

23    A    I'd say three or four months.

24    Q    Had Jerry only been there about that long?

25    A    I'm not sure how long he had lived there prior to

1    us becoming acquainted.

2  Q   And the tubing with the methamphetamine that you

3      testified was found on your person, you didn't

4      buy that from Jerry, did you?

5  A   No, ma'am.

6          MS. FARRAR:  That's all of this witness,

7      Your Honor, for me.

8          MR. LANDREAU:  No further questions.  May

9      this witness be excused?

10         THE COURT:  May he be excused?  Who is the

11     State's next witness.

12         MR. LANDREAU:  John Memmo.  You may step

13     down, Mr. Meadows.

14                    JOHN MEMMO

15         was sworn and testified as follows:

16                DIRECT EXAMINATION

17 BY MR. LANDREAU:

18 Q   Tell us your full name, please, sir?

19 A   It's Jonathan Memmo, M-e-m-m-o.

20 Q   Where are you employed?

21 A   With the Columbus Police Department, assigned to

22     the Metro Narcotics Task Force.

23 Q   On the night of September 21st, 2001, did you

24     have an occasion to go to Rusk Trailer Park?

25 A   Yes, sir, I did.

1    Q    Is that here in Russell County?

2    A    Yes, sir.

3    Q    And do you recall what time of day or night it

4         was?

5    A    Yes.  I believe it was about 5:00 in the evening.

6    Q    What was your purpose in going to Rusk Trailer

7         Park?

8    A    Myself, Sergeant Price, Sergeant Whitten had

9         received a complaint about a meth lab in one of

10        the trailers out there.

11   Q    What did you do when you first got to Rusk

12        Trailer Park?

13   A    When we located the trailer, we set up several

14        lots down, just set up surveillance to kind of

15        get an idea what was going on out there.

16   Q    And how long did y'all do surveillance?

17   A    I would say approximately 10 minutes before we

18        saw someone exit the trailer.

19   Q    And did you later identify who that person was?

20   A    Yes, sir.  Steve Moseson.

21   Q    And what happened next?

22   A    When he exited the trailer, he was walking

23        towards one of the vehicles outside, at which

24        point we decided to approach him to investigate

25        his activities.  We all had our marked colors on

208

1    identifying ourselves as agents. We exited our

2    vehicle, walked up to him. Agent Whitten began

3    talking to him. He was acting real nervous, kept

4    looking back at the trailer, was putting his

5    hands in his pocket, at which point Agent Whitten

6    put some handcuffs on him for officer safety.

7  Q  What did y'all do next?

8  A  He had a loud odor, an ammonia type odor, about

9    his person. At that point, like I said, Agent

10    Whitten handcuffed him, asked him to have a seat

11    there on the ground, at which point they decided

12    to go knock on the door. Agent Whitten and

13    Sergeant Price went to the front door. I went

14    around to the back to watch the back.

15  Q  And as far as you were concerned, what transpired

16    next?

17  A  While I was out back, a short time later,

18    probably 30 seconds, if that, I heard a commotion

19    out front. I came back around the trailer, at

20    which point I saw Sergeant Price struggling with

21    the subject who was later identified to me as

22    Jerry Whitley.

23  Q  Do you see the subject that Sergeant Price was

24    struggling with in the courtroom?

25  A  Yes, sir. He's sitting right there. He has a

1    light blue shirt on.

2 Q  You saw Sergeant Price struggling.  What happened

3    then?

4 A  He was being handcuffed.  Sergeant Price was

5    removing some sort of crescent wrench or some

6    type of wrench out of his pocket.  Mr. Whitley

7    was screaming something to the effect of, Wayne,

8    light it up, do it now, do it, Wayne, at which

9    point there was a female who was in the doorway

10   that Agent Whitten approached, had her come out

11   of the trailer.  She started struggling with

12   Agent Whitten.  Mr. Whitley kept screaming the

13   same thing, Wayne, light it up.

14       Quickly we asked was there anybody else in

15   the trailer, and she said Wayne's in there, at

16   which point I went in the trailer, at which point

17   I saw an individual coming from the back of the

18   trailer.  I briefly struggled with him and got

19   him handcuffed and got him out of the trailer.

20   The smell in there was very strong, a strong

21   ammonia type odor.

22       Quickly did a -- well, we had to go in a

23   couple of times because it smelled so bad, but

24   quickly checked the trailer to make sure nobody

25   else was in there.  As we were passing through

1     the kitchen area, you could see an active lab on

2     the floor in the kitchen. There were several

3     handguns laying about. But once we were sure no

4     one else was in the trailer, we came back

5     outside.

6  Q  Then what did you do next as part of the

7     investigation?

8  A  Well, all of the subjects were detained at that

9     point. I believe there was some meth found on

10     Mr. Whitley, some on, I believe her name is

11     Caylene White was the female, and also some on

12     Mr. Moseson. Once it was determined it was Mr.

13     Whitley's trailer, Agent Whitten asked him about

14     getting consent. He said no, at which point we

15     just secured the area, and at that point a search

16     warrant was obtained. We just maintained

17     security around that area until we got a search

18     warrant.

19  Q  And did y'all get a search warrant?

20  A  Yes, sir. By that time we had other agents and

21     then the fire department. Several other agencies

22     came out there.

23  Q  Why was that? Why would the fire department

24     respond to a call like this?

25  A  The process for making methamphetamine is

1    basically a chemical process, also using

2    different heat sources sometimes.  It's very

3    volatile.  I mean, just the chemical reaction

4    alone, any sort of mistake and it could explode,

5    so for safety reasons.

6  Q  Now, did you do anything further in the

7    investigation?

8  A  Once the search warrant was obtained, I

9    participated in the search of the residence after

10   the trailer had been aired out for quite a while

11   before we were able to go inside.  I assisted --

12  Q  I believe Mr. Boswell of the forensic science

13   department responded; is that correct?

14  A  Yes, sir, that's correct.

15  Q  Did he collect some evidence?

16  A  Yes, sir, he did.

17  Q  And did y'all collect or did you collect some

18   evidence other than what Mr. Boswell collected?

19  A  I personally did not.  I assisted Agent Whitten

20   on some of the evidence there.

21  Q  Okay.

22       MR. LANDREAU:  Your witness, Ms. Farrar.

23       MS. FARRAR:  I don't have any questions of

24   this witness.

25       THE COURT:  Who is the State's next

1    witness?

2         MR. LANDREAU:  May this witness be excused,

3    Your Honor?

4         THE COURT:  Yes.

5         MR. LANDREAU:  Call Jason Whitten.

6                    JASON WHITTEN

7         was sworn and testified as follows:

8                 DIRECT EXAMINATION

9    BY MR. LANDREAU:

10   Q    Tell us your full name, please, sir?

11   A    Sergeant Jason Whitten.

12   Q    Where are you employed?

13   A    Phenix City Police Department.

14   Q    Where are you assigned?

15   A    To the Metro Narcotics Task Force.

16   Q    And how long have you been with Metro Narcotics?

17   A    Three years and three months.

18   Q    Were you so assigned back on September 21st of

19        2001?

20   A    Yes, I was.

21   Q    On that day did you receive some information

22        concerning Rusk Trailer Park?

23   A    Yes, sir, I did.

24   Q    And what time of the day or night did you receive

25        the information?

1  A    It was approximately 3:30 to 4:00.

2  Q    And from whom did you receive the information?

3  A    I received a phone call from Sergeant Ricky

4       Lawrence at the Phenix City Police Department who

5       had a subject in his office.  Sergeant Lawrence

6       stated to me that this subject had --

7           MS. FARRAR:  Objection, hearsay.

8  Q    Well, let me ask you, did you speak to the

9       subject that Sergeant Lawrence had in his office?

10 A    Yes, sir, I did.  I spoke to him on the phone.

11 Q    And did that subject give you some information?

12 A    Yes, sir, he did.

13 Q    And what information did the subject give you?

14 A    Stated that there was a --

15          MS. FARRAR:  Objection, hearsay.

16          MR. LANDREAU:  Again, Your Honor, this is

17      not going to the --

18          THE COURT:  I will sustain the objection to

19      prove the truth of the matter asserted.  The fact

20      that he received this information does not mean

21      that it was true, only that he received the

22      information and that he acted upon this

23      information that he received.

24 Q    What information did you receive, Sergeant?

25 A    The information I received was that the subject

214

1        used Mr. Whitley's first and last name.  Stated

2        that Mr. Jerry Whitley at Rusk Trailer Park,

3        described the trailer and the vehicles at the

4        trailer, had an active meth lab at the trailer.

5 Q   Now, did you take any action based upon this

6        information?

7 A   Yes, sir.

8 Q   What action did you take?

9 A   We went to this location and set up surveillance

10        at the residence of Jerry Whitley.

11 Q   Who is we?

12 A   Myself, Sergeant Price, and Special Agent Memmo.

13 Q   Well, let me ask you, when you arrived at Rusk

14        Trailer Park, did you know the number of the

15        trailer?

16 A   No, sir.  I didn't know the actual house number.

17 Q   Were you able to find a trailer that matched the

18        information you had been given?

19 A   Yes, sir.

20 Q   Were you able to find vehicles in front of a

21        trailer that matched the description that you had

22        been given by this informant?

23 A   Yes, sir.

24 Q   And upon locating that trailer and those

25        vehicles, what did y'all do?

215

| | | |
|---|---|---|
| 1 | A | We set up surveillance and just watched the |
| 2 | | trailer for activity. |
| 3 | Q | And was there any activity? |
| 4 | A | Yes, sir. |
| 5 | Q | About how long was it before there was activity? |
| 6 | A | We sat there about 10 minutes.  Observed a |
| 7 | | subject later identified as a Mr. Moseson exit |
| 8 | | the residence and walk to the street to where a |
| 9 | | Chevy pickup was parked. |
| 10 | Q | And what did y'all do when y'all saw Mr. Moseson |
| 11 | | come out of this trailer? |
| 12 | A | We approached Mr. Moseson. |
| 13 | Q | And what happened then? |
| 14 | A | Once we approached him and made contact with him, |
| 15 | | he had a strong odor of chemicals such as ether |
| 16 | | and/or ammonia about his person.  He was covered |
| 17 | | in sweat and appeared to be very nervous and |
| 18 | | seemed to be, in my opinion, under the influence |
| 19 | | of some type of amphetamine or stimulant. |
| 20 | Q | Let me ask you, as a narcotics investigator, was |
| 21 | | the smell of ammonia or ether of any significance |
| 22 | | to you? |
| 23 | A | Yes, sir. |
| 24 | Q | And what significance? |
| 25 | A | Common ingredients for cooking methamphetamine. |

```
1   Q    What did you do next?

2   A    I spoke to Mr. Moseson, asked him his name, and

3        started talking to him about if he lived there

4        and who lived there.  And he was hesitant about

5        answering any questions at first, made a motion

6        toward the trailer with his head, and when he did

7        that, I noticed a camera looking at me from one

8        of the windows.  At this point --

9   Q    Now, let me stop you a minute and ask you to take

10       a look at a photograph I have here.

11            MS. FARRAR:  Your Honor, I would object to

12       any photograph of any camera because it's

13       irrelevant to the charge of trafficking in that

14       it is only a quantity of the alleged controlled

15       substance that the State would have to prove.

16            THE COURT:  I would overrule your objection.

17  Q    Let me show you State's Exhibit 24.  Do you

18       recognize that?

19  A    Yes, sir.

20  Q    And does it fairly and accurately depict the

21       object shown in that photograph?

22  A    Yes, sir.

23            MR. LANDREAU:  Move to admit State's Exhibit

24       24.

25            MS. FARRAR:  Objection, Your Honor, same
```

1    reason.

2         THE COURT:  Be admitted and received.

3    Objection overruled.

4              (State's Exhibit 24 was admitted in

5              evidence.)

6    Q    I want you to take a look at it.  Is this the

7    camera that you saw?

8    A    There were two different ones.  I remember one

9    was pointed at the door of the trailer.  One was

10   pointed toward the road.

11   Q    The camera shown in State's Exhibit 24, where was

12   it located?

13   A    I'm not sure which one that was.  There were

14   several of them.

15   Q    It was inside a trailer, though?

16   A    Yes, sir.

17        MS. FARRAR:  Object to him leading.

18        THE COURT:  Sustain the objection.

19   Q    Whose home was that -- in whose window was that

20   camera located?

21   A    That was in the trailer that Jerry Whitley was

22   living in.

23        MS. FARRAR:  Objection, Your Honor.  This

24   picture is not through a window.

25        MR. LANDREAU:  Judge, I think you can

1    clearly see the window frame around the camera.

2         THE COURT:  Well, the witness has identified

3    the photograph.

4  Q  Now, you saw a camera out of the trailer that you

5    had matched to the description given by the

6    informant; correct?

7  A  Yes, sir.

8  Q  What did you do next?

9  A  Mr. Moseson had at one point tried to reach into

10   his pocket while we were talking to him.  At this

11   point, based on him reaching for his pocket and

12   his demeanor and his nervousness, he was placed

13   in handcuffs for his and officer safety.

14 Q  Okay.  Then what happened?

15 A  A quick pat-down revealed a small plastic baggy

16   containing what later was determined as

17   methamphetamine in his pocket.

18 Q  After you found the methamphetamine on Moseson,

19   what did you and the other officers do?

20 A  Agent Memmo moved to the rear of the trailer.

21   Myself and Sergeant Price went to the front

22   door.  Sergeant Price knocked on the front door.

23 Q  Continue on with what happened after he knocked.

24 A  A subject later identified as Caylene White came

25   to the door, opened the door.  Sergeant Price

1      asked was Jerry Whitley there.  Approximately a

2      few seconds later, Jerry Whitley sidestepped and

3      went around Ms. White, came about halfway down

4      the steps, and greeted Sergeant Price with Jim.

5      Jim greeted him back.  At this point Mr.

6      Whitley --

7  Q    Let me stop you.  Did Mr. Whitley call Sergeant

8      Price by name?

9  A    Called him Jim, yes, sir.

10  Q    Then what happened?

11  A    Mr. Whitley then tried to run through Sergeant

12      Price and was yelling back at Caylene who was

13      standing still in the doorway -- she was in the

14      doorway, Sergeant Price was at the bottom on the

15      concrete, Jerry was on the steps -- at that point

16      started yelling back to her as he tried to run

17      through Sergeant Price to set it off, set it off,

18      blow it.  Made several comments to her about

19      that.

20  Q    Now, when he started screaming or yelling or

21      saying blow it up, what did you and Sergeant

22      Price do?

23  A    Sergeant Price attempted to restrain Mr.

24      Whitley.  Sergeant Price pulled one wrench out of

25      his back pocket and another wrench which was

```
 1        probably a foot-and-a-half long out of his front
 2        pocket.  Mr. Whitley was placed into handcuffs.
 3        When the wrench was pulled out of his pocket, a
 4        plastic bag containing a quantity of
 5        methamphetamine was found on the ground where it
 6        fell from his pocket.  Once he was handcuffed, I
 7        grabbed Ms. Caylene White, handcuffed her, and
 8        pulled her away from the door.  While all this
 9        was going on --
10   Q    Let me ask you, why did you do that?
11   A    I didn't want her to go back in there and blow
12        the trailer up.
13   Q    Had you received any information that was a
14        possibility?
15   A    Yes, sir.  Part of the information I received was
16        that --
17             MS. FARRAR:  Objection, hearsay.
18   A    -- there was --
19             THE COURT:  I'll sustain the objection.
20        That's been asked and answered previously.
21   Q    So, Sergeant, you pulled Ms. White out of the
22        trailer?
23   A    Yes, sir.
24   Q    What happened next?
25   A    She struggled, tried to get away, and I had to --
```

1    force had to be used on her to handcuff her.

2  Q  Then what happened?

3  A  Myself or Agent Memmo or maybe both of us asked

4    her who else was in the trailer.  She stated

5    Wayne.  While all this was going on, Jerry

6    started screaming, Wayne, you know what you have

7    to do, set it off, set it off, blow it, Wayne, do

8    it, you know what you have to do, Wayne.

9         MS. FARRAR:  Objection.

10        THE COURT:  What's your objection based

11   upon?

12        MS. FARRAR:  This is just cumulative

13   evidence that's been testified to already.

14        THE COURT:  I'll overrule your objection.

15  Q  So he was yelling, Wayne, blow it up, do what you

16   have to do.  What happened next?

17  A  Agent Memmo went in, arrested Mr. Meadows from

18   inside the trailer.  I went in and assisted him

19   in removing Mr. Meadows from the trailer.  A

20   quick walk-through was done through the trailer

21   for other persons and moved out of the area.

22  Q  During that walk-through, did you notice anything

23   unusual in the trailer?

24  A  Yes, sir.

25  Q  What?

```
 1    A    First thing I noticed was several handguns and

 2         loaded magazines right there at the door of the

 3         residence.

 4    Q    Did you notice anything else unusual in this

 5         trailer --

 6    A    Yes, sir.

 7    Q    -- other than guns?

 8    A    Yes, sir.

 9    Q    What was that?

10    A    There was a number of propane cylinders and gas

11         cylinders in the living room area, in the kitchen

12         area.  Based on my experience and training, there

13         was an active meth lab in the middle of the

14         kitchen floor and other large containers

15         containing a liquid and powder.

16    Q    Well, after you came out, did you make an attempt

17         to ascertain who was the owner or who was the

18         occupant of the trailer?

19    A    Yes, sir.

20    Q    How did you do that?

21    A    Spoke to Mr. Whitley.  He did not say he didn't

22         live there, and we asked him if he'd give us

23         consent to the residence and he stated no.

24    Q    Did y'all then go get a search warrant?

25    A    Yes, sir.
```

223

1    Q    And did you make a search?

2    A    Yes, sir.

3    Q    Did you call in anyone else to assist in the

4         search?

5    A    Yes, sir.

6    Q    Who was that?

7    A    The rest of the Metro agents, our task force,

8         arrived.  There were members of the Phenix City

9         Police Department as well as the Russell County

10        Sheriff's Department, the Russell County

11        Emergency Management coordinator, the fire

12        department, Phenix City and Ladonia's, the DEA

13        cleanup team and Sherwin Boswell from the Alabama

14        Department of Forensic Sciences.

15   Q    Let me ask you, did you receive any -- or let me

16        ask you to look at State's Exhibit 1A and ask you

17        did you receive that item at any point that

18        night?

19   A    Yes, sir, I did.

20   Q    And from whom did you receive it?

21   A    From Sergeant Price.

22   Q    And what did you do with it?

23   A    I properly marked, packaged, and transported it

24        to the Alabama Department of Forensic Sciences in

25        Auburn.

1    Q    From the time you got it from Sergeant Price

2         until you took it to the lab, did you change or

3         alter it in any way?

4    A    No, sir.

5    Q    Add anything to it or subtract anything from it?

6    A    No, sir.

7    Q    When you delivered it to the lab, was it in

8         substantially the same condition as when you

9         received it?

10   A    Yes, sir.

11             MR. LANDREAU:  Your Honor, at this time we

12        move to introduce State's Exhibit 1A.

13             THE COURT:  Be admitted and received.

14                 (State's Exhibit 1A was admitted in

15                  evidence.)

16             MS. FARRAR:  Where did this come from?

17             MR. LANDREAU:  Your client's pocket.

18   Q    During the course of this investigation, did you

19        take some photographs?

20   A    No, sir, I didn't take the photographs.

21   Q    But you were inside the trailer?

22   A    Yes, sir.

23   Q    Let me ask you to take a look at the following

24        exhibits:  State's Exhibit 20, 25.

25   A    Yes, sir.

```
 1   Q    26, 23, 22, 21, 27, 17, 18 and 19.  Do each of

 2        those photographs fairly and accurately depict

 3        the objects that are portrayed in those

 4        photographs?

 5   A    Yes, sir, they do.

 6             MR. LANDREAU:  Your Honor, at this time we'd

 7        move to introduce, I believe that would be 17

 8        through 27.  I apologize for the order I called

 9        them out in.

10             MS. FARRAR:  Your Honor, I would request an

11        opportunity briefly to go through these.

12             MR. LANDREAU:  These have been furnished to

13        you, Ms. Farrar.

14             THE COURT:  You may do so.

15             MS. FARRAR:  I just don't know which ones

16        they are.

17             MR. LANDREAU:  Okay.

18             MS. FARRAR:  Your Honor, I would object as

19        these are just cumulative evidence.  The jury has

20        already been shown the -- it's a violation of the

21        best evidence rule.

22             THE COURT:  May I see the photographs?

23                  (Brief pause.)

24             THE COURT:  All right.  The Court would

25        overrule the objection and show these admitted
```

226

1    and received:  Exhibits 17, 18, 19, 20, 21, 22,

2    23, 25, 26 and 27.

3                (State's Exhibits 17 through 23 and

4                25 through 27 were admitted in

5                evidence.)

6        MR. LANDREAU:  Judge, I believe 24 had been

7    previously admitted.

8    Q   Now, let me show you what's been marked as

9    State's Exhibit 17.  Is that one of -- or was

10   that item seized as evidence?

11   A   Yes, sir.

12   Q   And I believe that was one of the items that Mr.

13   Boswell had with him?

14   A   Yes, sir.

15   Q   Let me show you State's Exhibit 18.  Can you tell

16   us what this photograph depicts?

17   A   Yes, sir.

18   Q   And what does it depict?

19   A   That was inside the bathroom.  There were hoses,

20   hoses and some fittings and some jars and some

21   containers that looked like they had been used in

22   methamphetamine production.

23       MS. FARRAR:  Your Honor, I would object to

24   the testimony of what it looked like they've been

25   used for and also the grounds of relevance.

227

1          THE COURT:  I'll sustain the objection.  The

2     jury is to disregard that last comment.  If

3     you'll just answer the question.  He's asked you

4     to identify them.  If you'll identify them.

5   Q   This piping was found in the bathroom of this

6     trailer?

7   A   Yes, sir.

8   Q   Do you know what this liquid was that was here?

9   A   It had a solvent smell to it.

10  Q   You're not exactly sure of what liquid?

11  A   No, sir.

12  Q   But it did smell like solvent?

13  A   Yes, sir.

14  Q   Let me show you State's 19.  Can you identify the

15     item shown in this photograph?

16  A   Containers.

17  Q   And do you know -- can you identify from the

18     photograph the room this item was in?

19  A   That was in the kitchen.

20  Q   State's Exhibit 20, can you tell us what that

21     shows?

22  A   That was one of the containers with the

23     pseudoephedrine in it.

24          MS. FARRAR:  Objection.  This witness, I

25     don't believe, has knowledge of what was in what

```
 1        container.
 2                THE COURT:   Sustain the objection.
 3   Q    Was this item seized by Mr. Boswell?
 4   A    Yes, sir.
 5   Q    Let me show you the next one.  Do you recognize
 6        that item?
 7   A    Yes, sir.
 8   Q    And where was it located?
 9   A    It was in between the kitchen and the living
10        room.
11   Q    As a drug investigator, is there anything
12        significant about this propane tank?
13   A    Yes, sir.
14   Q    What is that?
15   A    The fitting around the top had some bluish green
16        residue on it.
17   Q    Would you use your pointer and show us what
18        you're referring to?
19   A    Right in here had a bluish green powdery residue
20        on it.
21   Q    And what's the significance of that?
22                MS. FARRAR:  Objection, relevance.
23                THE COURT:  Well, I'll direct you ask the
24        witness how he would know if it would have any
25        significance.
```

1    Q    Sergeant Whitten, have you had any training in

2         the identification of various components of

3         methamphetamine labs?

4    A    Yes, sir, I have.

5    Q    And what training is that?

6    A    I went to the Department of Justice Drug

7         Enforcement Administration narcotics investigator

8         school, and we had a 16-hour class on

9         methamphetamine clandestine labs.

10   Q    During the course of that training, do they cover

11        the significance of a fitting on such a tank

12        being green?

13   A    Yes, sir, they did.

14   Q    And what is the significance?

15   A    That tank contained at one time or --

16            MS. FARRAR:  Objection on relevance.  Again,

17        Your Honor, this jury is not deciding whether

18        there was a meth lab.

19            THE COURT:  I'll overrule the objection.

20   Q    Instead of going through all these photographs,

21        Mr. Whitten, did you make a videotape of this

22        trailer?

23   A    Yes, sir, a videotape was made.

24   Q    Show you State's Exhibit 31 and ask you is this

25        the videotape that you made of the lab?

1    A    Yes, sir.

2    Q    And you've reviewed this, and it fairly and

3         accurately shows the trailer?

4    A    Yes, sir.

5             MR. LANDREAU:  Judge, we move to admit

6         State's Exhibit 31 and ask that it be published.

7             MS. FARRAR:  I would object that it's just

8         not relevant, Your Honor, and cumulative.

9             THE COURT:  I'll sustain the objection as

10        being cumulative.

11            MR. LANDREAU:  Okay.

12   Q    Sergeant Whitten, during the course of your

13        search, did you find any weapons in this trailer?

14   A    Yes, sir, I did.

15   Q    And what weapons did you find and where were

16        they?

17            MS. FARRAR:  Objection, relevance again,

18        Your Honor.

19            MR. LANDREAU:  May we approach, Your Honor?

20                 (Bench conference, off record.)

21            THE COURT:  I'll overrule the objection.

22   Q    Sergeant, I believe the question was how many

23        weapons did you find and where were they?

24   A    There was a loaded 22 caliber rifle found in one

25        of the vehicles outside.  There was a Ruger

1    high-powered rifle, a 308 caliber, found under

2    the bed in the rear bedroom.  There was a Ruger

3    22 pistol, automatic pistol, found in one of the

4    couch cushions in the living room.  There was a

5    loaded 22 caliber magnum Derringer found on a

6    hutch next to the front door.  There was a Glock

7    semi-automatic pistol, a 357 caliber, found on

8    that same hutch loaded with two magazines.  There

9    was a Bryco Arms nine milliliter found in a

10   briefcase that was in the bedroom that was

11   loaded.  There was also a nine millimeter Ruger

12   pistol, automatic pistol, found in a safe that

13   was in the bedroom.

14  Q   Now, did you find any documents that belonged to

15      Jerry Whitley?

16  A   Yes, sir.  I believe there was a receipt.

17  Q   Let me show you State's Exhibit 28.  Did you find

18      that document in the trailer?

19  A   Yes, sir, I did.

20  Q   And that is a photocopy of a document you found?

21  A   Yes, sir.

22          MR. LANDREAU:  We'd introduce State's

23      Exhibit 28.

24          MS. FARRAR:  Your Honor, object on the

25      grounds of relevance.  I don't know the purpose

1    of what the receipt would show.

2         MR. LANDREAU:  Judge, it goes to show that

3    he was living there and he had possession.

4         THE COURT:  Overrule the objection.  28 will

5    be admitted and received.

6              (State's Exhibit 28 was admitted in

7              evidence.)

8  Q   Let me ask you, did you also seize a videotape

9    from the home there?

10  A   Yes, sir.

11  Q   Show you State's Exhibit 30.  Is this the

12    photograph or tape?

13  A   Yes, sir.

14  Q   Does this tape show the surveillance camera being

15    set up?

16         MS. FARRAR:  Objection, leading.

17         THE COURT:  Sustain the objection.

18  Q   What does the tape show?

19  A   The tape shows Mr. Whitley and Mr. Meadows

20    setting up a video camera in the pantry of the

21    living room.

22  Q   In this tape, and you've reviewed the tape, can

23    you or were you able to determine this was the

24    same trailer or not that had been raided?

25  A   Yes, sir.

233

1    Q    It shows Mr. Whitley setting up a camera inside

2         the pantry?

3    A    Yes, sir.

4              MR. LANDREAU:  Judge, move to introduce

5         State's Exhibit 30.

6              MS. FARRAR:  Objection, relevance.

7              MR. LANDREAU:  Goes to dominion.

8              THE COURT:  Overrule the objection.  Be

9         admitted and received.

10                  (State's Exhibit 30 was admitted in

11                   evidence.)

12   Q    The trailer that all these items were recovered

13        from, is that located in Russell County, Alabama?

14   A    Yes, sir.

15             MR. LANDREAU:  No further from this

16        witness.

17                      CROSS-EXAMINATION

18   BY MS. FARRAR:

19   Q    Agent Whitten, why not prosecute Jerry for

20        manufacturing?

21             MR. LANDREAU:  Your Honor, I object to

22        that.  First off, this is not the officer's

23        decision.  Secondly, Ms. Farrar is well aware

24        that there was no manufacturing statute on

25        September 21st, 2001.

234

```
 1              THE COURT:  Sustain the objection.

 2   Q    Was Mr. Whitley -- was Jerry reaching for a gun

 3        during the time that he was identifying and

 4        greeting Sergeant Price?

 5   A    Not that I'm aware of.

 6   Q    He had no gun, but you stated he had a wrench in

 7        his pocket?

 8   A    Yes, ma'am.

 9   Q    A foot-and-a-half long, that seems awful big.

10        What would that be used for?

11   A    I'm not a mechanic.

12   Q    And how would it have fit in a normal pocket, if

13        you know?

14   A    It was a wrench about that long (witness

15        indicating) sticking out of his pocket.

16   Q    It was in there well enough not to fall out;

17        right?  Is it possible it might have been smaller

18        than a foot-and-a-half?

19   A    From my observations and what my notes and my

20        report says, it was a foot-and-a-half.

21   Q    And was there a wrench in his back pocket as

22        well?

23   A    Yes, ma'am, there was.

24   Q    How big was that wrench?

25   A    It was approximately the same size.
```

| | | |
|---|---|---|
| 1 | Q | And did you personally view all of these firearms |
| 2 | | that you testified to just now? |
| 3 | A | Yes, ma'am. |
| 4 | Q | Was that during your plain view walk of the |
| 5 | | trailer, or was it after the search warrant? |
| 6 | A | When I did the walk-through, I didn't see all of |
| 7 | | the guns.  I saw several guns. |
| 8 | Q | And have you had any occasion to find out if any |
| 9 | | of these firearms were illegal? |
| 10 | A | Illegal? |
| 11 | | THE WITNESS:  I don't understand the |
| 12 | | question, Your Honor. |
| 13 | Q | Were any of them banned? |
| 14 | A | No, ma'am. |
| 15 | Q | And there's no license required to own any of |
| 16 | | them, is there? |
| 17 | A | No, ma'am. |
| 18 | | MS. FARRAR:  That's all.  Thank you. |
| 19 | | MR. LANDREAU:  No further for this witness. |
| 20 | | THE COURT:  You may step down.  Who's the |
| 21 | | State's next witness? |
| 22 | | MR. LANDREAU:  State rests, Your Honor. |
| 23 | | THE COURT:  All right, ladies and |
| 24 | | gentlemen.  This will be another time to take a |
| 25 | | break.  I'll send you to the jury room and |

1   probably be 10 or 15 minutes.  We'll bring you

2   back and resume the trial of the case.  Do not

3   discuss the case, nor allow anyone to discuss the

4   case in your presence until these cases are

5   submitted to you by the Court under the Court's

6   instruction.  Thank you.

7              (Jury not present.)

8        THE COURT:  Does either party have any

9   written jury instructions?

10        MR. LANDREAU:  Yes, sir, Your Honor, we do,

11   and I have those.

12        MS. FARRAR:  Yes, Your Honor, I have three.

13        THE COURT:  Have you exchanged them between

14   each other?

15        MS. FARRAR:  Not yet, Your Honor.

16        THE COURT:  You need to do so.

17        MR. LANDREAU:  Your Honor, here are our jury

18   charges.  This is the motion that I referenced

19   that's in the court file concerning the

20   enhancement.  I don't know if the Court would

21   like to have these or not.

22        THE COURT:  Okay.

23        MS. FARRAR:  Your Honor, I apologize to the

24   Court.  I do not have a copy for Mr. Landreau,

25   and I need to go make one in the law library

1    quick.

2          THE COURT:  Well, let him read them.

3          MS. FARRAR:  Okay.

4               (Brief pause.)

5          MR. LANDREAU:  Judge, I have no objection to

6    her requested charge two.  I do object to one and

7    three.

8          THE COURT:  On requested jury charge number

9    three, Court feels that is a correct statement of

10   the law.  Knowledge is a requirement for

11   conviction of the offense.

12         MR. LANDREAU:  That part is, Judge.  I

13   believe --

14         THE COURT:  Where the accused is not in

15   exclusive possession of the premises upon which

16   illegal drugs are found --

17         MR. LANDREAU:  That's the part we object to,

18   Your Honor.

19         THE COURT:  Well, there were other

20   individuals present.

21         MR. LANDREAU:  Yes, sir, but the individuals

22   can jointly possess something.  We submit you

23   don't have to show exclusive possession for there

24   to be an inference.

25         THE COURT:  Yeah.  I think there's plenty of

1    other evidence that connects the Defendant with

2    the contraband in this case.  I would give jury

3    charge number three.

4        It would seem that the second part of one is

5    the same as three, and I would not give both

6    instructions.  It says if you find the accused is

7    not in exclusive possession, where the accused is

8    not in exclusive possession of the premises where

9    the drugs are found, you may not infer the

10   accused knew of the presence of those drugs, and

11   this knowledge may not be inferred without other

12   evidence that connects the Defendant with the

13   contraband.  It seems to say the same thing in

14   different language.

15       MS. FARRAR:  It's kind of a negative

16   expression of it, and that's why I chose both of

17   them, Your Honor.

18       THE COURT:  I'll only give one of those.  I

19   will strike the second half of charge number one,

20   but, in effect, I'm giving it because it is

21   essentially the same instruction as number

22   three.  And I'll give the first half of one.

23       MS. FARRAR:  Your Honor, I do have a motion

24   for the record when the Court has --

25       THE COURT:  Okay.  Let me rule on the

1    State's requested charges.

2        MS. FARRAR:  I do object to --

3        THE COURT:  Number one is included in the

4    general charge, and I will not give that again.

5        MS. FARRAR:  I object to number two.  That

6    is not the wording of the statute or any case

7    law.  And I object to number five because of the

8    and does not depend on ownership, because even

9    constructive possession does depend on dominion

10    and control.

11        MR. LANDREAU:  Judge, charge two is straight

12    out of the Fowler case that the Court admitted

13    earlier.

14        MS. FARRAR:  The what case?

15        MR. LANDREAU:  I believe it's Fowler.

16        MS. FARRAR:  You mean Fletcher?

17        MR. LANDREAU:  Fletcher, I'm sorry.

18        MS. FARRAR:  I believe they interact, and

19    you can't say one out rules the other.  That's

20    all, Your Honor.

21        THE COURT:  I'm going to amend charge number

22    two and instead of saying you must count, say you

23    may count.

24        MS. FARRAR:  Your Honor, I also --

25        THE COURT:  Actually on five, you know, it

1    does not depend upon ownership, but it does

2    depend upon possession.  I can add does not

3    depend upon ownership but does require

4    possession.

5         MR. LANDREAU:  No problem with that, Judge.

6         MS. FARRAR:  I object to a portion also,

7    Your Honor, of number three.  I object to the

8    wording there is an inference under the law.  I

9    would be more satisfied with a presumption or a

10   rebuttal presumption.

11        THE COURT:  I see no problem with

12   presumption under the law.

13        MR. LANDREAU:  If she wants to use the word

14   presumption instead of inference, we don't

15   object.

16        MS. FARRAR:  I would like rebuttable to be

17   contained.

18        THE COURT:  All right.  I can add that.  You

19   have another motion at this time?

20        MR. FARRAR:  Your Honor, the defense would

21   move at the close of the State's case that the

22   Court enter a judgment of acquittal based on the

23   State's failure to present sufficient evidence to

24   warrant a finding of guilt on the charges in the

25   indictments in the three cases, CC 02-186, 187

1      and 188.

2           THE COURT:  Court would deny your motion.

3      We'll take about 10 minutes, and we'll come back

4      and we'll have the defense witness on the stand.

5           MS. FARRAR:  Thank you, Your Honor.

6                (Recess.)

7                (Jury present.)

8           THE COURT:  All right.  Who would the

9      defense call as its first witness?

10          MS. FARRAR:  Steven Moseson.

11                   STEVEN MOSESON

12          was sworn and testified as follows:

13                  DIRECT EXAMINATION

14     BY MS. FARRAR:

15     Q    State your name for the record, please?

16     A    Steven Duane Moseson.

17     Q    And do you recall on September 21st of 2001 where

18          you were?

19     A    Yes.

20     Q    Where were you that day?

21     A    Rusk Mobile Home Park.

22     Q    Who were you there to see?

23     A    Jerry.

24     Q    And how long have you known Jerry Whitley?

25     A    Somewhere around the neighborhood 15, 20 years.

1  Q    Would you say you and he have been friends for a

2       while?

3  A    Yes.

4  Q    You were arrested that day.  Briefly, what were

5       you arrested for?

6  A    What was I arrested for?

7  Q    What were you charged with?

8  A    Possession of methamphetamine.

9  Q    Were you charged with trafficking in

10      methamphetamine?

11 A    I was only indicted on possession.

12 Q    And were you offered a deal if you would testify

13      against Jerry Whitley?

14 A    No.

15 Q    Were you offered a deal if you would agree to

16      testify in the trial of Jerry Whitley?

17 A    A deal?

18 Q    Was that a -- when you pled guilty, which did you

19      plead guilty?

20 A    I pled guilty.

21 Q    Was a condition of the plea deal that you would

22      testify in any trial other than your own?

23 A    Yes.

24 Q    Okay.  Have you ever bought any methamphetamine

25      from Jerry Whitley?

1   A   No.

2   Q   And did you buy any methamphetamine that day, on

3       the 21st of September of '01, from Jerry?

4   A   No, but that I had he gave to me.

5   Q   And when you were over at his house that day, did

6       you notice any large quantity of methamphetamine?

7   A   No.  I didn't go no further than the kitchen.

8   Q   Have you ever known Jerry to sell or deal

9       methamphetamine?

10   A   I mean, when I say I known Jerry for a long time,

11      we knew each other as kids.  I didn't go around

12      him that much.

13   Q   Okay.  Thank you.  That's all I have.  The State

14      may want to ask you a question or two.

15         MR. LANDREAU:  Yes, sir.

16         CROSS-EXAMINATION

17  BY MR. LANDREAU:

18   Q   Mr. Moseson, let me show you State's Exhibit 32.

19      Can you recognize the signature at the bottom of

20      that document?

21   A   Yes, sir.

22   Q   That's your signature?

23   A   Yes, sir.

24   Q   What's the date of that document?

25   A   12/27/01.

1   Q   Could you start reading the document for the

2       members of the jury?

3   A   All that I know is that Jerry Whitley is the only

4       one involved in the manufacturing.  I was there

5       that day to get dope, and there was always a

6       strong smell of ammonia there.  I only got dope

7       for my own personal use.  I never gave anyone or

8       sold anyone dope.  I never actually saw him

9       making it because there was no one allowed past

10      the kitchen in the trailer.

11         Jerry Whitley was letting me use the truck

12      to move because I was moving from my residence at

13      Number 2 Faye Drive to Clegg's Fireworks stand.

14      My car, a Mercury Sable, was broke down at

15      Clegg's Fireworks stand.  I had known Jerry

16      Whitley since I was 15 years old and that's why

17      he allowed me to use his truck.

18         I have a drug problem and I'm addicted to

19      methamphetamine, and I have no knowledge of how

20      to make the stuff.  I need rehab and want to get

21      my life straightened out.  I have an

22      eight-year-old son who needs me.  I miss him so.

23   Q   That statement was truthful, wasn't it?

24   A   Yes, sir.

25   Q   And you said in it all I know is that Jerry is

1      the only one involved in the manufacturing;

2      that's Jerry Whitley?

3   A  Yes.

4   Q  You were there to get dope that day.  You were

5      there to get dope from Jerry Whitley; were you

6      not?

7   A  Yes, sir.

8   Q  And you said there was a strong smell of ammonia

9      there?

10  A  Yes, sir.  It smelled like Windex.

11  Q  In fact, you said there was always a strong smell

12     of ammonia there; is that right?

13  A  The times that I went there.

14  Q  And you did get dope that day from Jerry Whitley,

15     didn't you, methamphetamine?

16  A  Yes, sir.

17  Q  He gave you some?

18  A  Right.

19  Q  And the reason you weren't allowed in the kitchen

20     was Mr. Whitley stopped you and prevented you

21     from going back there, didn't he?

22  A  I didn't go past the kitchen.

23  Q  And Mr. Whitley had told you not to go back

24     there; right?

25  A  Right.

1    MR. LANDREAU:  Move to introduce State's

2 Exhibit 32.

3    THE COURT:  Be admitted and received.

4     (State's Exhibit 32 was admitted in

5     evidence.)

6    MR. LANDREAU:  No further questions for this

7 witness.

8    THE COURT:  Do you have anything further of

9 this witness, Ms. Farrar?

10    MS. FARRAR:  Just one question.

11     REDIRECT EXAMINATION

12 BY MS. FARRAR:

13 Q Did you get methamphetamine from Jerry regularly?

14 A No.

15    MS. FARRAR:  That's all, Your Honor.

16    MR. LANDREAU:  No questions.

17    THE COURT:  May this witness be excused?

18    MR. LANDREAU:  Yes, Your Honor.

19    THE COURT:  Who is the Defendant's next

20 witness?

21    MS. FARRAR:  The defense rests, Your Honor.

22    THE COURT:  Ladies and gentlemen, that would

23 conclude the close of the evidence presentation

24 portion of the trial.  We will now proceed with

25 closing argument.

1    Is the State ready to proceed?

2    MR. LANDREAU:  Yes, Your Honor.

3         (Closing argument by Mr. Landreau.)

4    THE COURT:  Ms. Farrar?

5         (Closing argument by Ms. Farrar.)

6    MR. LANDREAU:  Your Honor, I object to any

7    argument about a law that was not in effect at

8    the time this case was --

9    THE COURT:  I think you brought that up

10   during the course of the trial, Mr. Landreau, and

11   I'll allow Ms. Farrar to discuss it.

12        (Closing argument by Ms. Farrar

13         continues.)

14        (Closing argument by Ms. Farrar

15         concludes.)

16        (Final argument by Mr. Landreau.)

17   MS. FARRAR:  Your Honor, I object.  There's

18   not evidence of the cooking stage.

19   THE COURT:  Well, I'll overrule the

20   objection.  Ladies and gentlemen, what the

21   attorneys say is not evidence in the case and may

22   not be considered by you as evidence.  The

23   attorneys may argue any inferences that may be

24   raised from the evidence that can reasonably be

25   concluded from the evidence, and please keep that

1    in mind during closing arguments and in your

2    deliberations.

3              (Final argument by Mr. Landreau

4              continues.)

5              (Final argument by Mr. Landreau

6              concludes.)

7         THE COURT:  Ladies and gentlemen of the

8    jury, that would conclude the closing argument

9    phase of the trial, and the Court will begin to

10   instruct you as to the procedure that you will

11   follow and to the law to be applied to the facts

12   in this case.

13        As I previously instructed you, the

14   attorneys' statements and arguments are intended

15   to help you understand the evidence and apply the

16   law.  However, their statements are not evidence,

17   and you should disregard any remark, statement or

18   argument which is not supported by the evidence

19   or by the law as given to you by the Court.

20   Likewise, statements made by the Court are not

21   evidence and are not to be considered by you as

22   evidence.

23        It is my duty as judge to instruct you as to

24   the law applicable in the particular cases, and

25   it is your duty as jurors to follow the law as so

1    stated to you by the Court.  You will, therefore,

2    render a verdict in accordance with the facts as

3    you determine them from the evidence and the law

4    as given to you by the Court.

5        All the witnesses who testified today were

6    sworn and testified under oath.  Their testimony

7    is evidence.  There were a number of exhibits

8    offered that were received by the Court.  These

9    exhibits are evidence.  It will be upon the

10    testimony and these exhibits that you may

11    consider in arriving at your final verdict, and

12    you may consider only the testimony that you

13    heard from the stand and the exhibits that were

14    entered into evidence in reaching your final

15    verdict.

16        The Judge is not permitted by law to express

17    his opinion or comment on the effect of the

18    evidence presented to you or the credibility of

19    any witness in the case.  Any ruling, statement

20    or expression which may have been made by me

21    during the course of this trial is not to be

22    considered by you as any effort on my part to

23    convey to you any feeling or opinion about the

24    facts in this case or the credibility of any

25    witness.