IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA

2005 SEP 19  A 10: 07

Jerry Eugene Whitley,            *
                                 *
        Petitioner,              *
                                 *
    vs.                          *          Civil Action No.  3:05 CV-427-F
                                 *
J.C. Giles, Warden, et. al.,     *
                                 *
        Respondent(s)            *
                                 *

## AFFIDAVIT

Before me, a Notary Public in and for said county of Barbour and the
State of Alabama at large, personally appeared Jerry E. Whitley, who being
known to me and first duly sworn in accordance with the law, did depose and
state as follows:

On September 21, 2001, I, Jerry Whitley, was inside my residence sealed
from the public in everyway.  Inside the residence were also Kaylene White
and Wayne Meadows.  It was 5:35 p.m.

Steve Moseson had came to the residence to borrow my truck.  During the
brief time in which he was there to obtain the keys to the truck parked in the
driveway he never mentioned any drugs of police.

Upon his exiting the residence there was a very loud knock at the
front door and the command "Police, Open Up!"  At that time I was at the rear
of the residence and I did      hear the knock and command at that time.  I was
approached by Wayne Meadows and informed that the police were at the door and
were also surrounding the residence.

At that time I went to the front of the residence and noticed an agent
in the rear of the residence pointing his gun at the rear door of the residence.
I was able to see this through a hallway window as I was walking to the front.

Upon arrival at the front door I was confronted by Agent Jim Price, whom I had known since I was a child. Agent Price had his gun pointed directly at my face.

Although I was scared he would shoot me I asked "Whats up, Jim?" He told me that they were going to search my residence. At that point I asked for a search warrant and he informed me that no warrant was needed.

Agent Price then grabbed me by my arms and slammed me to the ground outside the front door of the residence, cuffed me and then searched me.

Inside my right front watch pocket there was a small amount of methamphetamine that he pulled out.

He then placed me into a marked patrol car. As I was being placed into the patrol car Agent Jason Whitten came over and spit in my face.

Also as soon as I was placed in the patrol car I noticed many police agents and the Fire Department were evacuating the entire trailer park.

At no time did I order that the residence should be blown up and there was no wrench in any of my pockets.

Wayne Meadows was placed in the patrol car with me and we were all transported to the Russell County Jail. I was informed by jail officials that the United States Attorney was filing charges and that we would all be transported to Montgomery, Alabama. That never happened.

I remained in jail uninformed until September 24, 2001, in which I was was transported to Russell County Circuit Court and charged with Unlawful Manufacture of a Controlled Substance. Bond was set at $523,000.00 This charge was not a crime punishable by the State of Alabama at the time I was arrested.

Jerry B. Whitley, pro se

-2-

**NOTARY BLOCK**

**STATE OF ALABAMA**
**COUNTY OF BARBOUR**

Suscribed and sworn to (or affirmed) before me this **15**th day of
September, 2005.

Carolyn R. Abercrombie
Notary Public

My Commission Expires August 18, 2007

Commission Expiration Date

-3-

## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF ALABAMA

Jerry Eugene Whitley,                    *
                                         *
         Petitioner,                     *
                                         *
vs.                                      *        Civil Action No.  3:05 CV-427-F
                                         *
J.C. Giles, Warden, et. al.,             *
                                         *

### AFFIDAVIT

Before me, a Notary Public in and for said county of Barbour and the State

of Alabama at large, personally appeared Jerry E. Whitley, who being known to me

and first duly sworn in accordance with the law, did depose and state as follows:

I, Jerry Whitley, hereby submit the following documents and state that

each is authentic copies as supplied to me by the Trial Counsel Honorable

Laurel Farrar and/or  the Honorable J. Michael Williams, Attorney on appeal

in this cause.

   Exhibit A:   Records of 911 Dispatch of Russell County, Alabama Sheriff's
                Department.

   Exhibit B1:  Portion of Transcript of Suppression Hearing testimony of
                Agent Jason Whitten, "lead agent."

   Exhibit B2:  Portion of Transcript of Suppression Hearing testimony of
                Steve Mosesen, "Co-defendant."

   Exhibit B3:  Portion of Transcript of Suppression Hearing testimony of
                Cindy Hoyle, "Resident Witness."

   Exhibit C:   Portion of Transcript of Suppression Hearing testimony of
                Sgt. James Price, and the Trial Court Judge Honorable
                George Green.

   Exhibit D:   Portion of Transcript of Suppression Hearing of the District
                Attorney Buster Landreau:  Statement to the Court

   Exhibit E:   Portion of Transcript of Suppression Hearing of the Statements
                made by the Court, Honorable George Green.

Exhibit F:   Portion of Transcript of Suppression Hearing testimony of Wayne Meadows, "Co-defendant."

Exhibit G:   Portion of Transcript of Suppression Hearing closing statement of the District Attorney Buster Landreau.

Exhibit H:   Portion of Transcript of Suppression Hearing closing statement of Trial Attorney Laurel Farrar.

Exhibit I:   Search warrant and return.

Exhibit J:   Portion of Transcript of Pretrial Hearing of Trial Attorney Farrar, District Attorney Buster Landreau and Trial Court Honorable George Green.

Exhibit K:   Portion of Transcript of Testimony of Sherwin Boswell of the Alabama Department of Forensic Sciences on cross examination by Trial Attorney Laurel Farrar.

I have not mailed copies of these Exhibits to the Alabama Office of

the Attorney General for two reasons:

1.   The Correctional Facility at which I am housed does not supply copies to inmates.

2.   The State has possession of the complete record and/or could obtain any of these documents easily or has possession of them.


_____
Jerry Eugene Whitley, pro se


**STATE OF ALABAMA**        **NOTARY BLOCK**
**COUNTY OF BARBOUR**       _____

Suscribed and sworn to (or affirmed) before me this 15 day of September, 2005.

_____
Notary Public

My Commission Expires August 18, 2007
_____
My Commission Expires On

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA

RECEIVED

2005 SEP 19  A 10: 06

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

Jerry Eugene Whitley,

  Petitioner,

vs.

J.C. Giles, Warden, et. al.,

  Respondent(s)

    Civil Action No.  3:05 CV-427-F

## AFFIDAVIT

Before me, a Notary Public in and for said county of Barbour and the
State of Alabama at large, personally appeared Jerry E. Whitley, who being
known to me and first duly sworn in accordance with the law, did depose and
state as follows:

On September 21, 2001, I, Jerry Whitley, was inside my residence sealed
from the public in everyway.  Inside the residence were also Kaylene White
and Wayne Meadows.  It was 5:35 p.m.

Steve Moseson had came to the residence to borrow my truck.  During the
brief time in which he was there to obtain the keys to the truck parked in the
driveway he never mentioned any drugs of police.

Upon his exiting the residence there was a very loud knock at the
front door and the command "Police, Open Up!"  At that time I was at the rear
of the residence and I did ___ hear the knock and command at that time.  I was
approached by Wayne Meadows and informed that the police were at the door and
were also surrounding the residence.

At that time I went to the front of the residence and noticed an agent
in the rear of the residence pointing his gun at the rear door of the residence.
I was able to see this through a hallway window as I was walking to the front.

Upon arrival at the front door I was confronted by **Agent Jim Price,** whom I had known since I was a child.  Agent Price had **his gun pointed directly** at my face.

Although I was scared he would shoot me I asked "Whats up, Jim?"  **He told** me that they were going to search my residence.  At that point I asked for a search warrant and he informed me that no warrant was needed.

Agent Price then grabbed me by my arms and slammed me to the ground outside the front door of the residence, cuffed me and then searched me.

Inside my right front watch pocket there was a small amount of meth-amphetamine that he pulled out.

He then placed me into a marked patrol car.  As I was being placed into the patrol car Agent Jason Whitten came over and spit in my face.

Also as soon as I was placed in the patrol car I noticed many police **agents** and the Fire Department were evacuating the entire trailer park.

At no time did I order that the residence should be blown up and there was no wrench in any of my pockets.

Wayne Meadows was placed in the patrol car with me and we were all transported to the Russell County Jail.  I was informed by jail officials that the United States Attorney was filing charges and that we would all be transported to Montgomery, Alabama.  That never happened.

I remained in jail uninformed until September 24, 2001, in which I was was transported to Russell County Circuit Court and charged with Unlawful Manufacture of a Controlled Substance.  Bond was set at $523,000.00  This charge was not a crime punishable by the State of Alabama at the time I was arrested.

Jerry E. Whitley, pro se

-2-

NOTARY BLOCK

STATE OF ALABAMA
COUNTY OF BARBOUR

Suscribed and sworn to (or affirmed) before me this ___15th___ day of September, 2005.

Carolyn R. Abercrombie
Notary Public


My Commission Expires August 18, 2007

Commission Expiration Date

-3-



# RUSSELL COUNTY SHERIFF'S DEPARTMENT

TOMMY BOSWELL, SHERIFF
POST OFFICE BOX 640
PHENIX CITY, ALABAMA
36868-0640
(334) 298-6535
FAX (334) 291-7667

**SEND TO:** Laurel Farrar      **FAX #:** (334) 297 - 3842

**ORGANIZATION:** _____      **VOICE #:** ( ) _____-_____

**SUBJECT:** dispatch records - 9/21/01

**FROM:** Tracy Nobles      **DATE:** 12/3/02

**SPECIAL INSTRUCTIONS:** _____

_____

_____

_____

_____

_____

_____

*This transmission contains __3__ pages, including this cover sheet. If you DO NOT receive all of the pages, please contact Russell County Sheriff's Office at one of the above numbers. Thanking you in advance.*



Exhibit A

/03/02                    RUSSELL COUNTY SHERIFF'S DEPARTMENT                        341
:24                          FIRE Incident Table:                         Page:    1

cident Number: 01LV00099
ture: Fire Standby
Addr: Rusk Drive Lot 22                                Area: LAVFD Ladonia·VFD J>
City: Phenix City      St: AL  Zip: 36867     Contact:
Complainant:   126652 --------------------------------------------
Lst: Phenix City Police              Fst:              Mid:            --------+
DOB:   /  /      SSN:     -  -    Adr: 1111 Broad Street                        |
Rac:   Sx:   Tel: (334)448-2800   Cty: Phenix City      St: AL Zip: 36867       |
                              ------------------------------------------------+
dition Codes: STAN
ircumstances: ___  ____  ____  ____  _     Reported: STAN  Observed:
ndg Officers: Landreau, B.
nsbl Officer: Landreau, B.              Agency: LVFD
  Received By: Massey, S.
 How Received: T  Telephone            CAD Call ID:    469
hen Reported: 17:27:45 09/21/01        Last RadLog: 20:08:34 09/21/01    CMPLT
urrd between: 17:27:45 09/21/01        Disposition: STB  Disp Date: 09/21/01
          and: 17:27:45 09/21/01       Misc Entry:

rrative: ___  ____  ____  ____  ____  ____  ____  ____  _
plement: ___  ____  ____  ____  ____  ____  ____  ____  _

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =


OLVEMENTS:
e  Record #      Date       Description                Relationship
    126652    09/21/01    Phenix City Police,        *Complainant
       469    09/21/01    17:27 09/21/01 Fire Standby *Initiating Call

 Conditions Detail:
        Fire Condition Codes
 Code
 STAN Standby Assignment


: Incident Responder Detail
 Responding Officers
 Name            Unit
 Landreau, B.    211FF


 Radio Log Table:
/Date            Typ  Unit    Code   Zone   Agnc  Description
8:34 09/21/01         211FF   CMPLT  LAVFD  RCSO  incid#=01LV00099  Completed cal
7:57 09/21/01         211FF   ARRVD  LAVFD  RCSO  incid#=01LV00099  Arrived on sc
8:51 09/21/01         211FF   ENRT   LAVFD  RCSO  incid#=01LV00099  Enroute to a

Exhibit A

/03/02                RUSSELL COUNTY SHERIFF'S DEPARTMENT                        341
::24                      CAD Master Call Table:                    Page:    1

ong-Term Call ID:        469
ctive Call: ____    Nature: Fire Standby        Type: f      Priority: 1

ddress: Rusk Drive Lot 22                          City: PHE  Phenix City
ones: __ : ____ __ : ____ __ : ____                Alarm Number:

-- Complainant:    126652 ---------------------------------------------------+
 Lst: Phenix City Police              Fst:              Mid:                  |
 Adr: 1111 Broad Street                               DOB:    / /             |
 Cty: Phenix City      St: AL  Zip: 36867             SSN:    -  -            |
 Tel: (334)448-2800       Race:  Sex:    Prev Calls: __ Wants: __  Adr: __    |
 Alrt:                                              ---------------------------+

Contact:                        Tel: (   )   -
ddress:
nfo:  _____

 How Rcvd: T Telephone             Occurred between: 17:27:45 09/21/01
  Rcvd by: Massey, S.                         and: 17:27:45 09/21/01
 ld Until:   :  :    / /            When Rptd: 17:27:45 09/21/01

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

NVOLVEMENTS:
pe   Record #    Date      Description              Relationship
FR  01LV00099  09/21/01    Fire Standby            *Initiating Call
M     126652   09/21/01    Phenix City Police,      *Complainant

Exhibit A

32

| | | |
|---|---|---|
| 1 | | would be located there? |
| 2 | A | Yes, sir. |
| 3 | Q | Specifically, did the informant give you an |
| 4 | | address? |
| 5 | A | No, sir. |
| 6 | Q | Did he give you the name of an occupant or the |
| 7 | | person who was renting the trailer? |
| 8 | A | Yes, sir. |
| 9 | Q | And who was that? |
| 10 | A | Jerry Whitley. |
| 11 | Q | Now, did he give you any information as to |
| 12 | | whether or not there were drugs located there? |
| 13 | A | Stated that there was a cook going on. |
| 14 | Q | Was he able to tell you how long it had been? |
| 15 | A | He said it was that day. |
| 16 | Q | And do you recall what time this was when you |
| 17 | | spoke with this person? |
| 18 | A | Probably around noon, 1:00. Maybe 2:00. |
| 19 | Q | Now, at that point, based on your experience and |
| 20 | | training, did you feel like you had sufficient |
| 21 | | evidence to obtain a search warrant? |
| 22 | A | No, sir. |
| 23 | Q | So what did you do? |
| 24 | A | Went to the trailer park and set up surveillance |
| 25 | | on the trailer. |

Exhibit B1

1  A  I was walking down the steps coming out of the

2     door.  I was going to get in the truck.

3  Q  How far away was your truck from the trailer, if

4     you recall?

5  A  About from me to you.

6  Q  And, for the record, how many feet would you say

7     that is?

8  A  15.

9  Q  And did you make it to the truck?

10 A  No.

11 Q  How far away from the truck were you when

12    something else happened?

13 A  About halfway.

14 Q  And what happened then?

15 A  Mr. Whitten and there was another fella that was

16    driving, I believe, he's not in here now, but he

17    had a gun on me and got out of the car and told

18    me to get on my knees, and Mr. Whitten searched

19    me.

20 Q  What did they find?

21 A  I had $25.00 worth of meth in my pocket.  I was

22    trying to get my keys out of my pocket, and he

23    grabbed my hand and said what have you got there,

24    and I pulled my hand out and it come out.

25 Q  Did you say anything?

Exhibit B2

1    A    No.

2    Q    Then what happened, if you remember?

3    A    They handcuffed me.

4    Q    Did they put you into any kind of car at that

5         point?

6    A    No.  They set me to the side.

7    Q    Where were you sitting in relation to the

8         trailer?

9    A    Right there between him and my truck.

10   Q    So it was maybe eight feet from the trailer; is

11        that halfway?

12   A    Probably.

13   Q    Did you have a full view of the front door?

14   A    Yes.

15   Q    What happened next that you saw?

16   A    They went to the door, knocked on the door, and

17        Caylene opened the door.

18   Q    They being who?

19   A    Officer Whitten and the other one.

20   Q    Can you describe the other one?

21   A    Bald-headed.

22   Q    And after Caylene answered, what happened?

23   A    They pulled her out of the front door.

24   Q    And then where did they put her?

25   A    Off to the side.

Exhibit B2

1    Q    Did they go back to the front door at that point?

2    A    Yes.

3    Q    And were their guns drawn?

4    A    Yes.

5    Q    Did they say anything?

6    A    Metro Narcotics.  I remember them saying Metro

7         Narcotics.

8    Q    Was the door shut at that point?

9    A    Yes.

10   Q    What kind of door was it, if you remember?

11   A    It's a trailer door.

12   Q    Was it the kind you can see through?

13   A    No.

14   Q    And then what happened?

15   A    The door opened.

16   Q    Could you see who was on the other side?

17   A    I didn't see them till they pulled him out.

18   Q    Who pulled who out?

19   A    I can't remember exactly who pulled who out.  I

20        know Jerry came out of the door.  There were two

21        officers at the door.

22   Q    The same two you described before?

23   A    Right.

24   Q    What else happened?

25   A    After they pulled him out, they went inside and

Exhibit B2

1   Q   And do you recall anything unusual happening that

2       afternoon?

3   A   I was standing outside and I seen one of the guys

4       pull out one of the guys in the house.

5   Q   What guys did you see?

6   A   It was -- there was a bald-headed guy.  There was

7       a long-headed guy.

8   Q   Did they have on Metro Narcotics Task Force gear?

9   A   Yes.

10  Q   Did you notice anything prior to that?

11  A   They pulled them out of that house, just jerked

12      them out of the house when they knocked on the

13      door.

14  Q   Who did they jerk out of the house?  Do you see

15      him in the courtroom, the person that was pulled

16      out of the house?

17  A   Huh-uh (negative response).

18  Q   Was it a female or male?

19  A   It was a male.

20  Q   And this was across the street from where you

21      live?

22  A   Diagonally from where I lived.

23  Q   Diagonal.  So how far away from you -- how far

24      away from that home were you when you were

25      watching?  Were you on the road?

Exhibit B3

| | | |
|---|---|---|
| 1 | A | No, ma'am.  We didn't have an address. |
| 2 | Q | Did you have a form that you were going to use as |
| 3 | | soon as you could fill in the blanks? |
| 4 | A | We had no search warrant whatsoever.  We went out |
| 5 | | there under -- we went to pull surveillance on it |
| 6 | | to see if there were any -- actually, to find the |
| 7 | | trailer and then to see if there's any activity. |
| 8 | Q | Did you personally arrest Steve Moseson? |
| 9 | A | Did I actually arrest him?  I was present when he |
| 10 | | was arrested, but I don't think I actually placed |
| 11 | | the cuffs on him. |
| 12 | Q | Did you read him his rights? |
| 13 | A | At that time?  No, we didn't read him his rights. |
| 14 | Q | Did you personally observe the pat-down? |
| 15 | A | Yes. |
| 16 | Q | Did the person patting Moseson down reach into |
| 17 | | any pocket? |
| 18 | | MR. LANDREAU:  Judge, I object.  It's |
| 19 | | irrelevant to this Defendant as to how some other |
| 20 | | defendant was searched.  This Defendant has no |
| 21 | | standing. |
| 22 | | THE COURT:  Well, I think this was brought |
| 23 | | out on direct examination that he was arrested |
| 24 | | and it's part of -- I don't know that this |
| 25 | | Defendant would have standing to challenge that |

Exhibit C

1    arrest.  It's part of the transaction that was

2    used to lead to the entry into the trailer, so

3    I'll overrule your objection.

4  Q   You can answer the question.

5  A   When he was patted down, I believe they did go in

6    his pocket.

7  Q   Did you -- withdraw.  Where did Moseson go when

8    he came out of the building, if anywhere, before

9    he went to the vehicle?

10  A   He came straight out and started walking straight

11    to the vehicle.  It's a red pickup truck.

12  Q   Where was the red pickup truck parked in relation

13    to the trailer?

14  A   Right on the street, right by the -- there were

15    several cars.  It was parked just kind of in the

16    driveway but facing away from the trailer, facing

17    north.

18  Q   So was he actually standing on the property or on

19    the road?

20  A   He was on the property.

21  Q   Did Metro Narcotics officers approach him by

22    walking onto the property?

23  A   Yes, we sure did.

24  Q   How many feet was it from the road, if you know?

25  A   It was like half on the road and half in the

Exhibit C

1   A    Yes, sir, if somebody had been watching it.

2   Q    Let me ask you.  Had the informant given you any

3        information about anything unusual about this

4        trailer as far as how it was rigged?

5   A    Yes, sir.

6        MS. FARRAR:  Objection.

7   Q    What had the informant told you?

8        THE COURT:  I'm going to sustain the

9        objection.  I don't think that's necessary at

10       this point, and especially since this is

11       apparently hearsay testimony that's given to

12       Officer Lawrence, not to this officer.  Is that

13       correct?

14       MR. LANDREAU:  Judge, my understanding --

15       let me ask that because that's not --

16  Q    Did the informant give this information directly

17       to you or to Sergeant --

18  A    Yes, sir.  I spoke on the phone with the

19       informant while he was in Sergeant Lawrence's

20       office.

21       MS. FARRAR:  I would object for relevance.

22       MR. LANDREAU:  Judge, it goes to the state

23       of mind of the officers in determining whether or

24       not they felt like they had exigent circumstances

25       and/or an emergency situation.

Exhibit D

THE COURT:  Well, I would think that would already be established by the fact that it's been testified that two individuals were requested to blow it up.

MR. LANDREAU:  Yes, sir.

THE COURT:  And I think that would be sufficient.

MR. LANDREAU:  We'll move on.

Q  Now, did Mr. Moseson have any type of contraband on him?

A  Yes, sir.

Q  After meeting with Mr. Moseson, did officers approach the mobile home?

A  Yes, sir.

Q  Who all approached and where did they approach?

A  Agent Memmo went to the rear of the trailer, and myself and Sergeant Price went to the front door.

Q  What was y'all's purpose in going to the front door?

A  We were going to speak to Mr. Whitley.

Q  Were you trying to confirm something?

A  Yeah.  We were trying to establish if this was where Mr. Whitley lived and get an address on the trailer.

Q  Did someone knock on the door?

Exhibit E

methamphetamine lab in there?

    MS. FARRAR:  Objection, Your Honor.

Relevance.

    THE COURT:  Well, this is a motion to suppress hearing at this point, and I'll sustain the objection.

Q  Did you notice some fishing line in that trailer?

A  No, sir, not really, no.

Q  Mr. Meadows, wasn't there some line that ran from the front door to a candle or some type of flame in the back?

A  Not that I'm aware of.

Q  Do you recall Jerry Whitley telling you to blow the trailer up?

A  No, sir.  I don't recall him telling me to blow the trailer up, no, sir.

Q  Do you remember the plea agreement you entered into?

A  Yes, sir.

Q  You remember testifying in front of the Court?

A  I heard -- I heard someone on the outside of the house say light it.  That's what I heard.  I didn't hear anybody say anything about blow anything up.

Q  Well, you recognize the voice that said light it?

Exhibit F

75

1    MR. LANDREAU:  No, sir, unless the Court

2    wishes some type of closing argument.

3    THE COURT:  You may do so if you want to,

4    but I'm not going to require it.

5    MR. LANDREAU:  Judge, I'll keep it very

6    brief.  This is a classic case of exigent

7    circumstances.  The officers received information

8    that was insufficient for a search warrant.  They

9    went there to set up surveillance.  They

10   encountered an individual who smelled strongly of

11   the precursor chemicals to methamphetamine.  They

12   went to the door in an attempt to verify who

13   lived there, and at that point they were

14   confronted by people screaming to light it or

15   blow it up, and they entered the trailer to

16   protect themselves and the citizens from the

17   threat of an explosion.  Also, obviously, it

18   would serve the dual purpose to preserve

19   evidence.  They went in there and secured Mr.

20   Meadows, brought him out, and then immediately

21   got a search warrant.

22   We think it's a classical case of probable

23   cause that coexists with exigent circumstances.

24   THE COURT:  Ms. Farrar, do you have anything

25   you'd like to add?

Exhibit G

1    MS. FARRAR:  Just really briefly, Your

2    Honor.  Police officers cannot create their own

3    exigent circumstances.  Rather than in

4    encountering an individual, they went up to him

5    and actually arrested him illegally and guns were

6    drawn, and they actually did raid the residence

7    of my client.  It was an illegal arrest, and

8    anything that stems from it would be poisonous

9    fruits.

10       Also, even though perhaps it could be argued

11   that my client, Mr. Whitley, does not have

12   standing to use the Moseson arrest, it actually

13   is what was used to create the exigent

14   circumstances, so I believe this would be

15   allowable.  That's all I have, Your Honor.

16       THE COURT:  All right.  The Court would deny

17   the motion to suppress.  Thank you.

18       MS. FARRAR:  Your Honor, I would like to ask

19   during the trial if I might be able to have a

20   continuing objection to the admission of any of

21   the arrests itself, the search warrant, any

22   statements or seized contraband as a result of

23   what we would like to preserve our objection as

24   an illegal arrest.

25       THE COURT:  Yeah.  I'll let you have a

*Exhibit H*

# SEARCH WARRANT

(X) State of Alabama

SL0105214
_____
Case Number

( ) Municipality

VS.

Jerry Whitley
Defendant

STATE OF ALABAMA
In the_____ Court
Of Russell _____ County

## TO ANY LAW ENFORCEMENT OFFICER WITHIN THE STATE OF ALABAMA:

Affidavit in support of application for a search warrant having been made before me, and the Court's finding that grounds for the issuance exists or that there is probable Cause to believe that they exist, pursuant to Rule 3.8 Alabama Rules of Criminal Procedure, you are hereby ordered and authorized to fore with search:

**THE FOLLOWING PERSON OR PLACE:** _a green and white trailer home on Rusk Drive, Phenix City, Alabama. This residence is between Lots #21 and #50 and accross from Lot #50. See exhibit A for diagram of area._

**FOR THE FOLLOWING PROPERTY:** _There is being concealed at the above residence methamphetamine, materials for making methamphetamine, weapons and hazardous chemical byproducts form making methamphetamine. The use, possession and manufacturing being a violation of Sections 13A-12-211 and 13A-12-212 of The Code of Alabama, as Amended._

and make return of this warrant and an inventory of all property seized by me within _____ (____) days (not to exceed ten (10) days as required by law.)
( ) This warrant may only be executed
  ( ) in the daytime between the hours of
  _____ __.M., and
  _____ __.M.
( ) The Court finds probable cause to believe that a nighttime search is necessary and this warrant may be executed at any time of the day or night.
ISSUED TO: _Agent Jason Whitten, Metro Narcotics Task Force._
at _8:21_ o'clock, pm .XX., this _21st_ day of _September_ , _2001_ .

_____
Judge

Exhibit I

000055

# RETURN AND INVENTORY

I certify that I executed the foregoing Search Warrant as directed therein by searching the person or place therein described at 2045 o'clock P. M., Sept. 21 2001 , and:

( ) Did not find and seize any property located

or:

(√) Found and seized the following described property and made return of same to the court at 2045 o'clock P.M. Sept. 21 2001 :

1) Ithaca 22 cal rifle modl M-49 (Bedroom 1w)
2) Ruger m77 rifle 308 cal (Bedroom) 1w
3) Ruger 22 cal Pistol Mark I (safe) JW, 4) Davis 22 cal pistol DM 22.
5) Bryco Arms 9mm pistol J9 (Living room JW), 6) Ruger P-89 9mm Pistol (case JW)
7) Glock M-31 357 pistol (living room JW) 8) Radio Shack scanning receiver.
9) Three walkie-talkie's, (10) Cobra Scanner, (11) Three Cell phones
12) CCTV Camera System, (13) Minolta Camera 35mm @
14) Canon Camcorder 8mm, ~~15) 1 ~~ JW
15) 4 Chemistry Books, 16) Night owl optics Night Vision,
17) 7 pistol Magizines, 18) Four Boxes of pistol Ammo
19) one brief case w/papers, 20) four 8mm Tapes.
21) quantity of Methamphetamine, 22) Meth Making Materials
23) quantity of Marijuana, 24) Various paper work and
documents.

( ) Copy or warrant and endorsed copy of inventory left in accordance with Rule 3.11(a), Alabama Rules of Criminal Procedure.

Date: 09 21 01

S/A J. W____ M16
Signature of Law Enforcement Officer

Agent, Metro N.T.F.
Title and Agency

# RECEIPT

I acknowledge receipt of return of the foregoing Search Warrant and all items, if noted on the foregoing inventory, at the date and time noted above.

Exhibit I

1          THE COURT:  Which was a two full months

2     ago.

3          MS. FARRAR:  I filed the motion for his

4     expenses to fly out here, and I was told -- I

5     believe that the Court said let's wait on what

6     the results are and then I will decide whether to

7     grant the extraordinary expenses for him to

8     travel out here, and then I did the motion for

9     extraordinary expenses as soon as I got the

10    results.

11         THE COURT:  Which shows that there was

12    methamphetamine present?

13         MS. FARRAR:  Yes, Your Honor.  It was -- my

14    offer of proof would be that --

15         THE COURT:  And you would want to fly the

16    witness here to show that there was

17    methamphetamine present?

18         MS. FARRAR:  To show that it was in such

19    small a quantity related to the liquid substance,

20    that that would be preserved for the record.

21         THE COURT:  Well, do you have a written

22    report from this individual?

23         MS. FARRAR:  Yes, Your Honor.

24         THE COURT:  Will the State stipulate to that

25    report?

Exhibit J

1    MR. LANDREAU:  Your Honor, we have no

2  problem with her introducing the report in terms

3  of an appellate record.  Our position is under

4  Alabama law, the ratio of meth to other

5  substances in the mixture is immaterial and

6  irrelevant, so we would object to it going to the

7  jury.  But if she wants to place it there for

8  some purposes of an issue down the road, we don't

9  have any objection to that.  We just don't think

10  it should go to the jury.

11    THE COURT:  Well, there's been a Motion in

12  Limine that has been filed --

13    MR. LANDREAU:  Yes, sir.

14    THE COURT:  -- in this matter in which the

15  State is asking that the argument not be made as

16  being impermissible.  Do you have any response to

17  that, Ms. Farrar?

18    MS. FARRAR:  Your Honor, I would object to

19  the Motion in Limine.  The jury has a right to

20  know the total circumstances surrounding this

21  alleged methamphetamine lab drug bust, and my

22  client has received information that was prepared

23  by the expert witness, and I believe that it

24  would be in the interest of justice that this

25  information and report be preserved for the

Exhibit J

1   record and placed in the file.  If it's the

2   Court's ruling that the jury doesn't see it,

3   that's one thing, but I would want it in the file

4   to be preserved.

5       THE COURT:  Let me say that I think it would

6   be permissible for the defense to show the

7   percentage of methamphetamine in any

8   controlled -- in any volume of material other

9   than what is there.

10      MS. FARRAR:  I don't understand.

11      THE COURT:  Well, what I'm saying is your

12  client is being charged with possession of 28

13  grams or more of methamphetamine; is that

14  correct?

15      MR. LANDREAU:  Yes, Your Honor.

16      THE COURT:  And if you have something to

17  show there is not 28 grams in there, in this case

18  you have a mixture that has methamphetamine in

19  it, according to your report.  Does it state the

20  actual amount of methamphetamine in that

21  mixture?

22      MS. FARRAR:  Yes, Your Honor.

23      MR. LANDREAU:  Your Honor, in response,

24  State's position is, under case law, if it's in a

25  mixture such as this, it is the total weight of

Exhibit J

1    the mixture, not the weight of the active

2    ingredient within the mixture.

3         MS. FARRAR:  And I have two arguments about

4    that.  The case law is certainly that a mixture

5    is defined as containing the drug and containing

6    other substances, but there has been case law

7    about what other substances can be defined as

8    being part of the mixture and what are excluded.

9         THE COURT:  Do you have that for me to look

10   at?

11        MS. FARRAR:  Yes, Your Honor.

12        MR. LANDREAU:  Ms. Farrar, are you referring

13   to the Fletcher case?

14        MS. FARRAR:  Yes.

15        MR. LANDREAU:  Your Honor, we submit that's

16   not applicable.  That case says if you have two

17   substances that are together that do not combine

18   into one mixture, in the Fletcher case it was

19   crack cocaine and soap chips, that's not a

20   mixture.  But Fletcher also holds that if the

21   methamphetamine or drugs are comingled and

22   diffused among a liquid or other substance, then

23   you do count the entire weight of the mixture.

24        MS. FARRAR:  Our position would be that it's

25   possible in our case that it's slightly different

Exhibit J

89

1    than that.  It's not soap certainly, but that

2    there could be new law by the Alabama Court of

3    Criminal Appeals up to the Supreme Court.  There

4    is a Federal law where mixtures are analyzed to

5    determine the amount of alleged controlled

6    substance.

7         THE COURT:  Do you have the Fletcher case

8    that you have cited?

9         MS. FARRAR:  Yes, sir.

10        MR. LANDREAU:  Here it is, Judge.

11             (Brief pause.)

12        THE COURT:  All right.  Do you have

13   something further, Ms. Farrar?

14        MS. FARRAR:  I do not have the case with me

15   or the case name, but in my research I found a

16   case where the Defendant had appealed or had a

17   Rule 32 for ineffective assistance of counsel.

18   One of the allegations was that the defense

19   attorney asked the question of the forensic

20   scientist did you check the ratio of the alleged

21   controlled substance to the other ingredients of

22   the mixture which was weighed.  The scientist

23   said in the presence of the jury, no, because I

24   didn't have to.  The Defendant was arguing that

25   that was a showing that the attorney was not

*Exhibit J*

1  learned in the law, but the Justices said, no,

2  that was not an example of ineffective assistance

3  of counsel.  That was something that was

4  appropriate, so I would just offer that.

5      THE COURT:  May I see the report that you

6  have from your --

7      MS. FARRAR:  Yes, Your Honor.

8      THE COURT:  -- testing?

9      MS. FARRAR:  I believe Mr. Landreau has a

10  copy, and I've marked it as Defendant's Exhibit

11  1.  It has five pages.

12      THE COURT:  Now, this is his result just of

13  the sample?

14      MS. FARRAR:  Of the samples.  They each

15  contained five milliliters.  There were two

16  samples.  One was found to have approximately

17  point three milligrams per milliliter, and the

18  other sample was found to have 1.8 milligrams per

19  millileter.  Attached to the report is the CV of

20  the independent expert, Dr. John Hiatt.

21      THE COURT:  I don't see any problem with

22  this report being entered into evidence and being

23  presented to the jury.  There's been a Motion in

24  Limine that has been filed, and the Court would

25  grant the State's Motion in Limine to the extent

Exhibit J

1    that it would be impermissible for you to argue

2    to the jury that a mixture containing

3    methamphetamine is not sufficient for conviction.

4         MR. LANDREAU:  Judge, just for

5    clarification, as I understand it, the Court is

6    telling defense counsel they cannot argue that

7    there was really less than 28 grams of meth

8    regardless of the weight of the mixture; is that

9    correct?

10         THE COURT:  No.  What I'm telling you is she

11    cannot bring up that there is -- that a jury

12    cannot convict upon the fact that there is less

13    than the actual 28 grams of methamphetamine; that

14    it is clearly the law that it is a mixture

15    containing methamphetamine of 28 grams or more.

16    And the Court is going to instruct the jury as to

17    what the definition of the mixture as cited by

18    the Court in the Fletcher opinion.

19         MR. LANDREAU:  Judge, do you want to keep

20    the Fletcher --

21         THE COURT:  I wrote down the definition.

22         MR. LANDREAU:  Oh, okay.  I was just going

23    to let you keep the case because I didn't think I

24    would be needing it again.

25         MS. FARRAR:  But, Your Honor, I would be

Exhibit J

1   allowed to argue to the jury simply the fact that

2   there was found to be this much proportion?

3       THE COURT:  Yeah.  I think you are entitled

4   to ask of the State's witness what the proportion

5   of methamphetamine is to that as well as present

6   the proportion from your expert analysis.

7       MS. FARRAR:  Your Honor, I don't have my

8   expert to get this evidence in.  I don't know how

9   I can get it in without laying the foundation

10  of --

11      THE COURT:  Well, I don't see any problem

12  with there being a stipulation that that be

13  entered into evidence.

14      MR. LANDREAU:  No problem with that.

15      THE COURT:  And it has his background as

16  well as --

17      MS. FARRAR:  Thank you, Your Honor.

18      THE COURT:  -- education and training and

19  experience to show that he is an expert.

20      MS. FARRAR:  Yes, sir.  And we need to get

21  that on the record before the jury, or is it

22  sufficient to have it on the record now?

23      THE COURT:  Well, I mean, you'll be able to

24  read that out to the jury as part of your

25  exhibit.

Exhibit J

1     similar tests to make sure that it's working

2     properly?

3   A   On the infrared spectrophotometer, we would run

4     what we call a polystyrene every morning or

5     anytime the instrument is going to be used that

6     particular day.  That will usually give us, I

7     guess you would say, a diagram of that particular

8     polystyrene.  And from there we can look at it

9     and tell whether or not the instrument is

10     performing properly.

11   Q   And how would I be able to know if there is 1.8

12     milligrams in a milliliter of a sample of the

13     seized substance?  How would I be able to know

14     about how much was the quantity of meth in that

15     particular sample?

16   A   The only way I could have determined that was to

17     do a quantitation on that particular sample.

18   Q   Based on the data that was arrived at by our

19     independent expert, can you give a ballpark

20     figure of about how much was in the samples which

21     we have before us today?

22          MR. LANDREAU:  Your Honor, same objection

23     previously stated.

24          THE COURT:  Overrule the objection.

25   A   Based on the report from your independent

Exhibit K

1  scientist expert, I cannot conclude as to whether

2  his results are correct because I have no idea

3  what instrumentation he used.  I have no idea how

4  he may have performed his extractions or his

5  analysis of the samples.

6  Q  I'm only asking you if they're correct, what

7  would his analysis have come up with as far as

8  how many grams were present in the quantity of a

9  liquid as by volume, grams per volume?

10  A  Based on his analysis, I cannot say because, like

11  I just testified, I do not know what he did and

12  how he did it.

13  Q  Thank you.  I've got one more.  Did you find any

14  methamphetamine in any of these samples that you

15  seized that was in a form suitable for ingesting

16  based on your experience and scientific

17  knowledge?

18  A  Based on the evidence that I collected and on my

19  analysis, the residue that was found on the

20  aluminum foil, it's a possibility it could have

21  been smoked, ingested, or used at any particular

22  time.  Based on some of the residue, something I

23  removed from the filter papers, you could

24  actually go back and take those filter papers and

25  maybe extract it with an alcohol and then dry it

Exhibit K