EXHIBIT "M"

IN THE COURT OF CRIMINAL APPEALS

STATE OF ALABAMA

JERRY E. WHITLEY

Appellant,
Vs
STATE OF ALABAMA,

Appellee.

CASE NO:  CR-02-0739

AN APPEAL FROM THE CIRCUIT COURT OF

RUSSELL COUNTY, ALABAMA

CASE NO:  CC-02-186, 187, 188

APPLICATION FOR REHEARING & SUPPORTING BRIEF

Comes now the Appellant in the above-styled cause by and through his Attorney, and moves this Honorable Court to render into it a rehearing in the said cause and to set aside, annul, and hold for naught, the Judgment heretofore rendered on;  to-wit:   March 19th, 2004, affirming the Conviction by the Circuit Court of Russell County, Alabama. This brief and argument in support of this Application is hereby submitted.

Request for Permission to file Application, Brief, Statement of Facts, and argument in excess of 15 pages, pursuant to Rule 32 (a)(6)(c), ARAP.

Appellant would request that this Court accept this Application and brief of approximately 39 pages.  In order to preserve the Appellant's Statement of the Facts as included in the original appellate brief (31 pages) they have been included in the application.  Further, the argument included four (4) issues and several were extensive.

HON. J. MICHAEL WILLIAMS, SR., WIL103
ATTORNEY FOR THE APPELLANT
P. O. BOX 1068
AUBURN, ALABAMA  36831-1068
334-705-0200

EXHIBIT "M"

IN THE ALABAMA COURT OF CRIMINAL APPEALS

===========================================================

APPEAL NO. CR-02-0739

===========================================================

JERRY E. WHITLEY,

    Appellant,

V.

STATE OF ALABAMA,

    Appellee.

===========================================================

BRIEF OF APPELLANT

===========================================================

Appeal from Russell County Circuit Court:

CC-02-186, 187, 188

Hon. J. Michael Williams, Sr.
P. O. Box 1068
Auburn, Alabama   36831-1068
(334) 705-0200
ATTORNEY FOR APPELLANT

## STATEMENT OF THE CASE

The Appellant adopts the Statement of the Case as set out in its original Brief in this Appeal.

## STATEMENT OF ISSUES

I.  The Trial Court erred in not granting Whitley's Motion to Suppress for two reasons:

    a)  The acts of law enforcement prior to obtaining a search warrant, and

    b)  The search warrant was not properly obtained or supported.

II. The Trial Court erred in not allowing for the testimony of Dr. Hiatt concerning the amount of methamphetamine in the liquid mixtures which were used to establish an amount of more than 28 grams. The scientific, unrebutted evidence of Dr. Hiatt, established less than 28 grams of methamphetamine, and therefore there was insufficient evidence to support a conviction of Trafficking.

III. There was insufficient legal evidence to support convictions for possession of methamphetamine and resisting arrest.

IV. The sentence of 35 years is cruel and unusual.

## STATEMENT OF THE FACTS

The Appellant, adopts in part, the facts as set forth in the Court of Criminal Appeals decision, but also supplements those facts by submitting the following:

## SUPPRESSION HEARING

Whitley's Motion to Suppress is found at (C-45). The Transcript of that Hearing begins at (R-3). Whitley's Attorney stated that the grounds for the Motion were due to the search being illegal because it was a warrantless arrest and search and did not fall under any of the exceptions.

**Sergeant James Price** of the Harris County (Georgia) Sheriff's Department testified first. He was assigned to the Metro Narcotics Task Force. In regard to the information received concerning the search of September 21st, 2001 at Rusk Trailer Park, he stated that Agent Whitten had received information from Officer Ricky Lawrence that he had a subject in his office that had information on a meth lab at that location. When asked what the subject told Price, the Defense objected and asked who the subject was. The Judge did not Order the disclosure of that person. Double hearsay was also

objected to but the Court overruled that objection.    The information received was that a subject known as Jerry Whitley was manufacturing meth at one of the trailers in Rusk Trailer Park.    The trailer was supposed to be booby-trapped and there were supposed to be several weapons at the trailer.    When asked, at that point, based on the information that the informant had given Price, did Price feel that he had sufficient information to obtain a Search Warrant?    His answer was "I don't think we had sufficient information" (R-7).    Note, this same officer testified at trial that another reliable informant had provided the same information to the task force two (2) weeks earlier and that he and others had gone to the same trailer and observed it, two weeks earlier (R-121).    The informant had not given a specific address, but described the trailer, its location and vehicles at the trailer.    Then Price, Agent Whitten and Agent Memmo went to the trailer park to try to locate the trailer and see if they could smell a chemical smell, based on the informant's information.    If the meth lab was running, we should smell chemicals.    The Officers located the vehicles at a trailer.    They set up surveillance and watched the trailer a few minutes.    They

observed a subject come out and walk toward a vehicle. That person's name was Steve Moseson. All three (3) Agents approached him. He had a shaken look on his face and he smelled of chemicals.

Price testified that he had received training on methamphetamine labs and recognized odors associated with a methamphetamine lab. Moseson was patted down for weapons for the officers' safety and a small plastic bag containing methamphetamines was located (and apparently thought to be a weapon). Moseson was then placed under arrest for possession of methamphetamine.

Price and Agent Whitten then went to the front door of the trailer and Agent Memmo went to the rear door. He knocked on the door for the purpose of finding out who lived at this trailer. A woman named Caylene White answered the door. Price asked if Jerry was home, but he also noticed the smell that came out of trailer, a strong ether smell. Ether is associated with the production of methamphetamine. Price asked if Mr. Whitley was there, Ms. White said yes; and Price asked to speak to him. Whitley then stepped out of the door. Price was wearing a Metro Raid vest and a sidearm and the vest had the words "Metro

Narcotics" written on it with a star, identifying him as a law enforcement officer. At that time, Whitley stepped out of the door. Price had known Whitley for a number of years. When Whitley stepped out, Price noticed that he had a big wrench in his pocket. Price removed the wrench and when he did a bag of methamphetamine fell on the ground. At that time, Price grabbed Whitley by the arms (R-13). Price stated that he removed the wrench because he thought it was a possible weapon. Whitley was then cuffed and put in the back of a car.

Price had received information from the informant that there was some type of booby-trap in the trailer. Whitley began to yell blow it up. There were other trailers just a few feet from the Whitley trailer. The District Attorney asked Price if the trailer had blown up, would it have endangered any of the people in that trailer park. Price responded, yes.

Agent Whitten went in and removed Ms. White from the trailer. Price testified that Whitley started yelling, Wayne, set it off. Agents Whitten and Memmo went back in the trailer and came out with a subject later identified as Wayne Meadows. Ms. White was secured and Wayne Meadows was

secured.    The trailer was secured and the subjects were placed in Police vehicles <u>and then a search warrant was obtained.    (Emphasis Added)</u>.    Mr. Whitley was already arrested for possession of methamphetamine, but his rights were not read to him.    Price testified that the other trailers were at least twenty-five (25) feet from that trailer of Whitley.    He again testified that Whitley had stepped out of the trailer and that Price pulled the wrench out of Whitley's pocket and that was when the methamphetamine fell on the ground (R-19).    After Whitley stepped out of the trailer, he in fact said "hey, Jim" and acknowledged that he knew Price.    There was no struggle between Price and Whitley until Price pulled the wrench out of Whitley's pocket and a little piece of plastic fell out.

The surveillance lasted between ten (10) and fifteen (15) minutes and occurred before five (5:00) in the afternoon.    Price did not talk with Sergeant Lawrence concerning the informant, nor has he talked to Lawrence about the informant since the date of the arrest.

Price testified that there was no search warrant whatsoever when he went to the trailer park to pull surveillance on it to see if there - - - <u>actually, to find</u>

6

the trailer and then to see if there was any activity (R-22). Whitley's attorney questioned Price about the pat-down search of Mr. Moseson. The State objected to this as being irrelevant. The Court allowed the questioning because it was brought up in direct examination and because it was part of the transaction that was used to lead to the entry into the trailer (R-23). The officer reached into the pocket of Moseson where the plastic bag of meth was found. Moseson had been approached by Metro Narcotics Officers after he left the trailer and as he was walking to a red pickup truck. He was actually approached while he was still on the trailer lot property. Moseson was not on the public road. Price did not remember Moseson putting his hand in his pocket (R-23-24).

Price did not observe any other people besides Moseson. He did not notice if the windows were open nor did he notice if there was a storm door on the front of the trailer. After Price grabbed Whitley and Whitley was yelling, Caylene White just stood at the door and Agent Whitten grabbed her. Whitten may have gone into the trailer. Price went back into the trailer after Meadows

had been removed.  The chemical odor was strong and he went into the kitchen and then he came back out.

**Jason Whitten,** who is employed with the Phenix City Police Department and assigned to the Metro Narcotics Task Force then testified.  Whitten received information about a methamphetamine lab in Rusk Trailer Park in Phenix City from Sergeant Lawrence from the Phenix City Police Department.  Whitten called Lawrence and spoke to him over the telephone.  There was "a subject" in Lawrence's office during the conversation.  Whitten then actually talked directly to the informant who gave the location of the lab as being about three-quarters of the way down Rusk Drive on the left;  he described the awning on the trailer and the vehicles in the driveway.  The informant did not give a specific address.  He stated that the name of the occupant or person renting the trailer was Jerry Whitley.  He stated that there was a cook going on, that day.  This conversation occurred around noon, 1:00, maybe 2:00 (R-32). The officer stated that based upon his experience and training he did not have sufficient evidence to obtain a search warrant.  He then went to the trailer park to set up surveillance on the trailer.  The purpose of going there

was surveillance, just to see if we could observe subjects coming and going, observe odors of methamphetamine labs. They were trying to confirm the information the informant had given them. They were also attempting to determine a street address for the property or a better physical address. Whitten testified that they arrived at around 2:30 in the afternoon and set up surveillance for fifteen (15) or twenty (20) minutes. They weren't there very long. They observed Moseson exit the trailer and walk toward a vehicle. The trailer that Moseson came out of matched the description given by the informant, and the vehicles around it matched what the informant had told Whitten (R-35). Moseson was detained and became nervous. Whitten did a pat-down search and felt a plastic bag in his pocket (R-36). Whitten testified that he saw a camera and that the informant had given him information about surveillance equipment being at the trailer. Cameras were visible from the outside of the trailer.

Whitten testified that the informant had told him about how the trailer was rigged. The Defense objected and the Court sustained the objection. The District Attorney then stated that this questioning "goes to the state of mind of

the Officers in determining whether or not they felt like they had exigent circumstances and/or an emergency situation." The Court then stated that it had been testified to that two (2) individuals were requested to blow it up, and the Court stated that this would be sufficient. The District Attorney then moved on in his questioning (R-37-38). The Officer testified that when they approached the front door of the trailer, the purpose was to speak to Mr. Whitley; to establish that this was where Mr. Whitley lived and get an address on the trailer. He testified that he was dressed like a law enforcement officer, with a gun belt with accessories and a mesh raid vest with a Metro Narcotics star on the front and a badge hanging over his shoulder and Metro Narcotics Agent patch on his back. He approached the door dressed like this (R-39). When Whitley stepped out of the door, Sergeant Price grabbed him and the wrenches that were in Whitley's front and back pockets (R-40). Caylene White first came to the door and then Jerry came to the door and stepped out of the door and halfway down the steps. After being arrested, Whitley started screaming for Wayne to "do it". Agent Memmo and Whitten went inside the residence and cuffed

Wayne Meadows. When they were in the trailer they noticed the smell of ammonia and ether type chemical smells, which were associated with methamphetamine labs. While Whitten was in the trailer he also recognized apparatus or equipment as a part of a lab. The Officer observed compressed gas cylinders of various sizes, shapes and colors, brass fitting hoses, a canister in the kitchen area that had fumes coming from inside it, handguns through out the living room; and surveillance equipment. At that point he did obtain a search warrant (Emphasis added). The search warrant was admitted as Exhibit "1" (C-529). This search warrant was not obtained until 8:25 p.m. that date on September 21st, 2001, and after the three (3) officers had already been in the trailer. Whitten testified that he personally went to Judge Funderburk to get the search warrant.

Whitten had testified that they entered the trailer about 3:00 that afternoon. There is no Affidavit attached to the search warrant or in evidence, nor is there Exhibit "A" for a diagram of the area to show where the subject residence is located. Whitten testified that there was no evidence of anyone violating the law at the residence,

prior to his actually stopping Moseson and in fact when Moseson came out of the trailer, the Officer had no reason to believe that he was violating the law. In fact, when the Officers approached Moseson they actually reached into his pocket and pulled out contraband (R-51). Whitten testified that he had never talked to the informant before or since. The informant stated that he had been in the trailer recently (R-52).

Agent Whitten stated that after he got the search warrant he did note a fishing line strung from the ceiling going around the walls to a candle in the back bathroom where there were containers of solvents and other flammable materials. The District Attorney testified that the way the fishing string was done, someone could grab it and tip over the solvents (R-44). The Officer testified that he did not know where the end of the line went to. There were pictures offered at the hearing concerning those surveillance cameras. The District Attorney asked the question of Whitten as to whether he was concerned about his safety and his fellow Police Officers when he entered the trailer and Whitten responded, yes. The District

Attorney asked him if he was also concerned about residents in the trailer park and he said yes.

A **Cindy Hoyle** testified that she lived at 24 Rusk Drive on September 21st, 2001. She was standing outside and saw one of the guys pull out one of the guys in the house. The men had on Metro Narcotics Task Force gear.

**Steve Moseson** testified that he walked out the door and was going to get in the truck. About halfway to the truck, the Officers got out of their car with guns drawn and told him to get down on his knees. Mr. Whitten then searched him. Whitten found $25.00 worth of meth in his pocket. Moseson was then hand cuffed. He was sitting on the ground near the trailer and observed the Police knock on the door. Caylene opened it and the Police pulled her out the front door, and put her off to the side (R-65). They went back to the front door with their guns drawn and said Metro Narcotics. The door opened and Jerry was pulled out of the door and then the Officers went inside and got Wayne out.

**Wayne Meadows** testified that he was at the residence of Mr. Whitley on September 21st, 2001. He was sitting in the living room when there was a knock on the door. Caylene White went to the door (R-68). Whitley went to the door

13

and Meadows heard some banging like the storm door was banging back and forth and that there was a bunch of commotion out there. Meadows looked out and then went back in the living room and sat down. Meadows did not notice any fishing line in the trailer; he did not recall Jerry Whitley telling him to blow up the trailer. The Officers came into the trailer and got him out of the trailer. There were jars on the kitchen floor. The Court then examined Mr. Meadows (R-74). Meadows was questioned about the smell of ether and whether or not some ether was spilled on Meadows before the raid. Meadows stated that nothing was spilled on him but he did smell something similar to ether.

In closing arguments to this Hearing the District Attorney stated that this was "A classic case of exigent circumstances." (R-75). The Officers received information which was insufficient for a search warrant; they set up surveillance; and they encountered an individual who smelled strongly; they went to the door to verify who lived there and at that point were confronted by people screaming to light it or blow it up. They entered the trailer to protect themselves and citizens from the threat

14

of an explosion. Obviously, it would serve the dual purpose to preserve evidence. They went in there and secured Mr. Meadows, brought him out and then immediately got a search warrant. Whitley's Attorney stated that the Police Officers cannot create their own exigent circumstances. She stated, "Rather than in encountering an individual, they went up to him and actually arrested him illegally with guns drawn, and they actually did raid the residence of my client. It was an illegal arrest and anything that stems from it would be poisonous fruits." The Moseson arrest was actually used to create the exigent circumstances. The Court then denied the Motion to Suppress (R-76). Whitley's Attorney requested that the Court allow her a continuing Objection to the admission of the arrest itself, the search warrant and any statements or seized contraband as a result of this search and seizure. The Court allowed this continuing objection.

## THE TRIAL

The Trial of this case began and ended on December 5th, 2002. The Court addressed some motions on the day of the trial. Whitley's attorney had an outstanding motion to continue and request for additional funds to get an

15

additional lab report and get Dr. Hiatt transported for trial. The Court denied that motion. Whitley's Attorney stated that she was not ready for Trial due to the denial of this motion. She explained the need to have Dr. Haitt further analyze the substances which were the subject of this case and in order to pay for his transportation from Nevada to Alabama for the testimony. There was a discussion concerning that Pending Motion and the need for that information. Dr. Hiatt's initial results showed that there was methamphetamine present in the liquid substance. However, Whitley presented an offer of proof that there would be a very small amount (less than three (3) grams) of methamphetamine mixed into the liquid substance (R-83-86). The report was admitted as Defendant's Exhibit "1" (C-547-551). The toxicology reports related to items 15 and 9 on the Department of Forensic Sciences Report and showed a small amount of milligrams per milliliter of methamphetamine in the liquids that constituted those two (2) items. The Exhibit was initially entered into Evidence for the purposes of the Appellate Record. The District Attorney argued that the ratio of meth to other substances in the mixture is immaterial and irrelevant.

16

There was a Motion in Limine which had previously been filed, which addressed whether or not the argument of the actual amount of meth could be argued and introduced by the Defense in order to argue that less than twenty-eight (28) grams of illegal substance was actually present. Both the District Attorney and Whitley's Attorney referred to the Fletcher case which called for a distinction between crack cocaine and soap chips in determining the overall weight of a substance or mixture. The Judge granted the State's Motion to the effect that Whitley's Attorney could not argue to the jury that there was less than twenty-eight (28) grams of methamphetamine and the Judge ruled that the law was clear that there was a mixture containing methamphetamine of twenty-eight (28) grams or more (R-87-93). At (R-84-92) is a long, confusing, discussion about the admissibility of Dr. Hiatt's report related to the percentage of methamphetamine in the mixtures which were listed on the Alabama Department Forensic Sciences report as Items 9 and 15. Finally, the State stipulated to this report being admitted into evidence to be presented to the jury and the Court admitted the report. However, Dr. Hiatt was not present to testify and explain any conclusions

based upon his tests.   Whitley's attorney pointed out that there was Federal Case Law which required a determination of the difference of the amount of the illegal drug in a mixture.

The District Attorney's Opening Statement included the following:

> On September 21st, of last year, 2001, agent Jason Whitten, who is employed by the Phenix City Police Department and assigned to the Metro Narcotics Task Force, a unit which, as the name implies, concentrates on drug offenses.   Jason received a phone call from a citizen, and he said I want to give you some information.   He said a guy named Jerry Whitley is running a methamphetamine lab in Rusk Trailer Park. This caller said, look, I don't know the exact trailer number, but here's a description of the trailer and here's a description of some cars that are parked in front of it.   And the caller said and oh, by the way, I think you need to know Whitley's got surveillance cameras, closed circuit television surveillance cameras set up so he can see outside the trailer.   He's got a bunch of guns, and he's booby-trapped the trailer so he can blow it up if the Police show up. . . . Jason Whitten, together with other Officers of Metro Narcotics Task Force, went out to Rusk Drive back on September 21st, to see if they could verify this information they had been given.   Sure enough, they found a trailer that matches the description.   Sure enough, in the yard of that trailer are the exact cars that the caller indicated.   So Agents Whitten, Price and Memmo decided that they would just watch this trailer a little while and see if there was anything unusual going on (R-101-103).

When the trial began the first witness was **Chris McKinstry** who works for the Monarch Company, which owns

18

Rusk Trailer Park. Whitley was the sole resident at Lot # 29 (R-113).

**Jody Williford,** an employee of the Russell County Sheriff's Department assigned to Metro Narcotics testified. The witness stated that he was the drug custodian and transported drugs to and from the lab. He testified that he had taken State's Exhibit "1" to the lab and then picked up those drugs on January 31st, 2002 and they had been in the Russell County Sheriff's Department evidence locker since that time in substantially the same condition they were, when he picked it up from the lab (R-116).

**Jim Price,** an employee of the Harris County, Georgia, Sheriff's Department testified as to his duties with the Metro Narcotics Task Force. He testified that he had known Whitley for over twenty (20) years and had grown up with Whitley. He stated that on September 21st, 2001 they had received information from a confidential informant. Whitley's Attorney objected to hearsay. The District Attorney stated that this information was not offered for the truth of the matter, but simply to explain why the Officers went there. The Court sustained part of the Objection and overruled the objection in part. The Court

19

explained to the jury that normally hearsay was not allowed
into evidence but that the Officer would be able to answer
the question to explain why he acted upon that information.
The Defense objection to this hearsay was overruled, (R-
119). Price testified that the informant stated Whitley
was cooking methamphetamine at his trailer. The informant
did not give an address. The District Attorney asked what
information - - how were you going to identify the right
trailer? Price then stated that the informant had provided
a description of the trailer and vehicles located at the
trailer. <u>Also, a few weeks prior to this, we had set up on
the same trailer (Emphasis added).</u> (R-121). The Officers
were told that the trailer was booby-trapped and there were
video surveillance cameras. He stated that they arrived at
the trailer around 5:00 p.m. The Officers located the
trailer that matched the description that the informant had
given, and the vehicles in front matched what the informant
had described. This included a truck parked in front of
the trailer, with Texas plates. The Officers observed the
trailer for about ten (10) minutes. They observed a
subject leave the trailer and go toward a red pickup truck,
this being Steve Moseson. The Officers then approached

Moseson. He acted nervous, looked toward the trailer, had a chemical smell on his person, so they placed him in cuffs for Officer safety and conducted a pat down. (R-123-124). Moseson smelled like ether and ammonia, items used in the manufacturer of methamphetamine. As a result of the pat-down search, a small plastic bag was recovered from Moseson's pocket, which contained suspected methamphetamine. Moseson was arrested. When asked the purpose of his going to the trailer, he responded "to see if Mr. Whitley was actually in the trailer" (R-125). Two Officers went to the front door and one Officer went to the back door. Price knocked on the door. A lady named Caylene White answered the door. She was asked if Jerry Whitley was in the trailer. She said yes and Whitley came to the door and stepped out of the trailer. Whitley spoke to Price and said hello Jim and he responded with hello Jerry. Price pulled a big wrench out of Jerry's front right pocket and when he did a bag of meth came out. Price then grabbed Whitley. Whitley started yelling to set it off. Price cuffed Whitley, who was trying to run away at the time. Ms. White was arrested and set in a chair outside the trailer door, next to the chair Mr. Moseson was

sitting in.   The other Officers went inside the trailer and came out with Wayne Meadows.   Price identified the plastic bag that came out of Whitley's pocket as methamphetamine and he identified State's Exhibit "1".   He later turned over all evidence to Agent Whitten.   The District Attorney then asked: "Let me ask you, after ya'll got everything settled down, after you got all of these people secured, did ya'll obtain a search warrant or any authority to search this trailer?"   Price answered that Agent Whitten obtained a search warrant for the residence.   The Officers found all kinds of chemicals used to cook methamphetamine. Price stated that Whitley was just rambling after his arrest and this was not done in response to questioning. He stated that his life was over and that he had messed up.

Under cross examination, Price stated that two weeks prior to September 21st, he had set up surveillance on the same trailer.   A confidential informant had called him at that time (R-133).   When asked who the confidential informant was, the Court sustained the objections made by the District Attorney.   The confidential informant who provided the earlier information had previously provided information to the police that was reliable.   The task

force had been working with that informant, who had provided information that produced other cases. The informant was doing this due to the fact that the informant had a case on him. The informant who provided information on September 21st, was a different informant from the earlier informant. Price was not aware of the reliability of the informant from September 21st.

**Melissa Kelly** testified as an employee of the Alabama Department of Forensic Sciences at the Auburn Laboratory. She testified as an expert witness. She testified in regard to State's Exhibit "1" and State's Exhibit "1(a)" and stated that there was methamphetamine in the sample.

**Sherwin Boswell**, testified that he was employed by the Department of Forensic Sciences, Auburn Laboratory as Chief of the drug chemistry section (R-143). He testified as an expert and stated that he processed illegal laboratories and explained how methamphetamine is made. He stated that some of the chemicals used in the process are explosive and toxic. Boswell and others arrived at 29 Rusk Drive on September 21st, at 8:59 p.m., to collect evidence. He had that evidence present with him in Court at the Trial. State's Exhibit "4" was a plastic container sealed with a

23

blue plastic lid holding a bi-layered liquid. The bottom layer of the liquid contained methamphetamine and pseudoephedrine. The top layer of the liquid did not contain a controlled substance (R-154). This liquid was not weighed. Several exhibits were admitted which were coffee filters, which were explained to be used in the straining process. The residue on several of these filters was determined to contain methamphetamine. Exhibit "9" was a liquid which contained methamphetamine and pseudoephedrine in the weight of 500 grams. There were several other jars of liquid which were seized, but did not contain any illegal substances. Whitley's Attorney objected to most exhibits which were not controlled substances. However, a number of these items were explained to be important in the manufacturing process of methamphetamine. Exhibit "15" was a glass jar containing a cloudy liquid and off-white powder. This liquid and powder revealed the presence of d-methamphetamine and pseudoephedrine, 1,435 grams (R-172). Exhibit "16" was a summary of the testimony in a written report form.

Under cross examination Boswell was asked about Exhibits "9" and "15", which were alleged to contain

methamphetamine.    Samples had been provided to the Defense for further analysis.    Boswell testified that he weighed the entire liquid after it was taken out of the container. He testified that he did not weigh the powder and the liquid in these samples separately.    He testified that item number 9 had a volume of about 800 milliliters and that there were 1,000 milliliters in a liter.    Item number 15 had less than a liter because there was powder and stuff involved.    The independent expert witness (Hiatt) did an analysis of these products and his report (Defendant's Exhibit "1") found that in one sample there was 1.8 milligrams per milliliter or 1.8 grams per liter.    The other sample had 3 milligrams per milliliter.    The witness was asked how many grams of methamphetamine would have been included in Exhibits "9" and "15".    The witness never answered the question.    The witness further stated that very little of the residue from the filter papers were suitable for ingesting.    This did not include any of the substance in Exhibits "9" and "15" (R-193).    The witness was asked if it was true that there was only approximately 3 grams in the whole sample as exhibited by "9" and "15". The District Attorney objected and the Court sustained the

objection (R-194). The District Attorney asked Mr. Boswell if there <u>had not been a police raid,</u> could the 8,000 grams of pseudoephedrine been turned into methamphetamine, his answer was yes (Emphasis added) (R-196).

**Wayne Meadows** testified that he knew Whitley for about a year and was at Whitley's trailer in Rusk Trailer Park on September 21st. Meadows stated that he smelled something when he came into the trailer and that he had been there about five minutes prior to the police arriving. He heard a knock on the door and Ms. White opened the door and the Officers said "Police". Whitley then went out and Meadows heard noises and shouting going on outside. Meadows was later charged with possession of methamphetamine and entered a plea bargain and pled guilty. He stated that the jars and things comprising the lab were visible inside the kitchen in the trailer. Under cross examination, Meadows stated that he was originally charged with trafficking and resisting arrest. However, those charges were dropped and he pled guilty to ten (10) years on one count of possession and seven (7) years on another count of possession. He was aware that he could have gotten ten (10) to ninety-nine (99) years for the trafficking charge.

**John Memmo** who is employed with the Columbus Police Department and assigned to Metro Task Force testified that he went to the trailer park on September 21st (R-206). They had received a complaint about a meth lab in one of the trailers out there. They went to the trailer park and located the trailer and set up several lots down (R-207). After about ten (10) minutes of surveillance they saw someone exit the trailer, being Steve Moseson. They then approached him to investigate his activities. All of the officers had on their marked colors identifying themselves as agents. Moseson acted nervous, looked back at the trailer, and had a loud odor about his person, so Agent Whitten handcuffed him. Memmo went into the trailer to arrest Wayne and while in the kitchen area he could see an active lab on the floor and several handguns laying about. Agent Whitten asked Whitley if he would give consent to search the trailer and Whitley said no (R-210). They then maintained security around the area until they got a search warrant.

**Jason Whitten** was employed by the Phenix City Police Department and assigned to the Metro Task Force. On September 21st, 2001 he received information concerning Rusk

Trailer Park.    He received a call from Sergeant Ricky
Lawrence of the Phenix City Police Department who had a
subject in his office.    Whitten talked to the subject that
had given information.    The Defense Attorney objected to
hearsay, but the Court allowed it.    The informant stated
that Jerry Whitley at Rusk Trailer Park had an active meth
lab.    The informant described the trailer and the vehicles
at the trailer.    Based upon this information the Task Force
went to the location and set up surveillance at the
residence of Jerry Whitley.    They did not know the actual
house number but the trailer matched the information that
they had been given, along with the vehicles in front of
the trailer.    They observed the trailer and observed Mr.
Moseson exit the trailer.    They contacted him and
subsequently arrested him because of his smell.    Exhibit
"24" was offered, being a picture of a camera from the
window of Whitley's trailer.    This camera which could be
observed from outside of the trailer, matched the
description given by the informant.    Whitten and others
then approached the trailer and arrested Caylene White,
Whitley, and Meadows, as had been described in earlier
testimony.    Whitten went inside the trailer to remove Mr.

Meadows and <u>did a walk-through</u> and noticed handguns, propane cylinders, gas cylinders, and large containers containing liquid and powder. Later, Whitley would not consent to a search of the residence, so they then went and got a search warrant. A number of pictures that were taken of the inside of the trailer were admitted into evidence. Several guns were testified about. A video tape of Whitley and Meadows setting up a video camera in the living room was admitted. Whitten testified that when he did his walk-through of the trailer he saw several guns and none of these guns were determined to be illegal (R-235). Therefore, there was not a sufficient basis for guns being an enhancement on the sentence of Whitley (R-235).

The Defense called as its only witness, Stephen Moseson, who had been at the trailer that date. He was arrested that day and has since pled guilty to possession. He stated that he did not notice any large quantity of methamphetamine in the trailer. Under cross-examination, Moseson's statement was offered as Exhibit "32". That document was dated 12/27/01, which was more that three (3) months after the initial arrest. The statement was that Whitley was the only one involved in the manufacturing.

The Defense rested (R-246).

The Court, it its Jury Charge, stated: "A mixture is defined to include a portion of matter consisting of two or more components that do not bear a thick proportion to one another and that however thoroughly commingled are regarded as retaining a separate existence. A mixture is also defined as two substances blended together so that the particles of one are diffused among the particles of the other (R-254).

Upon completion of the Closing Statements by the Attorneys and the Charge, the Jury began deliberations. They reached a verdict of Guilty on all charges and a decision that Whitley did possess a firearm during the commission of the crime of Trafficking in methamphetamine (R-268-269).

## SENTENCING HEARING

The State took the position that, based upon the weight of the drugs in this case, the minimum sentence to be imposed would be fifteen (15) years, plus a five-year enhancement for use of a gun during this crime. Whitley was sentenced to thirty-five (35) years on the Trafficking case, which ran concurrent with the possession charge, in

30

which he received a five-year sentence. A $50,000.00 fine was imposed as well as other Court costs, the $10,538.64 appointed attorney fee, and other fees and costs. He was sentenced to six (6) months on the Resisting Arrest charge. Whitley was informed of his right to Appeal the sentence and Oral Notice of Appeal was given at that time on all three (3) cases (R-276-277).

## ARGUMENT OF ISSUES

**ISSUE I: The Trial Court erred in not granting Whitley's Motion to Suppress for two reasons:**

> a) **The acts of law enforcement prior to obtaining a search warrant, and**
>
> b) **The search warrant was not properly obtained or supported.**

The opinion of the Court of Criminal Appeals failed to recognize that the Drug Task Force Officers had been to the Appellant's trailer approximately two (2) weeks earlier; had observed the trailer; acted on the same type of information that they were provided at the time of the actual arrest of the Appellant and search and seizure that occurred (R-121). The Officers' had sufficient information upon which to obtain a proper and legal search warrant two

31

(2) weeks prior to the arrest and immediately prior to the arrest of the Appellant and search of the trailer, when the Appellant was arrested. However, law enforcement failed to do this. The opinion of the Court of Criminal Appeals did not address this particular issue. The Appellant still avers that the law enforcement Officers created any exigent circumstances, in a deliberate act to circumvent the requirement and necessity of obtaining a search warrant. The facts and the arguments as set forth below establish the requirement of law enforcement to obtain a search warrant.

The Court of Criminal Appeals relied on factors as set forth in Bush v. State, 523 So.2d 538 (Ala. Crim. App. 1988). These factors, as used by law enforcement, did not create the exigent circumstances which would negate the need of a search warrant and are addressed as follows:

1. The gravity or violent nature of the offense with which the suspect is to be charged. Appellant would argue that the charges concerning methamphetamine are not necessarily violent. Further, the task force already knew, through two (2) different confidential informants, of the nature of the offense for which the

Appellant was a suspect and this was the second time that they had been to the Appellant's trailer.

2. A reasonable belief that the suspect is armed. The Court of Criminal Appeals and the law enforcement Officers seemed to rely on the fact that the Appellant had a wrench in his pocket. Many working people, regularly have a wrench, hammer, or screw driver in their pocket, depending on what activities they are participating in. The Appellant would argue that the Courts did not anticipate nor expect to include a wrench as indicating that a suspect is armed.

3. Probable cause to believe that the suspect committed the crime. The law enforcement Officer's certainly has probable cause to believe that a crime was being committed. In fact, this was the second time that they had been to this trailer, after having informed by confidential informants that a crime was being committed. This probable cause was the reason law enforcement should have obtained a search warrant. Recall, also, that several cars containing Officers went to the trailer for "surveillance" purposes, yet

33

they were already dressed in their "raid uniforms, with vests and drawn guns".

4. Strong reason to believe that the suspect is in the premises being entered. Once again, the confidential informants had informed law enforcement that this was the Appellant's trailer and that he was in the trailer, committing a crime. Thus, law enforcement had a basis upon which to obtain a search warrant.

5. A likelihood that delay could cause the escape of the suspect or the destruction of essential evidence or jeopardize the safety of Officers or the public. If the law enforcement Officers had obtained the search warrant prior to going to the Appellant's trailer, the arrest of the Appellant and others as well as the search of the trailer would have occurred immediately. Law enforcement actually created a delay, by not having a search warrant when they went to the trailer. Note, that if the confidential informant was reliable, and he is supposed to be, law enforcement could have obtained the search warrant prior to going to the trailer park.

34

6. The peaceful circumstances of the entry. The Appellant voluntarily exited his trailer upon the request of law enforcement. These peaceful circumstances existed until when the law enforcement Officers pulled weapons on the Appellant and dragged him down the steps outside the trailer.

The facts establish that the law enforcement Officers should have obtained a search warrant prior to going to the trailer and thus the Appellant respectfully contends that the Court overlooked these facts and circumstances.

The Appellant further renews his argument of this issue as set forth in his original brief.

**ISSUE II: The Trial Court erred in not allowing for the testimony of Dr. Hiatt concerning the amount of methamphetamine in the liquids mixtures which were used to establish an amount of more than 28 grams. The scientific, unrebutted evidence of Dr. Hiatt, established less than 28 grams of methamphetamine, and therefore there was insufficient evidence to support a conviction of Trafficking.**

The Appellant would argue that the number of grams of the illegal product should be the basis of the crime. The

Court of Criminal Appeals has followed the "any mixture" language which was greater than 28 grams. Both the expert, Dr. Hiatt and the State Forensic Expert would have and did provide testimony of only approximately 3 grams of methamphetamine existing in its final form from the mixture. This interpretation of Alabama Law is in direct contrast with the procedures used in the Federal Courts. The Appellant would aver that there is not sufficient proof and evidence which warranted a conviction of trafficking. The failure of the Court to allow the Defendant's expert to present a defense on this issue was error.

The Appellant further renews his argument of this issue as set forth in this original brief.

**ISSUE III:** **There was insufficient legal evidence to support convictions for possession of methamphetamine and resisting arrest.**

The Appellant would point out that in the argument concerning the insufficiency of the evidence and the removal of a plastic bag which was later shown to possess methamphetamine from the pocket of the Appellant was illegal. In his original brief, the Appellant argued that this was in a violation of his Fourth Amendment right and

all of the other cases related above in Issue I.  The Court
of Criminal Appeals makes the comment that no cases were
cited as to this issue.  The Appellant would argue that the
illegal seizure of this plastic bag was similarly argued in
Issue I which included the Fourth Amendment and numerous
other cases in that issue.  The arrest, seizure, and other
facts and circumstances as related to the Appellant were
basically one occurrence, which would have been included in
the same arguments as in Issue I.  Therefore, the Appellant
would request that the Court reconsider its decision as to
Issue III and consider the argument presented along with
the arguments presented in Issue I, with the cases cited
therein.

The Appellant would further renews his argument of this
issue as set forth in the his original brief.

**ISSUE IV:  The sentence of 35 years is cruel and unusual.**

Appellant would point out that the Appellant had no
prior felony record.  Therefore, the Habitual Offender Act
was not applicable.  He was sentenced to thirty-five (35)
years under the Trafficking Provision.  The Appellant would
argue that this was cruel and unusual.  It should be noted
that if the Appellant had been arrested five (5) days

later, he would have been charged under a completely different Statute which would not have warranted a sentence of between ten (10) years and life. Further, the evidence clearly indicated that the Appellant actually only possessed at the most three (3) to five (5) grams of methamphetamine. The Appellant further noted that under the theory or rationale as set forth in Wilson v. State, 835 So.2d 765 (Ala. Crim. App., 2001), this sentence should have been considered to be cruel and unusual.

The Appellant further renews his argument of this issue as set forth in his original brief.

CONCLUSION

The Appellant does request that the Court reconsider this earlier decision and either reverse and/or render the Appellant's Conviction.

RESPECTFULLY SUBMITTED,

Hon. J. Michael Williams, Sr., WIL103
Attorney for the Appellant
P. O. Box 1068
Auburn, Alabama   36831-1068
(334) 705-0200

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing Brief of Appellant upon the following counsel of record by placing a copy of same in the United States Mail, properly addressed and postage prepaid, on this the 2nd day of April, 2004:

Office of the Attorney General
ATTN:  Hon. Stephen N. Dodd
Criminal Appeals
11 South Union Street
Montgomery, Alabama  36103

Of Counsel